FILED
IN CLERKS OFFICE
2022 FEB -1 AM 11:36
U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF
MASSACHUSETTS

BRENT ANDREW BRACKETT ARBOGAST,

Plaintiff,

vs.

PFIZER; SHEEHAN, PHINNEY, BASS + GREEN, P.A.; JOHN BRACK; KERRI LEWANDOWSKI; LEIGH COWDRICK; MICHAEL J. LAMBERT; THOMAS M. CLOSSON,

Defendants

Case No.:

PLAINTIFF REQUESTS A TRIAL BY JURY

## A. Parties to the Lawsuit

1. Plaintiff, Brent Arbogast (Plaintiff) is a resident of New Hampshire with a mailing address of

   9 Maple St. Apartment C
   Exeter, NH 038330

2. Defendant Thomas M. Closson is an attorney licensed to practice law in New Hampshire. Attorney Closson's New Hampshire Bar Number is 9966. Closson has an address of

   46 Parrish Hill Drive
   Nashua, NH 03063

3. Defendant Michael J. Lambert is an attorney licensed to practice in New Hampshire and Massachusetts. Attorney Lambert's Massachusetts Bar Number is 632053. Lambert's last known address is

   363 Walden Street
   Concord, MA 01742

4. Defendant Sheehan Phinney Bass + Green (Sheehan) is a law firm headquartered in Manchester, NH. According to filings at the New Hampshire Secretary of State's office, Sheehan is a Domestic Professional Profit Corporation with a Business ID 16492. Sheehan's physical address is

   1000 Elm Street 17th Floor
   Manchester, NH 03101

   Sheehan's mailing address is

   PO Box 3701
   1000 Elm Street
   Manchester, NH 03105

5. Defendant Pfizer (Wyeth) as successor to Wyeth Pharmaceuticals, is a corporation organized under the laws of Delaware with a principal place of business at 235 East 42nd Street, New York, New York, 10017-5755. Pfizer's Federal Identification Number is 13-5315170. Pfizer's registered agent in Massachusetts is CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110. Pfizer will be referred to in this Complaint as Wyeth for clarity. Wyeth has a physical address of

   One Burtt Road
   Andover, MA 01810

6. Defendant John J. Brack was a Human Resources (HR) Business Partner for Wyeth's Andover, MA facility. Brack has a physical address of

   7 Bernard Drive
   Rye, NH 03870

7. Defendant Kerri Lewandowski worked as an HR Consultant under Brack's leadership at Wyeth's Andover, MA location. Lewandowski has a physical address of

   11 Emerson Rd
   Chester, NH 03036

8. Defendant Leigh Cowdrick worked as an HR Consultant under Brack's leadership at Wyeth's Andover, MA location. Cowdrick has a physical address of

   8 Freemont St
   Lexington, MA 2421-6513

## B. Jurisdiction

9. Pursuant to the provisions of 28 USC § 1331, 42 USC § 1983, 18 USC § 1595, 18 USC § 1965, 18 USC § 1964, and Federal Rule of Civil Procedure 60(b) this court has subject matter jurisdiction over this Complaint because the claims are based on federal laws and the U.S. Constitution, and are substantially related to a previous action Arbogast v. Wyeth, Case 1:06-cv-10333-PBS USDC Mass. 2/23/2006, at which time a fraud was perpetrated on the court and justice demands the case be revisited.

10. This court also has personal jurisdiction over all of the defendants because the transactions and business activities giving rise to the cause of action occurred in the jurisdiction of Massachusetts.

## C. Venue

11. The United States District Court for the District of Massachusetts (USDC Mass.) is proper pursuant to the provisions of 28 U.S. Code § 1331, and 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Massachusetts. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants reside, are found, have agents, or transact their affairs in that district.

## D. Facts

### Introduction

12. Plaintiff's experience as relayed in this cause of action is a tragedy. The fact that over ten years have passed since his odyssey began should in no way diminish the need for justice. To this day, an employer screening Plaintiff's civil court history will find case files that are the product of fraud and a collusive lawsuit that Wyeth controlled from start to finish. The collusive suit was in furtherance of various schemes to defraud Plaintiff and others.

13. Wyeth conspired with Plaintiff's attorneys to perpetrate a character assassination against him in retaliation for providing law enforcement authorities information about their egregious labor violations. Wyeth used Plaintiff as an example of the severe harm their exploited employees would face if they also refused to waive their rights under the Fair Labor Standards Act (FLSA) and resisted working 10-20 hours of overtime a week for free.

14. The legal proceedings associated with the complaint Lambert and Sheehan filed against Wyeth on Plaintiff's behalf were not adversarial. Plaintiff never met or communicated with Lambert or Sheehan before they filed the complaint, and he never authorized anyone to file a complaint in his name. Lambert and Closson provided Plaintiff spurious legal representation

and shut him out from meaningful participation in the case; Plaintiff exercised no control and bore no expenses in the suit.

15. Closson was not licensed to practice law in Massachusetts, never made an appearance on Plaintiff's behalf, was not an attorney of record, and never sought or received pro hac vice admission. However, Plaintiff trusted Closson due to personal relationships with his family. Lambert, Sheehan, Closson, and Wyeth exploited Plaintiff's trust to make their schemes work.

16. Plaintiff did not learn that a lawsuit was filed on his behalf until a month afterwards, when Closson summoned him to his office and showed him the complaint while simultaneously presenting a contingent fee agreement.

17. Lambert, Closson, and Sheehan fraudulently induced Plaintiff into signing a contingent fee agreement with them. The agreement obligated them to represent Plaintiff, without limitation, in the suit against Wyeth. However, they never intended to represent him, they were conspiring with Wyeth and their agents to further various schemes to defraud Plaintiff and others.

18. In the complaint filed on Plaintiff's behalf, Lambert and Sheehan represented to the court that they were both his attorneys and authorized to file suit on his behalf. With Closson's help, Plaintiff was deceived into believing those representations. Under the circumstances, it was reasonable for Plaintiff to rely on Lambert and Sheehan's representations to the court, and he agreed to the belated contingent fee arrangement without contemplating the possibility that he was being conned yet again, the most troublesome one yet that resulted in a death blow to his professional career.

19. To the extent there was an adversarial process, Plaintiff was the adversary of a wealthy and powerful corporation that spent over $4 billion in legal costs the same year he became ensnared in their web of deceit, exploitation, and abuse. Their money and power thwarted any chance Plaintiff had at to petition his government for redress for the damages he suffered resulting from Wyeth's corruption.

20. Plaintiff was not Wyeth's only victim, there were hundreds of others. Wyeth maliciously targeted Plaintiff because his evidence against them was extensive and undeniable. Plaintiff had engaged in concerted action on behalf of his coworkers many times, Wyeth dreaded the thought of their despotic business practices being exposed through a collective action of young professionals trying to assert rights the U.S. worker won in 1938. Wyeth wanted to continue surreptitiously despoiling these rights from vulnerable employees in a systematic manner.

21. Plaintiff will begin his story around the time Wyeth recruited him to work in a position they intentionally misrepresented as requiring a bachelor's degree and qualifying for a professional exemption under the FLSA. After accepting an offer of employment and making several

financial commitments based on Wyeth's representations, Plaintiff's first day of work was March 15, 2004.

22. Plaintiff soon realized he was duped, his position was not at all similar to the last position he had as an exempt professional. The educational requirements for the position were met with a high school diploma and some on-the-job training, no bachelor's degree was required. There was no opportunity to use any sort of discretion or judgment, and any attempts to do so were impetuously rebuffed.

23. Plaintiff worked in what is known in the Commonwealth of Massachusetts as a factory. For most of the day he operated a machine to manufacture agar, which is food for microorganisms. His products were used in various development and quality control applications for biopharmaceuticals. The rest of his day consisted of other production duties, cleaning, and loading finished materials on a pushcart and delivering them throughout Wyeth's Andover, MA, facility.

24. As Plaintiff was being trained by the senior worker in the laboratory, she informed him that she did not have any formal education past high school, and she believed Wyeth hired employees with bachelor's degrees, so they did not have to pay them overtime compensation. This coworker was about the same age as Plaintiff and was classified as non-exempt; she was paid for overtime in accordance with the FLSA. Plaintiff took over many of her duties while she advanced to increased responsibilities.

25. Within a week, Plaintiff approached his supervisor regarding the misrepresentation of his position as requiring a bachelor's degree and qualifying for a professional exemption under the FLSA. He requested to see a copy of the job description for his position and his supervisor told him that one did not exist. Nine days after Plaintiff started working at Wyeth, his supervisor presented him with a newly created job description that indicated the educational requirements were met with a high school diploma.

26. Plaintiff was expected to work over ten hours a day and only get paid for eight. He was certain his position did not qualify for any exemptions from overtime compensation under the FLSA. He waited to receive his first paystub before concluding that Wyeth not only misrepresented his position but was also violating the FLSA by not compensating him for overtime.

27. On Thursday, April 1, 2004, Plaintiff received his first paystub and noticed Wyeth did not pay him for overtime. Late in the day, after he had already worked forty hours for the week, he complained to his team leader that Wyeth was unfairly withholding overtime compensation from him and that in the future he would either have to be assigned duties that were consistent with a properly classified exempt professional or receive overtime compensation for hours worked over forty. Shortly after this exchange, Plaintiff's team leader sent a scandalous email to his supervisor bemoaning Plaintiff's insistence on limiting his hours to forty if Wyeth refused to adjust his duties or pay him overtime compensation.

28. The next day, Friday, April 2nd, Plaintiff requested a meeting with his supervisor to discuss the misclassification of his position. She agreed to meet with him the following Monday, April 5th.

29. During the meeting, Plaintiff respectfully explained that employers could not classify employees as exempt from overtime compensation simply because they were paid a salary. Plaintiff's supervisor believed that they could, and the meeting ended with her stating she would contact HR regarding his concerns.

30. Brack and several of his consultant associates operated Wyeth's HR department in Andover outside of corporate oversight, and in total disregard for Company policies and procedures meant to ensure Wyeth maintained compliance with government regulations. Brack, Lewandowski, Cowdrick and others were members of their own enterprise within the Wyeth organization.

31. After Plaintiff met with his supervisor, Como, to express his concerns that his position was misclassified as exempt, Wyeth Company policies dictated she should have consulted with the location head of HR for advice on how to respond. Instead, she was directed to consult Lewandowski and Cowdrick, unscrupulous consultants working under Brack's leadership. Brack and his enterprise usurped many sensitive HR responsibilities that were reserved for regular employees with integrity, not self-interested consultants who worked in the shadows trying to avoid corporate oversight.

32. Wyeth and Brack were business partners that aided and abetted each other's fraudulent conduct. Several members of senior management acted as principals in various schemes to defraud young professionals in the community, their own employees, and multiple government agencies. Most of their schemes were accomplished through racketeering activities associated with organized crime such as wire fraud, mail fraud, attempted extortion, witness tampering, retaliating against a witness, etc.

33. As a result of the defendants' actions, Plaintiff was subjected to a vicious, fraudulent, and corrupt campaign of retribution that led to his termination but did not culminate until a couple of years later when Wyeth conspired with Sheehan, Lambert, and Closson to defile the judicial system and tee Plaintiff up for a pummeling of baseless and defamatory accusations in the pleadings of a collusive lawsuit. Plaintiff's attorneys promised him justice, while working with Wyeth to ensure the opposite. Hiding behind the privilege of immunity in a legal pleading, Wyeth was able to use the court to publish their spiteful fabrications with complete assurance that no confutation was in the offing.

34. Wyeth's answer was concealed from Plaintiff along with troves of evidence that would have exposed as comical the pretentious façade of integrity with which the participants of this charade justify their usefulness to society.

35. Before Plaintiff was terminated by Wyeth, he filed complaints against them with both the U.S. Department of Labor (DOL), Wage and Hour Division (WHD), and the Massachusetts Attorney General's Fair Labor and Business Practices Division (Mass. AG). In the complaints, he informed law enforcement authorities that Wyeth was violating basic labor laws on a large scale; between 20-40 employees.

36. Shortly after filing his complaints, and one day after his termination from Wyeth, the District Director for the WHD mailed Plaintiff a letter suggesting he retain a private attorney because of a backlog of cases at their office.

37. Plaintiff searched diligently for an attorney but had difficulty finding one. He was never involved in a lawsuit before, had no money, and was not familiar with any attorneys. During his search, Plaintiff was given a list of labor attorneys in the area and he quickly noticed the name of a childhood friend's brother.

38. Plaintiff contacted attorney Thomas Closson in late 2004 and soon afterwards they met in his office in Exeter, NH. Closson declined to represent Plaintiff because he was not licensed to practice law in Massachusetts. He did not refer Plaintiff to any other attorneys in the area who could help him.

39. Shortly afterwards, and unbeknownst to Plaintiff, the WHD began investigating Wyeth in response to his complaint. By early March 2005, Wyeth and Brack knew they were facing extensive sanctions for misclassifying at least 157 employees just at their Andover facility, and within only two pay grades.

40. Closson contacted Plaintiff around mid-March 2005 and requested to meet at his office again. During the meeting Closson agreed to represent Plaintiff in his claims against Wyeth on a contingent fee basis. He told Plaintiff that his claims against Wyeth were federal in nature and that federal laws are the same regardless of what state they are brought. Closson told Plaintiff that a friend was going to sponsor him so he could practice law in Massachusetts. He did not inform Plaintiff who the friend was or describe the sponsorship process.

41. By law, and in in conformance with the New Hampshire Rules of Professional Conduct (NHRPC), Closson should have put that contingent fee agreement in writing, but he didn't because he knew what he was doing was unlawful, and what he was about to do was even worse.

42. Closson was engaged in a conspiracy with Wyeth, Sheehan, and Lambert to ensure Plaintiff never learned of the investigation, adjudication, and final order by the WHD, which resulted in sanctioning Wyeth for misclassifying him and 150 similarly situated employees as exempt. The plan called for deceiving the WHD, Plaintiff, and eventually USDC Mass. into believing Plaintiff had competent legal representation in the matter.

43. Wyeth's fraudulent inducement of Plaintiff to accept a position that did not exist, and their pervasive misclassification of employees was part of a larger scheme to defraud the National Labor Relations Board (NLRB) by intentionally misrepresenting several material terms of employment of hundreds of employees, and then appearing before the NLRB and objecting to the composition of a proposed collective bargaining unit based on the information they intentionally manipulated.

44. The investigation by the WHD threatened exposing Wyeth's scheme to defraud the NLRB along with several other schemes to defraud their employees, government agencies, and others.

45. As a result of the conspiracy between Wyeth, and Plaintiff's attorneys, he did not learn of the WHD's investigation and sanctioning of Wyeth until December of 2018. He did not learn the full extent of the investigation and adjudication until September of 2019 when he received a response from a Freedom of Information Act (FOIA) request he submitted in pursuit of the truth, which his attorneys were still trying to conceal.

46. For twelve years Plaintiff walked around believing his professional career was ruined because he acted like a belligerent jerk at Wyeth for no reason and they had a right to terminate him. That is what Closson told him while fraudulently inducing him to settle his claims on unfavorable terms.

47. Shortly after the adjudication of Wyeth's labor violations, the District Director for the WHD retired. All of the investigative files associated with the Wyeth case vanished with him. On January 25, 2006, Plaintiff received a letter from the new District Director of the WHD, George Rioux. He informed Plaintiff that the Mass. AG's Office had notified him about a complaint he filed against Wyeth and expressed their belief that the proper agency for him to contact was the WHD.

48. In his letter, Rioux asked Plaintiff for more information about his complaint so the WHD could decide what further action to take. Closson had directed Plaintiff not to communicate about the Wyeth matter with anyone and to forward all inquiries from law enforcement to him. Just as he did several times before, Plaintiff immediately gave Rioux's inquiry to Closson for him to respond.

49. Two months later, around March 20, 2006, Closson asked Plaintiff to meet him at his office in Exeter. During the meeting, Closson informed Plaintiff that a complaint had been filed on his behalf with USDC Mass., a month earlier, on February 23, 2006. The complaint was filed by Lambert and Sheehan pursuant to 29 USC § 216(b) and included a claim for overtime compensation and retaliatory discharge.

50. Plaintiff had barely spoken with Closson in the months leading up to the filing of the complaint. He was never shown the complaint before it was filed and was not informed that a plan to file a complaint was underway. In the complaint, Lambert and Sheehan represented to the court that they were Plaintiff's attorneys. Plaintiff had never met them and was only vaguely familiar with the law firm Sheehan. They were not and could not have been Plaintiff's attorneys because of public policy considerations related to regulations of the legal profession intended to protect people like him from incompetent legal representation.

51. When Closson agreed to represent him in 2005, Plaintiff had already tried to assert his rights at least twenty times to different representatives of Wyeth, through informal discussions, emails, and meetings that extended up several layers of management. Then he filed multiple complaints with law enforcement and tried to convince several attorneys that he had a legitimate claim. He also had to repeatedly explain to multiple family members that what he was doing was not crazy, and though he became bankrupt and unemployed, justice would prevail in the end.

52. Plaintiff was going through a very difficult time, and he placed complete trust in Closson to do the right thing. As Plaintiff was reading the complaint that Lambert and Sheehan filed on his behalf, Closson presented him with a new contingent fee agreement that obligated both Closson and Lambert to represent him in his case against Wyeth. In accordance with Closson's advice, Plaintiff signed the contingent fee agreement. He took comfort in Lambert's representation to the court that both he and Sheehan were acting as his attorneys in the case. There were no discussions about any limitations on the scope of either Closson's or Lambert's representation of Plaintiff.

53. Neither Lambert nor Closson, intended to fulfill their obligations under the contingent fee agreement. They were engaged in a conspiracy with Wyeth to fraudulently conceal, and facilitate various schemes to defraud the NLRB, Plaintiff, the WHD, and others. Their promises in the contingent fee agreement were lies meant to induce Plaintiff into ratifying their fraudulent and illegal conduct. Due to public policy concerns, it was impossible for Plaintiff or anyone else to legitimately ratify their actions.

54. Filing an unlawful and unauthorized civil complaint on Plaintiff's behalf was necessary to convince law enforcement to drop their investigation on account of the competent legal representation Plaintiff already had. Closson, Lambert, Sheehan, and Wyeth maximized the benefits of defrauding the court by using legal pleadings to retaliate against Plaintiff for providing law enforcement with information about their lucrative exploitation of young and vulnerable employees. They used him as an example of the harm others would receive if they also refused to waive their rights under the FLSA, they also intended to affect the common law in the First Circuit related to biopharmaceutical production workers.

55. In addition to assuring Wyeth and their attorney that no rebuttal of their dastardly pleading would materialize; Lambert, Closson, and Sheehan conspired to and did conceal from Plaintiff

a trove of incriminating evidence against Wyeth. They concealed Wyeth's answer from him, and sabotaged Plaintiff's opportunity to expose Wyeth's pleading as ludicrous.

56. The defendants in this action turned laws intended to protect people from scoundrels on their head, giving them the opposite effect. Wyeth's abuse of the exemptions allowed under the FLSA is one example, another is their abuse of Local Rules of Civil Procedure that were implemented as part of the Civil Justice Reform Act.

57. Local Rule 16.1 obligated the attorneys of record to engage in a variety of conferences and negotiations early in the legal process. Along with simplifying the issues in contention, the attorneys were supposed to exchange evidence they relied on to support their pleadings. This flurry of activity is meant to allow the parties, and the judicial officer, to make an early assessment of the merits of the claims and defenses, and to discuss their assessments at the scheduling conference. There is no point in having a scheduling conference presided over by a judicial officer unless the attorneys of record fulfill their obligations beforehand.

58. Lambert and Sheehan conspired with Wyeth to neutralize the effectiveness of the pre-scheduling conference procedures by concealing all available evidence from Plaintiff and the court. In addition, Lambert filed certifications with the court that were fraudulent and contained a forgery of Plaintiff's signature. After attending the scheduling conference on Plaintiff's behalf, he phoned Plaintiff and urged him to settle because both he and Judge Saris believed his claims lacked merit. Lambert said Judge Saris wanted the case settled quickly.

59. If not for the opportunity to appear before a judicial officer on Plaintiff's behalf at the scheduling conference, Lambert would not have phoned him afterwards and urged him to settle quickly because both he and the judge believed his claims lacked merit. This was an example of exploiting regulations meant to protect people in a manner that results in the opposite.

60. It is a mystery as to what Lambert and Judge Saris based their assessment of Plaintiff's claims on without any evidence, particularly in light of Wyeth's ridiculous pleading. Lambert and Wyeth were able to further their fraudulent schemes by capitalizing on the scheduling conference feature of the Civil Justice Reform Act. However, because they subverted most if not all of the Local Rules related to their pre-conference obligations, any assessments of the merits of Plaintiff's claims at the scheduling conference were farcical.

61. Plaintiff would not have settled his claims on the terms he agreed to without Lambert's assessment that they lacked merit and that Judge Saris agreed with him. However, Plaintiff did not know that Lambert worked to ensure no evidence was available to base his and the judge's assessment of the claims. He also failed to disclose that his representation of Plaintiff was limited in scope.

62. No developments in the case had occurred since Lambert and Sheehan filed the complaint on Plaintiff's behalf. Lambert's conduct along with Wyeth's attorney during the legal proceeding was in complete disregard of the Federal Rules of Civil Procedure and Local Rules; and their actions flaunted the hallmarks of collusion.

63. Not only did Judge Saris encourage and ratify the insolent conduct by Lambert and Fitzhugh, but she also neglected to perform her duties as a judicial officer which facilitated the grave injustices intended by Sheehan, Lambert, Wyeth and Closson.

64. At the time, Saris was serving as President of the Harvard Board of Overseers and shared a confidential relationship with multiple fiduciaries of Wyeth. Overseers meet five weekends a year in a closed door, confidential setting. In addition, Harvard itself had at least $5 million invested in Wyeth at the time, not including mutual funds. The financial services company of one of the Overseers held over 5% of Wyeth's stock at the time.

65. After sabotaging any chance Plaintiff had at winning his case, Lambert abandoned him as a client and directed Wyeth to serve Closson with all papers, offers of settlement, etc. Closson was not licensed to practice law in Massachusetts, never made an appearance on Plaintiff's behalf, and was not an attorney of record.

66. Sheehan ratified Lambert's representation to the court that their entire firm was Plaintiff's attorney in the action against Wyeth. Sheehan knew that this representation made it more likely that Plaintiff would agree to the proposed illegitimate course of conduct after the complaint was filed.

67. Sheehan stayed informed of the case through Notices of Electronic Filings (NEF) that multiple Sheehan employees received as a result of their registration with the courts Case Management and Electronic Case Filing system. The NEFs chronicled Lambert's fraudulent conduct. Neither Closson nor Plaintiff were registered to receive NEFs associated with the case.

68. Ultimately, Plaintiff was fraudulently induced into settling his claims on unfavorable terms, but that was not enough. On January 22, 2007, Lambert and Wyeth's attorney filed a fraudulent stipulation of dismissal that was materially different than the stipulation Plaintiff agreed to. Plaintiff did not authorize the filing of the January 22nd stipulation and it was concealed from him until December of 2018.

69. All of this happened and was able to be concealed from Plaintiff because of the trust he placed in Closson and his total lack of experience with lawyers and lawsuits. Plaintiff moved on with his life but has not been able to find adequate employment to provide the basics and pay off his student loan debt. His family has been very generous in helping to support him, and he is lucky in that regard. However, he has suffered immensely as a result of the defendants' actions, which were primarily accomplished through corrupt officers of the court.

70. In 1945, the founder of U.S. News, David Lawrence, wrote an editorial after the United States bombed Japan with a nuclear weapon. In the article, he decries the horrors of war, then looks to a future world where people must learn to live alongside a new weapon that can annihilate entire cities within seconds. He said the atom bomb made war seem like an "absurdity". Lawrence ends his article suggesting hope through a world of law and morals. He calls for the adjudication of all disputes and controversies in tribunals and courts of justice. He believed it was the only path for man to be elevated "from the nadir of his brutality to the lofty heights that so long have been the goal of a righteous civilization".

71. Plaintiff is not particularly familiar with the life and works of Mr. Lawrence. By most accounts he was an honorable, wise person, and an excellent journalist. The purpose of referencing his 1945 editorial is to spotlight where he placed his hope after one of the most brutal and tragic episodes in the history of mankind. Lawrence had just witnessed tens of millions of soldiers slain on battlefields, tens of millions more citizens murdered far away from any battlefield, and the use of a new technology that could end civilization as we know it within minutes; and this man turned to tribunals and courts of justice as the path of hope for a brighter future.

72. What do these tribunals and courts of justice look like? Who are the men and women entrusted to labor within them? Plaintiff has witnessed part of the story, and he has written down all that he saw. Time will tell whether or not courts and tribunals of justice are truly the answer. However, after reading and understanding exactly what happened here, it would be difficult to blame someone for recognizing what seems like part of a war on working-class citizens, facilitated and legitimized by the court and her officers.

## The Trap and Persons of Significance

73. Plaintiff was recruited to work for Wyeth Pharmaceuticals in 2004, he had just graduated college with a degree in chemistry and was about $40,000 in debt from student loans.

74. The previous year Plaintiff worked in a research and development laboratory in the automotive industry. He was responsible for calibrating and maintaining scientific instruments, performing tests on various samples of plastics sent from factories around the world, and creating reports for customers that usually were oriented towards troubleshooting material defects or serving as a measure of quality assurance. Plaintiff loved his job. Though his pay was relatively low, he relished in the freedom to use discretion and judgment, and the many opportunities for learning. He had to tear himself away from work nearly every night to maintain a healthy work/life balance.

75. After being laid off at the end of 2003, Plaintiff sought a position that would provide similar opportunities to use his judgment and learn. He was not particularly motivated by financial gain.

76. Plaintiff learned that the "exempt" classification of his position was the biggest reason he enjoyed his work so much. During a company meeting, he offered to come in on the weekend with some coworkers to move equipment around in preparation for trials a new product was undergoing. His manager declined and said that only the non-exempt employees should come in. Plaintiff asked what the difference was, and almost in unison, the thirty or so employees present in the room said, "it means you don't get paid for overtime, only non-exempt workers do". Plaintiff's manager did not want him taking work away from the hourly employees.

77. Plaintiff was curious and did some research. He learned why he was exempt, and why his co-workers were not; and it all made sense to him. It was primarily his job to ensure all the instruments in the laboratory were functioning properly, calibrated, and in statistical control. It was their job to use the instruments while following standard operating procedures (SOPs). If the instruments were not working correctly, or an SOP had errors, or the laboratory ran out of reagents needed for a particular test, Plaintiff allowed the technicians to go home while he stayed and fixed the problem that prevented them from efficiently performing their job. This often meant long frustrating nights alone at the lab, but it also meant independence and invaluable learning opportunities. Of course, there was more to it than that, and we all worked as a team with the same goal in mind. However, after researching the exempt issue, Plaintiff believed he had a good understanding of the difference between an exempt and non-exempt position.

78. Plaintiff was very happy in early 2004, when Wyeth told him about an opportunity to work in a position that qualified for a professional exemption. Wyeth was a well-known pharmaceutical company, and their cutting-edge biotechnology products improved thousands of people's lives every day.

79. After being hired, Plaintiff soon learned that Wyeth had a dark side. Not only did they misrepresent his position as requiring a bachelor's degree and qualifying for a professional exemption, but they turned the purpose of the FLSA on its head by abusing the exemptions available to force recent college graduates to work 10-20 hours a week in overtime for free. The exempt classifications were based on nothing but a desire to exploit people.

80. The overtime provisions of the FLSA were intended to lower unemployment by incentivizing employers to hire more employees and work them forty hours a week, rather than hiring few employees and working them 50-60 hours a week or more. Before the FLSA, workers only received their usual hourly rate for hours they worked over forty. After the FLSA, workers received a 1.5x premium rate of pay for hours worked over forty. Under both circumstances, employees were paid for their time.

81. Wyeth was intentionally abusing a humanitarian Act of Congress to subject employees to working conditions that were worse than before the overtime provisions of the FLSA were enacted. Instead of having to pay straight time to their employees, Wyeth didn't have to pay them at all for overtime and worked them 50-60 hours a week. Not only that, but their chosen victims were just out of college and probably tens of thousands of dollars in debt; like Plaintiff was.

82. The predicament Plaintiff found himself in at Wyeth was not an accident. It was a shrewdly calculated plan that preyed on innocent and vulnerable young professionals who were either unaware of their rights under the FLSA, or too afraid to assert them. The upside was tremendous. Wyeth was in a bitter fight against the formation of a collective bargaining unit; by mixing and matching their exempt and non-exempt employees within a single unit performing the same tasks as each other, it became nearly impossible for successful concerted activities. In addition to benefitting from thousands of hours of free overtime labor a week, Wyeth didn't have to invest much on training their employees because they already received training in college.

83. Plaintiff found himself within a well-choreographed predatory machine whose primary objective was to identify victims who easily be exploited and separating them from those who could not.

84. Wyeth and Brack formed a business partnership where he would lead an enterprise of associates-in-fact within Wyeth's HR Department in Andover that included consultants Lewandowski and Cowdrick, as well as full time Wyeth employees that further discovery will identify. Brack was responsible for recruiting hundreds of employees for manufacturing positions at Wyeth's facility in Andover, MA. (Exhibit 1)

85. From 2004-2007 Wyeth was registered with the Massachusetts Secretary of State's Office to do business in Massachusetts, and during that period of time Wyeth did do business in Massachusetts. According to filings at the Massachusetts Secretary of State's Office, from 2004 through March 13th, 2007, the name and address of Wyeth's registered agent in Massachusetts was The Prentice-Hall Corporation, 84 State Street, Boston, Massachusetts, 02109. (Exhibit 2)

86. During the years 2004-2008, Wyeth Biopharma was a business unit of Wyeth Pharmaceuticals, a division of Wyeth. According to Wyeth's Form 10-K filings with the Security and Exchange Commission (SEC) for fiscal year 2004, Wyeth Pharmaceuticals was a reportable segment of Wyeth and a separately managed strategic business unit.

87. According to filings with the SEC, Wyeth and Pfizer merged on October 16, 2009, and Wyeth became a wholly owned subsidiary of Pfizer effective January 1st, 2008.

88. On January 9, 2004, Karin Como, GMP Supervisor, Development Support Services (DSS), submitted a request for the creation of a new position at Wyeth's Andover, MA location. The title for the new position was DSS Technologist, and an exempt classification pursuant to 29 U.S.C. § 213(a)(1), of the FLSA was proposed.

89. The same day Como proposed the new position, her supervisor, Dominique Sexton, Senior Manager, DSS, approved it and its exempt classification.

90. Tonia Socha, Director of HR at Wyeth's Andover facility approved of the new position and its exempt classification on January 14, 2004. (Exhibit 3) Socha was the highest level of management at Wyeth to approve of the DSS Technologist position and its exempt classification. At the time, no job description existed for a DSS Technologist. In addition, an employee with no formal education past high school had been successfully fulfilling the duties of a DSS Technologist for close to a year. The employee's official title was "Glass Washer", and she was classified as hourly nonexempt.

91. The DSS Technologist position was within Wyeth's Development Production Operations (DPO) department, part of their manufacturing organization known as Technical Operations and Product Supply (TO&PS). Charles Portwood led the TO&PS organization at Wyeth.

92. Around February 3, 2004, Plaintiff contacted Wyeth, a division of Wyeth Pharmaceuticals, in response to a job opportunity they posted on the popular internet job board, Monster.com. The title of the position was, GMP Solution Chemistry Technologist, and was located at their Andover, MA facility.

93. Wyeth Recruiter, Bonnie Schwamb, responded to Plaintiff's inquiry by phoning him at his New Hampshire residence. She encouraged him to apply for a different position that was not posted, the position of DSS Technologist. Schwamb represented the position as requiring a bachelor's degree in a scientific discipline and meeting the requirements for an exemption from the overtime provisions of the FLSA.

94. Schwamb later sent Plaintiff a follow-up email purporting to contain the job description for a DSS Technologist, which indicated the position required a bachelor's degree. (Exhibit 4) At the time, Schwamb knew she was not sending a job description for the DSS Technologist position, she knew that no such job description existed at Wyeth. She also knew that an employee with no formal education past high school was successfully fulfilling the duties of the position and had been for close to a year.

95. Based on Schwamb's representations, Plaintiff applied for the position of DSS Technologist on February 5th, 2004. (Exhibit 5) In the ensuing weeks, he went through the application and interview process at Wyeth in Andover, MA.

96. As part of the application process Plaintiff was required to submit to a background check that included the release of any and all civil court legal records. Wyeth would not have hired Plaintiff if his civil court records included the fraudulent documents that currently exist on USDC Mass.'s Public Access to Court Electronic Records (PACER) database.

97. On March 3, 2004, Schwamb phoned Plaintiff at his apartment in Portsmouth, NH. She told him that Wyeth wanted to hire him for the position of DSS Technologist. Plaintiff verbally committed to accepting employment in the position.

98. On March 4, 2004, Plaintiff received an official offer of employment in the mail from Schwamb, to work for Wyeth as a DSS Technologist in their DPO department. Wyeth's offer letter indicated that his position was exempt, and he was eligible to participate in Wyeth's Performance Incentive Award Program. In addition, Plaintiff was eligible for a stock option grant to purchase 145 shares of Wyeth common stock, subject to the provisions of their 1999 Stock Incentive Plan. The Option grant was subject to the approval of Wyeth's Special Interim Grant Committee, at a meeting generally held within 60 days after employment.

99. On the same day Plaintiff received the employment offer in the mail, an internal Employment Offer Form was generated at Wyeth. The Form includes signatures from Como, Schwamb, and Sexton, indicating their approval of the offer.

100. Wyeth Company policies required the approval of at least a director-level representative of management to authorize the new position. A signature line on the approval form was reserved for the director-level representative's signature. Sexton signed on the line reserved for a director-level representative; she was not a director-level member of management and no director-level member of management approved of the employment offer. (Exhibit 6)

101. Plaintiff formally accepted Wyeth's offer by signing several documents and mailing them back to Schwamb on March 5th, 2004. (Exhibit 7) After accepting the offer, Plaintiff made several financial commitments in reliance on Wyeth's representations regarding the conditions of his employment. For example, he turned down multiple other employment opportunities and moved to a new apartment that cost about $800 more per month than his previous apartment. The new apartment required a one-year lease, whereas his previous apartment required no such commitment. Plaintiff submitted to Wyeth HR a belated change of address form indicating his move (Exhibit 8).

102. Plaintiff's first day of work at Wyeth was March 15th, 2004. That same day, an internal HR document was generated stating that the title of Plaintiff's position at Wyeth was Tech CTS. (Exhibit 9) Other internal documents demonstrate that his position was officially considered Tech CTS throughout his entire time at Wyeth. (Exhibit 10)

103. Como was Plaintiff's supervisor at Wyeth from March 15, 2004, until she resigned on June 10, 2004. Galina Szakacs, Supervisor, Solution Chemistry, became his new supervisor until he was terminated on June 30, 2004.

104. Szakacs and Como reported to Sexton, who reported to Kevin Hanley, Director of Pilot/Clinical Manufacturing. Hanley reported to Hubert Scoble, Assistant Vice President of Development. Scoble reported to Michael E. Kamarck, Senior Vice President, Biopharmaceutical Development and Manufacturing. Kamarck worked out of Wyeth's Collegeville, PA, headquarters and reported to Portwood.

105. Schwamb reported to Jack Fitzmaurice, Associate Director of Staffing at Wyeth BioPharma. (Exhibit 11) Fitzmaurice also served as Network Staffing Head, and Network Human Resources consultant. (Exhibit 12) Fitzmaurice reported to Brack in his role as a consultant.

106. Socha was hired by Brack to be the Director of HR for Wyeth's Andover location. She also served as a Network Human Resources Consultant, alongside Fitzmaurice, and reported to Brack in that role.

107. For the purpose of explaining the term "Network" in the biotechnology industry, Plaintiff submits excerpts of a 2003 joint publication by the Boston Consulting Group and Massachusetts Biotechnology Council (MBC) titled "Mass Biotech 2010 ACHIEVING GLOBAL LEADERSHIP IN THE LIFE-SCIENCES ECONOMY". The publication calls on Massachusetts' political, commercial, and academic leaders to act quickly and decisively to ensure a regional advantage in the biotechnology industry with a special emphasis on attracting industry leaders to create jobs in the area. (Exhibit 13)

108. On page 24 of the joint publication, we learn that a "regional advantage" is secured through a regional "network" that includes not only biotechnology industry leaders, but also "non industry players such as state government, local academic institutions, venture capital networks, and the like."

109. Wyeth's Vice President of Operations Network, Michael Koplove, served on the Board of Directors of the MBC at the time. He also served as the Committee Chair for the Workforce Development and Education Committee of the MBC, alongside Wyeth HR Consultant Pia Theophiles. By networking with other biotechnology industry leaders along with non-industry players from government, academic institutions, venture capital networks, and the like, Wyeth's Andover location served an outsized role in developing a workforce for the regional biotechnology industry.

110. Chris Perley was the Managing Director of Human Resources at Wyeth's Andover, MA location; Socha was supposed to report directly to Perley, but Brack usurped Perley's role. (Exhibit 14) In Wyeth's written company policies such as their Disciplinary Action, and

Assurance of Fair Treatment (AFT) policies, Perley is referred to as the "Location Head of Human Resources".

111. Kerri Lewandowski was an associate-in-fact of Brack's and worked as an Employee Relations Representative at Wyeth. In this role, Lewandowski was an agent for a labor organization formed and administered by Socha, Brack, and other members of Wyeth management. She was not a supervisor or member of management. She did the dirty work of ridding Wyeth of burdensome employees who tried to assert their rights under the FLSA or other protective regulations. Lewandowski usurped Perley's role as an advisor to management whose subordinates had grievances about the terms and conditions of their employment.

112. Leigh Cowdrick was also an associate-in-fact of Brack's. She served Wyeth as an HR Consultant who worked with members of Wyeth management and HR including Como, Sexton, Lewandowski, Brack, and Socha. Cowdrick usurped the role of Perley and Socha by taking responsibility for approving Employment Action Notices (EAN). Such Notices were required when a new position was created at Wyeth. Cowdrick's approval of EANs was not within Company policies, and she operated outside of the oversight of corporate management. (Exhibit 15)

113. Eileen Blazek was a Corporate Compensation expert located at Wyeth's headquarters in Collegeville, PA. Whether she knew it or not, Blazek was instrumental in helping Lewandowski and Cowdrick create a fraudulent job description post facto. Pursuant to Company policies, Blazek should have been involved in creating and approving the DSS Technologist position at the beginning, before the position was offered to recruits and represented as requiring a bachelor's degree and qualifying for an exemption under the FLSA. Cowdrick and Socha knew they were violating Company policies by approving the position without assistance from experts like Blazek. As consultants, they were motivated by personal financial gain.

114. Kenneth O'Brien was Wyeth's in-house labor counsel, he worked out of Collegeville, PA. Michael F. Dougherty also served as an attorney in Wyeth's Labor Law Department in Collegeville. O'Brien was directly involved in Wyeth's fraud and racketeering activities during the time frame Plaintiff was recruited, hired, and terminated, as well as during the WHD adjudication of Wyeth's labor violations, and during the legal proceedings after Sheehan and Lambert filed a complaint on Plaintiff's behalf.

## Plaintiff Starts Work at Wyeth

115. After a few days on the job, Plaintiff began to suspect his position was misrepresented as requiring a bachelor's degree and qualifying for a professional exemption under the FLSA. His primary duty was to operate a machine called an Agarclav, that manufactured and

packaged sterile agar. He spent at least six hours a day operating the machine which consisted of repetitive hand operations using physical skill and energy.

116. Plaintiff's other significant responsibility required him to load, unload, identify, and distribute materials produced in the laboratory, throughout Wyeth's Andover campus. He used a pushcart for the end-of-the-day task, and it took him about 2 hours.

117. Plaintiff's tasks were usually assigned on a daily basis by Gerard Walsh, the laboratory team leader. Walsh spent most of his time in his office and rarely came into the laboratory.

118. Plaintiff worked in a production laboratory with two coworkers who performed the same types of tasks under the same working conditions. The senior coworker, who we will refer to as Coworker A, had worked in the lab for about a year. She did not have any formal education past high school, and trained Plaintiff on many of the tasks he was responsible for. She also assigned Plaintiff and his other coworker their daily tasks when Walsh was absent.

119. At no time while working at Wyeth did Plaintiff have any duties or responsibilities that Coworker A could not also perform. Her official title at Wyeth was "Glass Washer" and she was a member of their Engineering, Validation, and Maintenance (EVM) department.

120. Plaintiff's other coworker had been at Wyeth for about two months. She did have a bachelor's degree and was also trained by Coworker A on many of her duties, we will refer to her as Coworker B.

121. Soon after Plaintiff started at Wyeth, Coworker B expressed intense frustration regarding her experience there. She told Plaintiff that her position was not at all what she expected and that she spent many nights crying because of how late she had to work. She said she would often stay at a friend's house in the area because her long hours made the commute from home untenable. She was extremely dissatisfied with Walsh because of his authoritarian style of management.

122. Plaintiff and Coworker B were classified as exempt professionals and received no compensation for working overtime hours. Coworker A was classified as nonexempt and received compensation for overtime.

123. Como trained Plaintiff to make two different agars (a gelatinous substance used as a medium to grow microorganisms) using the Agarclav, which sterilized a solution of agar powder mixed with water, dispensed it into petri plates, and automatically stacked the plates in groups of 10.

124. The Agarclav constantly malfunctioned during batches that were supposed to be made according to SOPs under strict Food and Drug Administration (FDA) regulations called Good Manufacturing Practices (GMPs). When the machine malfunctioned, an alarm would sound

and several stacks of agar plates would crash and spill on the machine, lab bench and floor. Plaintiff had to perform a time-consuming clean-up process that was not part of the SOP and resulted in substantial amounts of agar being discarded. Part of the clean-up process required guessing which plates were still sterile, and which ones were compromised and needed discarding.

125. Plaintiff was expected to do other cleaning or production tasks while the Agarclav was operating. However, he would often see plates filled with sterile agar bump into each other while being transported on a conveyor belt by the Agarclav. The bumping caused the lids of the sterilized agar plates to dislodge, exposing them to contaminated air. When the compromised plates reached the end of the conveyor belt, the lids got pushed back on, and the plate was stacked along with the sterile plates.

126. If the machine was not watched during operation, the end result often looked as though it functioned properly, and it was impossible to identify which plates were compromised. If a contaminated plate was chosen as a sample for sterility testing, the contamination would be discovered several days later, and the entire lot needed discarding. If one of the contaminated plates was not chosen as a sample for sterility testing, the lot was released after it passed the sterility test, and a false positive would occur in a manufacturing suite or elsewhere.

127. The poor operation of the Agarclav caused stress in the laboratory and required Plaintiff to work longer and harder than he would have with a properly functioning machine.

128. Plaintiff asked Como and Walsh for access to the operating manual for the Agarclav so he could troubleshoot it, but his request was denied. Walsh told Plaintiff there was no history of the problems he was experiencing with the machine. He insinuated Plaintiff caused the malfunctioning due to improper operation. Walsh kept the Agarclav operating manual locked in his office and refused Plaintiff access.

## Plaintiff Begins to Assert His Rights

129. After about a week, Plaintiff approached Como and said he believed the position of DSS Technologist was misrepresented as requiring a bachelor's degree and qualifying for a professional exemption under the FLSA. He asked for a copy of Wyeth's job description for a DSS Technologist, and Como told him one did not exist.

130. On March 24, Como presented Plaintiff with a copy of a new job description for the DSS Technologist position. (Exhibit 16) The description indicated a bachelor's degree was not necessary, and the primary duty was media production. Plaintiff and Como signed and dated the description, attesting to the accuracy of the duties and educational requirements of a DSS Technologist.

131. After the malfunctions on the Agarclav intensified, Como submitted a work order for maintenance to come and fix it. A representative of maintenance came to the lab and informed Plaintiff about the machine's notorious history of operating poorly. Plaintiff was shown maintenance records chronicling a pattern of problems similar to what he was experiencing.

132. Plaintiff did not understand why Walsh told him the machine did not have a history of performance problems. He asked Walsh about the accuracy of the maintenance records, but Walsh left the laboratory without responding.

133. Soon after maintenance "fixed" the Agarclav, it started malfunctioning again. During Plaintiff's orientation at Wyeth, he was told that he was legally obligated to record deviations from SOPs in the GMP laboratory logbook. According to Wyeth's Disciplinary Action policy, failing to report deviations from SOPs was a terminable offense. However, when Plaintiff recorded incidents of the Agarclav malfunctioning, Walsh chastised him and removed the logbook from the lab.

134. Plaintiff found a copy of the Agarclav operating manual while searching the internet at home. He learned Wyeth was using petri plates that did not conform with the manufacturer's required specifications. After confirming his discovery with the sales engineer who sold Wyeth the machine, Plaintiff asked Como if he could order the appropriate plates and was denied. Como said she would order them herself.

135. About two weeks passed while Plaintiff continued using incompatible petri plates with the Agarclav. The malfunctions became more frequent and intense, and Plaintiff's coworkers often expressed annoyance at the constant alarm sound coming from the machine.

136. Plaintiff continued working over 10 hours a day under precarious circumstances. Although Como indicated he would not be compensated for working overtime, he believed people in HR were more knowledgeable about the FLSA and would understand that his position was not truly exempt. He believed his first paystub would include compensation for the overtime hours he worked.

137. On April 1st, Plaintiff received his first paystub and noticed Wyeth did not compensate him for working overtime. April 1st was a Thursday, and by the end of the day he had already worked 40 hours for the week. After finishing all his responsibilities, he was in the process of leaving when Walsh directed him to complete an extra delivery task. It was common for Walsh to direct Plaintiff to complete various menial tasks just as he was about to leave for the day.

138. Plaintiff told Walsh that he completed all his deliveries for the day, except an item that was clearly marked "Do Not Deliver Customer Pick Up". Walsh told Plaintiff he should deliver the item because lab policy prohibited customers from picking up their orders.

139. Plaintiff informed Walsh that Wyeth improperly withheld overtime compensation from his first two weeks of employment, and that he had already worked 40 hours that week. He said he was willing to deliver the item but did not think he was obligated to work overtime for free. Plaintiff told Walsh that he intended to speak with Como about the misclassification of his position as exempt.

140. Walsh told Plaintiff that because he was paid a salary, he had to stay and work for as long as it took to complete his assignments, and Wyeth did not have to pay him for overtime.

141. Plaintiff explained to Walsh that only certain positions were exempt from overtime pay, and it depended on what the employee's duties were. He said his position did not qualify for an overtime exemption because he followed strict instructions while manufacturing media and carrying out deliveries and had no say in how or when his work was accomplished.

142. Walsh asked Plaintiff if he had a doctor's appointment or something to get to and Plaintiff said no. Walsh offered to deliver the item himself but warned Plaintiff not to make a habit of leaving early.

143. Plaintiff tried to explain the potential for abuse if an employer could arbitrarily classify an employee exempt from overtime compensation, regardless of their duties. He asked Walsh if he considered the time it took Plaintiff to complete his daily tasks. Walsh said he did not consider how long Plaintiff's tasks would take. He said the lab had to meet set production goals, and he assigned daily tasks based on those goals regardless of how long it took. The conversation ended and Plaintiff went home. He had offered to deliver the item Walsh asked him to, but Walsh insisted on delivering it himself.

144. That evening Walsh sent an email to Plaintiff's supervisor falsely accusing him of not completing his delivery tasks for the day. (Exhibit 17) Walsh knew that Plaintiff completed all deliveries for the day and that he did not deliver the single extra item because Walsh insisted on delivering it himself. Paperwork Walsh kept in his office verified that Plaintiff completed all assigned deliveries for the day and the single item Walsh asked him to deliver was picked up by the customer.

145. The frequent and time-consuming clean-ups required by the Agarclav reflected negatively on Plaintiff's productivity without explanation. He began briefly recording the incidents in his own notebook so there was a record of why production was low, or material failed sterility testing. The following is an example of records Plaintiff kept in a notebook while operating the Agarclav at Wyeth. The GMP code at the beginning is the lot number for a production run of agar that was supposed to be manufactured in compliance with cGMP regulations

> GMP-04-0830 had six jams, two of which were coded as 007 by the machine which the manual indicates the cause as "dish contact defective" and suggests the remedy as "call your local dealer". I asked Gerard if I should record this incident in

the equipment logbook and he said no. This jam resulted in around nine plates being tossed and several minutes of cleaning up. Overall 19 plates needed discarding and I witnessed four plates being open to the air then covered and stacked by the machine. I removed these plates but did not watch the machine the whole time.

146. Plaintiff's secondary duty at Wyeth was the end-of-the-day task of deliveries. The delivery process was unnecessarily stressful, time consuming, and prone to mistakes because of a lack of organization.

147. At the end of the day, Plaintiff would receive documentation indicating which materials were released for delivery, but there was no easy way to find the products. He had to engage in a tedious scavenger hunt through multiple labs, storage areas, and cold rooms, which involved interrupting other workers to ask for help finding the material.

148. Another problem arose once the material was found; there was no reliable information indicating where it was supposed to be delivered. Plaintiff frequently had to roam hallways asking random workers about the location of certain customer's labs. Despite his best efforts, he was often accused of delivering the product to the wrong place.

149. The April 1st, delivery incident with Walsh is a good example of the tedious difficulties Plaintiff experienced while performing deliveries. Wyeth's Andover campus is rather large, it took about 10 minutes just to walk the hall from one side to the other. Walsh insisted that the laboratory had a policy prohibiting customers from picking up their orders. If that was true, why would an item say in big bold letters "Do Not Deliver, Customer Pick Up"? Who is responsible for preventing these mistakes?

150. Plaintiff believed an organized process for the task of deliveries was needed to make it more efficient and less stressful. He asked his supervisor if he could spend some time creating a procedure that would eliminate some of the chaos associated with the task of deliveries and was denied.

151. On April 2nd, Plaintiff requested a meeting with his supervisor to talk about Wyeth's misclassification of his and Coworker B's position as exempt from overtime. Como agreed to meet with him the following Monday, April 5th.

152. During the meeting, Plaintiff expressed his belief that Wyeth was improperly withholding overtime compensation from him, and Coworker B. Como said Wyeth did not have to pay them overtime because they were salaried employees. She believed the only requirement for claiming an exemption under the FLSA was that the employee was paid a salary, she was unaware that an employee's actual duties were relevant.

153. Plaintiff tried to explain the unreasonable potential for abuse if employers could shirk their responsibility to pay overtime compensation without regard to an employee's actual duties. He used the malfunctioning Agarclav as an example.

154. Plaintiff was solely responsible for operating the Agarclav in the laboratory. During nearly every batch, the machine malfunctioned. His days were much longer and more stressful than if he had a properly functioning machine. If Wyeth used petri plates that conformed with the manufacturer's specifications, the machine would stop malfunctioning.

155. About two weeks had passed since he informed Como that the petri plates were the wrong size and had a lip on the bottom that the machine was not designed to handle. Nobody seemed to think it was important to get compatible plates, and Plaintiff was not allowed to get them himself. He had to work harder and longer through no fault of his own but wasn't being compensated for the extra time. A true exempt professional would be allowed to purchase compatible petri plates themselves.

156. When Plaintiff was initially assigned to operate the Agarclav, Walsh blamed him for the malfunctions and told him the machine never exhibited the problems he was having. Walsh denied Plaintiff access to the operating manual but took no action himself to address the problem. When the malfunctions became unmanageable, Como submitted a work order for maintenance to come and fix the machine. When maintenance came, Plaintiff learned the machine had an extensive history of malfunctioning in a manner identical to what he was experiencing.

157. At this point Como said she was uncomfortable talking about Walsh without him present. She phoned him and invited him to the meeting. When he arrived, Como asked Plaintiff to repeat what he just told her in private, and Plaintiff complied. While he repeated what he said in the presence of Walsh, Como became frustrated because Plaintiff accused Walsh of misrepresenting the Agarclav's performance history.

158. The Agarclav seemed like a sensitive topic, so Plaintiff changed the focus to the task of deliveries. He said that a lack of organization made the delivery task very inefficient and prone to mistakes. Whenever he suggested ways to reduce the chaos surrounding the task, he was ignored. He was forced to spend extra time and energy because nobody seemed interested in addressing the issue, and he was criticized for trying. Plaintiff said that an exempt professional would be empowered to create an efficient delivery process; but since he was forced to complete deliveries under close supervision, in a disorganized inefficient manner, it was only fair that Wyeth pay him for the extra time.

159. At the end of the meeting, Como expressed a willingness to learn about the duties requirement for claiming exemptions under the FLSA. She also said she would contact HR for guidance on the exempt issue. Plaintiff asked for a way to formally keep track of his hours and Como said she would ask HR. After the meeting, Plaintiff sent Como a publication from the WHD that

explained why technicians and technologists did not qualify for any exemptions available under the FLSA. (Exhibit 18)

160. After the April 5th meeting, Como allowed Plaintiff to work with Coworker A to develop a delivery process that would make the task more efficient and less prone to mistakes. (Exhibit 19)

Lewandowski and Cowdrick Implement Retaliation Protocols

161. After the meeting, Como consulted Lewandowski and Cowdrick regarding Plaintiff's concerns about the misclassification of his position, and his request for a formal way to keep track of his hours.

162. Lewandowski and Cowdrick intentionally provided Como with false information regarding Plaintiff's obligation to work overtime for free. They directed Como to retaliate against him by issuing him a verbal counseling. (Exhibit 20)

163. Lewandowski and Cowdrick advised Como to falsely represent that she discussed the topics with Plaintiff before issuing the verbal counseling, and that the counseling was a summary of the discussion; but no discussion ever took place. Lewandowski also advised Como to back date the counseling to make it seem like it was issued before Plaintiff sent her a publication from the WHD stating why technicians and technologists did not qualify for any exemptions under the FLSA.

164. Wyeth's Discipline Action policy makes it clear that a verbal counseling was not considered discipline at Wyeth. A verbal counseling was issued for informational purposes only, when an employee's deficiencies were the result of a lack of skill or knowledge, rather than a willful decision not to perform or other misconduct. (Exhibit 21)

165. On April 12th, Como issued Plaintiff a written "verbal counseling" at the direction of Lewandowski and Cowdrick. Lewandowski and Cowdrick knew that Plaintiff did not qualify for any exemptions under the FLSA, but they intentionally deceived Como into believing that he was obligated to work overtime for free. The entire verbal counseling was a result of Como's frustration at Plaintiff for asserting rights he believed he had under the FLSA.

166. Because a verbal counseling was not considered discipline at Wyeth, Plaintiff was not afforded certain protections that employees who were subject to discipline enjoyed under Wyeth's policies. For example, if the verbal counseling was considered discipline, Plaintiff's supervisor would have had to document an investigation or review of the issues related to the discipline. She also would have had to discuss the issues with him in private and given him a chance to explain his actions and provide information to support his actions before issuing the discipline. Plaintiff would have been asked to sign documentation related to the discipline.

Plaintiff was not afforded any of these protections because a verbal counseling was not considered discipline at Wyeth.

167. At the time Lewandowski and Cowdrick directed Como to issue a verbal counseling, they had an overwhelming amount of evidence indicating that Plaintiff's position was not properly classified as exempt. Lewandowski and Cowdrick knew that Wyeth owed Plaintiff back wages for overtime compensation they withheld during his first few weeks.

168. The verbal counseling severely harmed Plaintiff's professional reputation at Wyeth, and he feared he would be terminated if he did not continue working overtime for free without complaint.

169. Plaintiff approached Como about the counseling, and she apologized for not investigating or discussing the issue with him first. She promised to look at the delivery records and see whether he completed all deliveries on April 1st, she also promised to learn about the FLSA.

170. Como took no action to clarify the inaccuracies in her verbal counseling, and informed Plaintiff that he would not be given a formal way to keep track of his hours. In accordance with Wyeth's AFT policy, Plaintiff asked to meet with Como's supervisor, Sexton. He was told that Sexton would not be available for two weeks. After initially agreeing to wait, Plaintiff changed his mind and requested to meet with Sexton's manager, Hanley.

171. When Plaintiff requested to meet with Hanley, Como encouraged him to meet with Lewandowski instead. She assured him that Lewandowski would act as his advocate and keep their communications confidential. Plaintiff chose to follow Wyeth's AFT policy and meet with Hanley.

172. Shortly after he requested to meet with Hanley, Lewandowski phoned Plaintiff and urged him to meet with her instead. She promised to be his advocate and represent his interests to management. She said that their communications would be confidential, and she would be a neutral source for information about his concerns. Internal Wyeth documents supported Lewandowski's assertions regarding the role of an Employee Relations Representative. (Exhibit 22)

173. In the meantime, on April 15th, Como met with Lewandowski regarding Plaintiff's concerns about the verbal counseling and misclassification of his position. According to Wyeth Company policies, Como should have met with Perley, the location head of HR, not Lewandowski. In addition, Plaintiff should have been given the option to meet with Perley instead of Lewandowski. There is no mention of Employee Relations Representatives in Wyeth's AFT policy. (Exhibit 23)

174. Notes taken by Lewandowski during her meeting with Como, indicate Como confessed that much of the contents of the verbal counseling were not discussed with Plaintiff before she

issued it on April 12th. The notes also indicate that Como informed Lewandowski about Plaintiff's concerns related to the misclassification of his position as exempt. (Exhibit 24)

175. On April 16th Plaintiff emailed a request to meet with Hanley as part of Wyeth's AFT policy. (Exhibit 25). The following is an excerpt from the email

> I've thought about your proposal to wait a couple of weeks to address my concerns with Dominique. Because of the importance of the issues I feel the meeting with Kevin Hanley should take place as soon as possible. An important point I will be mentioning at the meeting is the blatantly obvious misrepresentation of this position as meeting federal guidelines for a Professional exemption.

176. Plaintiff met with Hanley on or around April 19th, 2004. During the meeting, Hanley assured him that a formal discipline process existed at Wyeth that would be followed. He also assured Plaintiff that a verbal counseling was not considered disciplinary in nature and would not become part of his permanent file. Hanley stated that Wyeth had their own ideas about what types of positions were exempt and he believed that Plaintiff's position was properly classified as exempt.

177. Hanley encouraged Plaintiff to meet with Lewandowski. He assured Plaintiff that Lewandowski's job was to be his advocate and represent his interests in dealing with Wyeth management. He said she would be a neutral resource of information and keep their communications confidential.

178. According to Wyeth's AFT policy, Plaintiff should have been given the option to meet with either Hanley's supervisor, Scoble, or the location head of HR, Perley. Plaintiff was not given the opportunity to meet with either of them, he was coerced into meeting with Lewandowski.

179. Plaintiff met with Lewandowski on April 21st. She told him that she was his advocate, and a neutral resource of information. She said that his communications with her would remain confidential.

180. Lewandowski was responsible for representing employees from two departments: Engineering, Validation, and Maintenance (EVM), and Development. Plaintiff worked in the Development department. The EVM department was in the middle of a labor dispute with Wyeth, and about 70 employees were trying to form a collective bargaining unit. Other Employee Relations Representatives worked alongside Lewandowski and were assigned to different departments. No Employee Relations Representative was a supervisor at Wyeth.

181. During the April 21st meeting with Lewandowski, Plaintiff said he believed the DSS Technologist position was misrepresented as qualifying for a professional exemption and requiring a bachelor's degree. He told her about the absence of a job description, and the new description he and his supervisor agreed to on March 24, which did not require a bachelor's

degree. He agreed to work overtime if he was compensated or received more opportunities to work in a professional capacity. He relayed Coworker B's similar concerns to Lewandowski.

182. Plaintiff told Lewandowski about the malfunctioning Agarclav and how he was forbidden from fixing it or accessing the operating manual. He informed her about being banned from recording deviations from SOPs in the GMP logbook.

183. Plaintiff informed Lewandowski that Coworker A trained him on many of his primary duties, and that he took over many of her duties while she moved on to increased responsibilities. Coworker A performed the same types of tasks as Plaintiff under the same working conditions, she did not have a bachelor's degree and was paid overtime.

184. Plaintiff told Lewandowski about the verbal counseling he received and how it contained false accusations that could easily be proven false by looking at laboratory records which Walsh kept secured in his office.

185. Plaintiff told Lewandowski that he and Como never discussed the topics contained in the verbal counseling before she issued it. Lewandowski assured Plaintiff that a verbal counseling was informational only and not considered discipline at Wyeth. She said the counseling would not go in his personnel file.

186. Plaintiff explained to Lewandowski that his supervisor and team leader were unfamiliar with a duties requirement for claiming exemptions under the FLSA. He told her they expressed a belief that the only requirement for not having to pay employees compensation for overtime was that they get paid a salary.

187. Plaintiff asked Lewandowski if he could see his personnel file and was told no; that one did not exist for him yet because he was so new.

188. Lewandowski promised to investigate whether Plaintiff was properly classified as exempt under the FLSA. Plaintiff requested that the investigation focus on his first several weeks at Wyeth because the verbal counseling he received was very damaging to his reputation and based on the false assumption that he qualified for an exemption during that period. Lewandowski agreed to focus her investigation on Plaintiff's actual duties during his first several weeks at Wyeth. She also said she would investigate Walsh's dishonesty related to the April 1st delivery situation.

189. Plaintiff asked Lewandowski for a formal way to keep track of his hours while she investigated, and she said she would ask her boss. Lewandowski took notes during the meeting. (Exhibit 26)

190. Lewandowski also met with Walsh on April 21st after meeting with Plaintiff. During the meeting Walsh informed her that Coworker A's official title at Wyeth was "Glass Washer",

and that she was solely responsible for the task of deliveries before Plaintiff arrived. He informed Lewandowski that Plaintiff's position was not complicated and required more than 8 hours a day in a high paced media production lab. He told her that Plaintiff was prohibited from troubleshooting the Agarclav because Wyeth paid other people to do that. Lewandowski took notes of her meeting with Walsh. (Exhibit 27)

191. On April 22nd, Lewandowski met with Schwamb in response to Plaintiff's concerns. Schwamb informed her that Coworker A did not have a bachelor's degree and had been successfully performing the duties of a DSS Technologist for close to a year. Lewandowski took notes of her meeting with Schwamb. (Exhibit 28)

192. On April 23rd, Lewandowski called a meeting between herself, Como, and Plaintiff. She claimed that she called the meeting to inform Plaintiff that she was working with Corporate Compensation experts in Collegeville, PA, to evaluate whether the DSS Technologist position was properly classified as exempt. During the meeting, Plaintiff asked why nobody at the Andover facility could help her and was told only experts in Collegeville were knowledgeable enough and authorized to make the determination of whether a position was exempt or not. Plaintiff questioned the wisdom of having such a large number of exempt employees with no one around who knew the legal requirements for claiming an exemption.

193. Lewandowski informed Plaintiff that Wyeth would not provide him with a formal way to keep track of his hours.

194. At no point during the April 23rd meeting did Plaintiff disparage either Lewandowski or Como, and neither Lewandowski or Como accused him of being insubordinate or unprofessional. The meeting ended and Plaintiff went back to work without incident. His relationship with his supervisor was improving and they never discussed the April 23rd meeting after it ended.

195. The meeting Lewandowski scheduled with Plaintiff and his supervisor on April 23rd was a direct result of his internal complaints regarding the misclassification of his position as exempt. Plaintiff was unaware at the time, but Lewandowski already knew that he was misclassified as exempt. She was leading an effort to fraudulently conceal Plaintiff's misclassification by creating a sham job description that seemed like it could qualify for an exemption. She was not concerned whether the job description accurately reflected the duties and educational requirements of the position, only if it seemed like it was exempt on paper.

### Plaintiff Diligently Pursues His Concerns and Lewandowski Breaks Cover

196. Plaintiff did not hear from Lewandowski for a few days after the April 23rd meeting. He sent her an email on 4/26/04 (Exhibit 29), which contained the same WHD Fair Pay Fact Sheet #170 that he sent to Como on April 6th. The Fact Sheet explained why technicians and

technologists did not meet the requirements for a learned professional exemption under the FLSA. Plaintiff's email to Lewandowski read in part

> Here's a webpage sponsored by the DOL. I understand from my past correspondences you're under the impression my position requires me to make discretionary judgments. I cannot emphasize enough this is far from the facts of the situation. When I started working here at Wyeth I was immediately given the responsibilities of making agar on the Agarclav/Tecnomat, and delivering the goods made in the lab. Because of inefficiencies inherent in both tasks as they were, and because I felt if I spent some extra time in correcting these inefficiencies I could get out of work in less than 10 hours, I began to push for the appropriate changes in the lab. The steps I took were not part of my job and in fact my pushing for change was a vital source of friction between myself, Gerard, and Karin.

197. The next day, April 27th, Lewandowski issued Plaintiff a disciplinary memo that falsely accused him of being insubordinate, she distributed the memo throughout Wyeth management and HR (Exhibit 30).

198. Lewandowski also accused Plaintiff of calling her and Como incompetent during their April 23rd meeting. She warned him that his behavior would continue to be evaluated and he would be terminated if he did not improve. She thanked him for bringing the issue of exempt/hourly to Wyeth's attention and expressed an appreciation for his patience while they finalized the investigation. This was the first reprimand/discipline that Plaintiff received at Wyeth.

199. Plaintiff did not call either Como or Lewandowski incompetent during their April 23rd meeting. He used the word "incompetent" during his initial April 21st meeting with Lewandowski, believing that his communications with her would remain confidential.

200. Lewandowski was not a supervisor and did not follow Wyeth's written Disciplinary Action policy when issuing her April 27th discipline.

201. Plaintiff's supervisor, Como, was present for the entire meeting that formed the basis of Lewandowski's discipline. She did not contribute to the discipline whatsoever because it was fraudulent.

202. Wyeth's Discipline Action policy makes it clear that only supervisors are supposed to initiate disciplinary action, not Employee Relations Representatives. The following quote is from Wyeth's Disciplinary Action policy

> The fair and uniform administration of disciplinary action is the responsibility of every member of management, regardless of his or her level in the organization. Supervisors are authorized to counsel and/or reprimand only those employees who are under their direct jurisdiction; however, any supervisor is authorized to take immediate and

necessary action to prevent or halt an unsafe practice or violation of the Code of Conduct or Conduct in the Workplace policies.

203. Even if Wyeth's Disciplinary Action policy allowed non-supervisory HR personnel to discipline employees, Lewandowski's role as Plaintiff's Employee Relations Representative created a conflict of interest that should have precluded her from doing anything besides advocating for him and being a neutral source of information.

204. When Plaintiff was coerced into using Lewandowski's services, an agreement of advocacy and confidentiality was created between them. Lewandowski had a fiduciary duty towards Plaintiff that transcended the typical relationship between an employer and employee. Lewandowski breached her fiduciary responsibility to Plaintiff under the direction of Brack. Senior members of Wyeth management knew about Lewandowski's conduct and ratified it.

205. At this point Plaintiff had filed complaints regarding the misclassification of his position with his team leader, supervisor, the Director of Clinical Manufacturing, and Lewandowski. He had multiple meetings and sent multiple emails regarding the issue. Each of these complaints met the criteria of First Circuit case law established in Valerio v. Putnam Assocs. Inc., 173 F.3d 35, 37 (1st Cir. 1999), regarding activity that is protected from retaliation if an employee "[f]iled any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]".

Como Refuses Participation in Corrupt Scheme and Is Forced to Resign

206. Plaintiff excelled at Wyeth during the month of May 2004, and his relationship with Como improved dramatically. She seemed determined to help him catch up with his training module and assigned a coworker from another lab to train him. Plaintiff received high ratings for all the tasks he was trained on. (Exhibit 31)

207. Como increased Plaintiff's responsibility in the lab and assigned him duties that were more consistent with a professional position. She frequently praised him and tried to provide him with more of the same equipment his coworkers enjoyed. (Exhibit 32)

208. Como implemented a delivery system Plaintiff helped design that greatly reduced the time and confusion associated with the task. He appreciated the professional type duties and in the spirit of compromise he continued to work about 50 hours a week without overtime pay.

209. The GMP lab performed very well, and morale was high in May 2004. The following is an excerpt from an email Como sent throughout the department on June 1, 2004 (Exhibit 33)

> The last run of liquid load testing for S-1637 PQ was completed today significantly ahead of schedule. Three and a half weeks had been scheduled to complete this

work. We did it in 9 business days. This accomplishment was a result of collaboration, dedication and flexibility. We should all be very proud.

210. Meanwhile, unbeknownst to him at the time, after determining that Plaintiff was misclassified as exempt, Lewandowski and Cowdrick surreptitiously led an effort to create a new job description that seemed like it could qualify for an exemption under the FLSA.

211. Eileen Blazek worked out of Collegeville, PA, and assisted in concocting the fraudulent job description. The creation of the new job description was not an effort to accurately describe the educational requirements and duties of a DSS Technologist, it was meant to deceive others into believing the position qualified for an exemption under the FLSA.

212. Although Lewandowski promised she would investigate Plaintiff's actual duties to determine whether he was properly classified as exempt, she never intended to follow through on her promises. Lewandowski worked on behalf of Brack and Wyeth to gain Plaintiff's trust and lull him into a false sense of security while she worked behind the scenes to lay the groundwork for terminating him for pretextual reasons.

213. Lewandowski knew that Plaintiff had an agreement with his supervisor that was reflected in the March 24th job description they both signed and dated. She also knew that the agreement accurately reflected the educational requirements of the DSS Technologist position. However, she was also aware that no professional exemptions under the FLSA were available for positions that only required a high school diploma to meet the educational requirements. Therefore, she ignored that agreement, and instead of fulfilling her promise to investigate his concerns and act as a confidential advocate, she worked on behalf of Brack and Wyeth to fraudulently conceal evidence of their illicit behavior and rid Wyeth of Plaintiff for asserting his rights under the FLSA.

214. Lewandowski knew that the verbal counseling she and Cowdrick directed Como to issue Plaintiff subjected him to unfair scorn and ridicule and caused him to fear being terminated for asserting his rights. She knew that Plaintiff was distressed about the counseling because it was based on the false premise that he was obligated to work overtime for free. Lewandowski could have redeemed Plaintiff's reputation at Wyeth through an honest attempt at investigating his concerns and advocating on his behalf in accordance with the promises she and Wyeth made to him.

215. Lewandowski, Cowdrick, Brack, and Wyeth knew that the DSS Technologist position did not require advanced knowledge customarily acquired through a prolonged course of specialized intellectual instruction. They also knew that Plaintiff's position was misclassified as exempt. Their effort to create a new job description that seemed like it would qualify as exempt was in furtherance of various schemes to defraud the NLRB, Plaintiff, the WHD, and others.

216. On May 11th, a conference was had between Lewandowski, Cowdrick, Sexton, Como, and Szakacs. Blazek participated by telephone from Collegeville. Lewandowski made an internal

memo documenting the meeting in which she states that after review of the job descriptions for a DSS Technologist and DSS Technician, a final determination by Blazek, pursuant to the FLSA, was that the technologist position was exempt, but the technician position was non-exempt. (Exhibit 34) Lewandowski states that a final meeting will be set up between herself, Como, Sexton, and Plaintiff to communicate to him that after her investigation, a final determination had been reached that the DSS Technologist position was exempt.

217. The intentional misrepresentations proffered by Lewandowski and Cowdrick during the May 11th meeting and others, resulted in reinforcing false accusations against Plaintiff in retaliation for asserting rights he believed he was entitled to under the FLSA. It was Lewandowski and Cowdrick's intention to subject him to further scorn and ridicule. As a result of their fraudulent actions Plaintiff was harassed by Sexton, Szakacs, and others and eventually terminated.

218. On May 12th, Como sent an email to Cowdrick, Sexton, and Szakacs stating that she made changes to the new DSS Technologist job description that were discussed in the May 11th meeting. The email was also forwarded to Lewandowski at her residence in New Hampshire. Cowdrick sent an email from Andover, MA, to Blazek in Collegeville, PA, asking if the new description seemed to meet the requirements of a professional exemption under the FLSA. (Exhibit 35) Remember, Lewandowski had already created an internal memo indicating that Blazek determined the position was properly classified as exempt based on the job description.

219. That same day, Cowdrick sent an email to Blazek in PA, stating that there was a better distinction now between the exempt technologist position and the non-exempt technician position, and asking for Blazek's advice.

220. Blazek responded on May 12th from Pennsylvania, agreeing that there was a much clearer distinction between the technician and technologist role after Como's changes. She advised Como to reduce the font size for the cleaning and maintenance activities, so they did not seem emphasized over the other activities. Blazek also advises Cowdrick to send the descriptions to Wyeth's Cambridge location in case they had the same jobs.

221. On or around May 17th, Lewandowski called a meeting between herself, Como, and Plaintiff. (Exhibit 36) At the meeting she presented the new job description for a DSS Technologist. Plaintiff did not realize it at the time, but she offered the new description as proof that his position had always been properly classified as exempt from overtime, and that Wyeth did not owe him back wages. Lewandowski informed Plaintiff that he was expected to continue working overtime for free without complaint, otherwise he would be terminated.

222. The job description Lewandowski presented on May 17th included signature lines for Plaintiff and his supervisor to sign, confirming their belief that it accurately reflected the duties and

educational requirements of a DSS Technologist. Neither Plaintiff nor his supervisor would sign the new job description because it was fraudulent. (Exhibit 37)

223. Como was forced to resign less than three weeks later on June 10, 2004. She never disciplined or reprimanded Plaintiff, not for being rude or unprofessional, and not for being insubordinate. Towards the end of her tenure at Wyeth, Como constantly complimented and encouraged him. There was harmony in the lab and increased productivity as the days went by.

## Wyeth's Bitter Fight Against a Union

224. At the same time Plaintiff was working at Wyeth, they were involved in a labor dispute with about 70 employees in their EVM Department who were trying to form a collective bargaining unit. A union had filed a Certification of Representation Petition, and a hearing before the NLRB occurred on May 19th.

225. On or around May 20th, Socha distributed to all Wyeth personnel, a screed against the employees who were trying to form a collective bargaining unit. (Exhibit 38) In the message, Socha stated that "On the hearing date, the Company management appeared before the NLRB with the Union present to argue that the Union's characterization of the unit was inappropriate and deceptively misleading."

226. She went on to say, "Some of the rhetoric used by the Union and its advocates was demeaning and insulting to many who the Company believes should have a voice but are not part of their inner circle." Socha stated, "Your management argued that if such a significant issue impacting EVM is to be put to a vote, all non-exempt employees within the EVM department should be deemed eligible to vote."

227. The petition was withdrawn, and Socha noted, "There were no reasons given for the withdrawal, however, it is logical to conclude that the Union representative realized that he would have difficulty proving that a lawful basis exists to exclude certain groups and certain individuals from those performing the same types of jobs under identical working conditions."

228. Socha accused the employees of resorting to "...division and name calling in a blatant attempt to stack the deck and win a less than inclusive election." She warned "We do not assume that the Chemical Workers will just walk away and we may continue to deal with this issue for some time."

229. When Socha wrote the memo, Wyeth had just spent several weeks trying to determine whether Plaintiff's position was exempt. They had to consult with Corporate Compensation executives in Collegeville, PA, because nobody at the Andover location was qualified to make

the determination. The WHD later determined that Plaintiff and over 150 employees at Wyeth were misclassified as exempt at the time.

Plaintiff's New Supervisor Fulfills A Sinister Role as Como's Replacement

230. Galina Szakacs, DSS Management, became Plaintiff's new supervisor on June 10th. In the afternoon of June 15, he was at his desk working on a project previously assigned to him by Como. The project was part of an unwritten compromise she and Plaintiff reached whereby she would assign him some professional type duties, and he refrained from complaining about working overtime for free.

231. Szakacs approached Plaintiff and accosted him for wasting his time on the project. She said she was relieving him of those types of duties and assigning them to Walsh.

232. Plaintiff told Szakacs that he expected to be paid overtime if his professional responsibilities were taken away. Szakacs yelled back; "I saw your job description, it say solution prep 90% time!" Szakacs was referring to the job description concocted under Lewandowski's direction.

233. Under Brack's and Wyeth's leadership, Cowdrick and Lewandowski intentionally deceived Szakacs into believing that manufacturing media in a production laboratory qualified as professional type duties that obligated Plaintiff to work overtime for free.

234. Later that evening, Szakacs entered the lab where Plaintiff was working and chastised him for a mistake on a worksheet he submitted for review. He said he believed that some of his simple mistakes were partially the result of not having the same workbench and equipment as his coworkers. He had to use their space and equipment while producing media, and his work would sometimes become spread out. It was difficult to constantly try to sneak a moment to use a coworker's balance or stir plate. Occasionally friction arose when Plaintiff accidentally got in the way of a coworker.

235. Plaintiff asked Szakacs if he could get his own bench and balance like all the other workers had. She ridiculed him for blaming others for his own failures. A coworker suggested Plaintiff submit a work order for the equipment he was missing, but he was not authorized to submit work orders and usually relied on Coworker A to submit them for him. (Exhibit 39)

236. It was about 10 hours into Plaintiff's workday, and he told Szakacs that it was unfair that some in the lab got paid overtime while others had to stay late and work for free. Szakacs responded that all her workers were paid a salary. Plaintiff said that his coworkers told him they were paid hourly, and that management got angry if they worked overtime because only salaried employees should work overtime. Szakacs told Plaintiff he could not work for her anymore because she only wanted happy workers, and he should leave Wyeth if he did not like working there.

237. The next morning on June 16, Szakacs told Plaintiff not to go to training his previous supervisor had scheduled for him. About 20 minutes later, she summoned him to her office where Sexton was waiting. Szakacs told Plaintiff that he could not work for her anymore. Plaintiff raised the issue of exempt/non-exempt again with Sexton and Szakacs. Sexton told Plaintiff he was suspended with pay and she was contacting legal. During this meeting, Plaintiff learned for the first time that the job description Lewandowski concocted in May was supposed to represent a fulfillment of her commitment to investigate his overtime claims during his first several weeks at Wyeth.

238. Subsequently, on June 16th, Plaintiff spoke with Lewandowski on the phone regarding the lack of an investigation into whether his position at Wyeth was exempt. He followed up their conversation with an email (Exhibit 40) which read in part

> Kerri
>
> As I told you on the phone this afternoon, and also told Dominique and Galina during our meeting, I am not, nor was I ever under the impression Wyeth's Corporate Compensation Department completed their re-evaluation of my position as a DSS Technologist. I do not remember discussing the results of the investigation nor do I remember receiving any documentation regarding the event. I am skeptical of the completeness of the investigation however since I was never contacted by any person regarding the investigation other than you....The job description I agreed to required a bachelor's degree in a scientific discipline and qualified for a professional exemption under Federal Guidelines. My suspension came the morning after a conversation I had with Galina Szakacs my new supervisor, regarding this very issue. At about 5:00pm 10 hours into my workday I was expressing my concerns to Galina about not getting paid for overtime. Galina told me all her workers get paid salary and not for overtime. I pointed out [REDACTED] also worked in the laboratory doing the exact same work I did (even more advanced though including scheduling) but she got paid hourly. Galina became very upset when I pointed this inconsistency out and said "if you don't want to work here go somewhere else." Galina also said "I want happy people in my labs" and "if you're not happy go".

239. On June 16th, Socha, Sexton, Szakacs, Cowdrick, and Lewandowski met to discuss Plaintiff. Lewandowski joined the meeting via telephone from New Hampshire. Somebody took notes indicating that Socha was contacting "legal", and Lewandowski would contact in-house labor attorney O'Brien. (Exhibit 41)

240. The notes indicate that Plaintiff had expressed concern to Szakacs regarding the misclassification of his position as exempt, and that Szakacs could not understand why he was

still at Wyeth if he was unhappy. The notes indicate that Plaintiff was looking for a new job but could not find one, and that Socha was going to determine whether he was insubordinate.

241. On June 17th, Lewandowski authored a memorandum addressed to Wyeth's in-house labor attorney M.F. Dougherty. In the memo, she recommended Plaintiff's termination. She regurgitated the same fraudulent accusations which she advised Como to include in her verbal counseling, and which she promised Plaintiff she would investigate but never did. She also omitted materially important information with the intent to deceive Dougherty into believing her desire to terminate him was not a pretext of the true retaliatory reasons Plaintiff was not welcome at Wyeth. (Exhibit 42)

242. On June 30th, Socha faxed a recommendation of termination to Dougherty that basically repeated Lewandowski's memo word for word.

243. At some point during his suspension, Lewandowski assisted Szakacs in writing a discipline memo against Plaintiff. This was the second time he was disciplined at Wyeth and the first by someone other than Lewandowski. However, Lewandowski was directly involved in every discipline Plaintiff received, in addition to the initial "Performance Action" he was issued in the form of a verbal counseling.

244. During Plaintiff's suspension, Wyeth phoned to inform him he was scheduled to return to work on June 22nd; but first he had to meet with Sexton, Szakacs, and Lewandowski on June 21, 2004.

245. On June 20th, Plaintiff mailed complaints to both the WHD, (Exhibit 43) and the Mass. AG regarding Wyeth's illegal labor practices. (Exhibit 44)

246. Plaintiff met with Lewandowski, Sexton, and Szakacs at Wyeth on June 21st in Andover. During the meeting, he informed them that he filed complaints with the WHD and Mass. AG because of Wyeth's illegal labor practices.

247. After Plaintiff returned from his suspension on June 22nd, Szakacs put him in difficult situations that gave her an opportunity to criticize and create a pretextual reason to terminate him. For example, she assigned Plaintiff a new task of entering data into the DPO online database. While he tried to complete his task, the computer lagged tremendously. He contacted the Company Help Desk for assistance and the operator suggested certain remedial actions which Plaintiff tried, but the problem remained. At this point his workload was extremely high compared with others in the lab. Plaintiff sought help from Szakacs, but she refused to even talk to him. She said she was sick of him blaming his problems on other people. (Exhibit 45)

248. Szakacs continued to create a hostile work environment for Plaintiff. On June 30, he emailed Lewandowski with concerns about how she acted in seemingly the exact opposite way that

she and others promised she would as his Employee Relations Representative. Instead of being an advocate and confidential, neutral resource, she took the lead in disciplining him in retaliation for asserting his rights under the FLSA. Plaintiff was terminated on June 30th, shortly after he sent Lewandowski the email.

## Plaintiff Remains Diligent After Being Terminated

249. Pursuant to Wyeth's AFT policy, Plaintiff appealed his termination to Hubert Scoble, Assistant Vice President of Development. Scoble was the highest-ranking member of Plaintiff's management team who worked at the Andover facility. (Exhibit 46)

250. On July 23, 2004, Plaintiff met with Scoble as part of Wyeth's AFT policy. However, instead of meeting privately in conformance with the AFT policy, Socha also attended the meeting.

251. During the meeting Plaintiff explained his belief that Wyeth misrepresented his position as requiring a bachelor's degree and qualifying for a professional exemption under the FLSA. He said the verbal counseling he received was unfair and severely harmed his professional reputation. He told them that both his supervisor, and Lewandowski promised to investigate and correct any false information included in the counseling but never did. Instead, Lewandowski further harmed him by regurgitating scandalous accusations that came from an unreliable source with a reputation for dishonesty.

252. Plaintiff explained that he thought Lewandowski was his advocate, that she would keep their communications confidential, and that she was a neutral resource of information. He said he was devastated when she disciplined him for something he said in a supposedly confidential meeting, which she falsely claimed was said during the April 23rd meeting with her and his supervisor.

253. Plaintiff explained that his supervisor refused to participate or contribute to Lewandowski's discipline, though she was present during the events it was based on. He noted that under Wyeth's AFT policy, supervisors and members of management were responsible for administering discipline. He said that Lewandowski was not a supervisor or member of management and had no right to discipline him without the involvement of his supervisor.

254. Plaintiff told Scoble and Socha that his supervisor never expressed any objections to his behavior at the April 23rd meeting. Wyeth's written Discipline Action policy required her to issue the discipline if she observed inappropriate behavior. It was management's responsibility to ensure the fair and uniform administration of disciplinary action at Wyeth, not an Employee Relations Representative who was not a member of management.

255. Plaintiff noted that Lewandowski issued the discipline a day after he sent her an email contesting his misclassification as exempt from overtime. The email included a publication

from the WHD explaining why technicians and technologists did not qualify for an exemption from overtime compensation under the FLSA. Plaintiff said it seemed that Lewandowski's discipline was in retaliation for him asserting rights he believed he had under the FLSA.

256. Scoble told Plaintiff that Lewandowski was a long-time employee at Wyeth, and he trusted her to make good decisions regarding discipline, even though she was not a supervisor. He said she was the most senior employee present at the meeting, and therefore it was appropriate for her to take a lead role in the discipline. Scoble was responsible for ensuring compliance with Wyeth's Disciplinary Action policy. The policy did not allow for non-supervisors to discipline employees simply because of their seniority or perceived trustworthiness.

257. During the July 23rd meeting, Socha made it clear to Plaintiff that nobody working for Wyeth at the Andover facility, including herself, knew the legal requirements for classifying a position as exempt under the FLSA. Scoble nodded his head in agreement.

258. Socha said that no position at Wyeth could exist without a job description. She said that only a few people in Corporate Compensation at their headquarters in Collegeville, PA, were authorized to classify a position as exempt, and they used a job description in conjunction with a computer program to make the determination. While Socha was saying these things, Scoble continued nodding in agreement. The meeting ended without incident.

259. On August 3rd, 2004, the Mass AG's Office sent Wyeth a letter that was a follow-up to a previous letter which Wyeth did not respond to. In the letter, Inspector Cabezas from the Fair Labor and Business Practices Division of the Mass. AG's Office warned that civil or criminal proceedings would result if Wyeth did not respond within 10 days. (Exhibit 47)

260. Scoble responded to Plaintiff's appeal by letter on August 10, 2004. He said that after reviewing the discipline process Plaintiff was subject to, he would not take any action. He suggested that Plaintiff meet with Kamarck if he wanted to pursue the issue further through Wyeth's AFT process. (Exhibit 48)

261. At the time Plaintiff was going through the appeal process, he had requested a copy of his complete personnel file from Wyeth. Cowdrick responded on Socha's behalf with a letter indicating she attached a complete copy of Plaintiff's personnel file. Several documents Plaintiff received in December 2018 from Closson were required by Massachusetts law to be included in his personnel file and they were not. These files would have helped Plaintiff during his appeal.

262. On November 2, 2004, Plaintiff met with Kamarck and Brack as part of Wyeth's AFT process. During the meeting, he explained everything he previously told Socha and Scoble. Plaintiff should have met with Kamarck privately, but Brack insisted on being present for the meeting.

263. At one point, Kamarck asked Plaintiff what he wanted as a result of his appeal and Plaintiff said he wanted to work at Wyeth in a professional position. Kamarck told him that was not possible because he escalated the situation by going to outside authorities. Plaintiff never heard back from Kamarck or Brack. Pursuant to Wyeth's AFT policy, he should have been offered an opportunity to meet with Kamarck's manager, Charles A. Portwood, or the Andover location head of HR, Perley.

## Plaintiff Retains an Attorney

264. Meanwhile, on July 1, 2004, Corey Surett, the District Director of the Boston WHD, had contacted Plaintiff in response to his complaint against Wyeth. Surett urged him to get a private attorney due to a backlog of complaints at his agency, and issues regarding the statute of limitations. (Exhibit 49)

265. Plaintiff searched diligently for an attorney to represent him. He had never been involved in a lawsuit before and had virtually no connections with any lawyers. Attorney Dan Finbury, of Haverhill, MA, agreed to meet with him. Finbury said he was not qualified for Plaintiff's case but gave him a list of labor attorneys that included Thomas M. Closson.

266. Plaintiff first heard the Closson name in 1991, at the New Hampshire State Wrestling Championships. Tom's brother Pat thrilled a gym filled with hometown fans by pinning his opponent in the finals with a three-quarter nelson. Pat was a good sport and influenced Plaintiff's decision to attend Bishop Guertin High School (BG). Tom's youngest brother John also wrestled for BG. John was a great teammate and fun to be around. John and Plaintiff became friends as roommates at wrestling camp in Virginia. They had mutual friends and occasionally went to social events together. Plaintiff slept over the Closson's house occasionally. If Tom was home from Harvard, they had to be very quiet, especially at night. Tom's parents were warm and welcoming.

267. After watching Tom argue before the NH Supreme Court on WMUR-TV, around the year 2000, Plaintiff sent John a note of admiration and congratulations for his brother. Tom serves as an attorney for many NH municipalities and school districts, he seemed very trustworthy.

268. Plaintiff contacted Closson late in 2004. They met at his law firm's office on Court St. in Exeter, NH. Closson recognized Plaintiff's name from wrestling and BG.

269. Closson did not agree to be Plaintiff's attorney at their initial meeting. He said he could not represent Plaintiff because he was not licensed to practice law in Massachusetts.

270. On January 10, 2005, Plaintiff sent a follow-up to his original complaint filed with the WHD. He informed them of new developments including his retaliatory suspension and termination, and events that transpired during his appeal process with Wyeth. (Exhibit 50)

271. In early 2005, the DOL began investigating Wyeth as a result of Plaintiff's complaint. They limited their investigation to employees in two pay grades on the lower end of Wyeth's compensation scale. They interviewed employees and observed them performing their duties. They also analyzed job descriptions, employee records and other evidence.

272. Inspector Patty Colarossi of the WHD led the investigation of Wyeth. She determined they had at least 157 employees misclassified as exempt from overtime who were owed back pay in the amount of about $150,000. The positions of DSS Technologist, and CTS Technologist were among those found to be misclassified as exempt. Wyeth also failed to keep accurate records of the hours their employees worked, in violation of the record keeping requirements of 29 U.S.C. § 211(c). (Exhibit 51)

273. During the adjudication of the WHD's charges, Wyeth agreed to reclassify 22 employees and compensate them for back wages they unlawfully withheld. However, they repudiated the WHD's conclusions for the other 135 positions and refused to comply with the sanctions.

274. During the adjudication process, Wyeth was represented by in-house counsel, O'Brien, along with Blazek and Socha. As a result of Wyeth's capable defense, the WHD agreed that six positions they initially concluded were misclassified, could remain exempt from overtime. (Exhibit 52)

275. During the adjudication process, O'Brien provided a false Employer Identification Number (EIN) that belonged to a subsidiary named Wyeth Laboratorios C.A. (Exhibit 53) No such corporation was registered to do business in Massachusetts at the time, and no principal office or primary place of business existed in the Commonwealth. The subsidiary is not listed in any of Wyeth's filings with the SEC.

276. The false EIN O'Brien gave the WHD contributed to the fraudulent concealment of Wyeth's liabilities incurred through their illegal labor practices, and impeded the ability of multiple government agencies, including the NLRB and the DOL, to carry out their lawful duties.

277. Around the same time Wyeth realized they were facing extensive sanctions from the WHD for pervasive labor violations, Closson had a change in heart regarding his ability to represent Plaintiff. He phoned Plaintiff and invited him to a meeting at his Court St. office in Exeter, NH. The meeting was in early to mid-March and Closson agreed to represent Plaintiff's legal interests relating to his claims against Wyeth. (Exhibit 54)

278. Plaintiff was filled with joy when a trustworthy and well-respected attorney, who graduated from Harvard Law School, agreed to take his case. He took great comfort knowing that Closson grew up in the same city and attended the same small private school. His brothers were either good friends or acquaintances he looked up to. His family was warm and

welcoming and opened up their home to him. Plaintiff had followed Closson's career for a long time and was proud of his connections with the Closson family.

279. At this point, Plaintiff had respectfully pleaded his case to over 10 different representatives of Wyeth management. When that failed, he filed three separate complaints with State and Federal agencies. He met with several law firms in accordance with the WHD's recommendations and was denied representation by each of them. He was bankrupt and placed complete trust in Closson to represent his legal interests as best he could in accordance with the law.

280. Pursuant to Closson's advice, Plaintiff delegated all responsibilities for communicating about the matter to him. Closson was responsible for communicating on Plaintiff's behalf with the WHD, Mass. AG, Wyeth, and others.

281. Closson agreed to represent Plaintiff on a contingent fee basis. Pursuant to the Massachusetts Rules of Professional Conduct (Mass. R. Prof. C.), and New Hampshire Rules of Professional Conduct (NH R. Prof. Con.) 1.5, and NH RSA 508:4-e (I), the contingent fee agreement should have been put in writing. The 2005 contingent fee agreement Plaintiff entered into with Closson was never written down.

282. In the meantime, well after a year since Plaintiff worked at Wyeth, Schwamb had been monitoring his job search activities on the Monster Jobs website and made printouts when he created new resume's. (Exhibit 55)

283. Closson began representing himself to Wyeth, the DOL, the Mass. AG, Sheehan, and Lambert as having the authority to adjust or bring suit on Plaintiff's behalf for claims relating to his time at Wyeth.

284. On July 12, 2005, Inspector Ronnie Cabezas, from the Mass. AG's Fair Labor and Business Practices Division, sent Plaintiff a letter stating he had been trying to reach him regarding his complaint against Wyeth. (Exhibit 56) Plaintiff promptly gave this communication to Closson.

285. On July 21, 2005, Plaintiff met with Closson and signed an authorization for Wyeth to release all records associated with his employment to Closson, and any employees or associates of his law firm, Flygare Schwarz & Closson (FSC). That same day, Closson sent a letter (Exhibit 57) to Socha at Wyeth stating in part

> Dear Ms. Socha;
>
> Our Office has been retained to represent the legal interests of Brent Arbogast.
>
> Mr. Arbogast claims that during his employment at Wyeth, his position was misclassified as an exempt position for purposes of the Fair Labor Standards Act (the "FLSA"). Furthermore, according to Mr. Arbogast, when he complained about this misclassification, and about the fact that he was working well in excess of forty hours

> per work week without receiving overtime compensation, he was subjected to discipline, and ultimately termination....
>
> If Wyeth is interested in trying to resolve this matter before legal action is initiated, please feel free to contact me at (603) Redacted.

286. The letter Closson sent to Socha was written on his firm's FSC stationary with a heading that says; "Attorneys At Law". Closson showed the letter to Plaintiff during their meeting, and he took comfort in the opening phrase "Our Office has been retained to represent the legal interests of Brent Arbogast".

287. Plaintiff has since learned that a common technique used by conmen on their victims is to make it appear as though more people are involved and backing a specific course of action than is true. Closson wanted Plaintiff to rely on his representations in the letter to Wyeth that his entire office had been retained to represent Plaintiff's legal interests. This technique was later used by Lambert and Sheehan as well.

288. Before the WHD issued their final order regarding Wyeth's illegal labor practices, a Joint Review Committee meeting was held between Director Surett of the WHD, and Francis V. McDermott, the DOL's Regional Solicitor. At that meeting, McDermott informed Surett that his office would not accept any case files from the Wyeth investigation.

289. According to McDermott's own writings (Exhibit 58), his Office had a duty to preserve the files for potential future litigation, regardless of whether he intended to prosecute the case. The official reason McDermott gave for refusing to accept the files was that case law in the First Circuit was weak. The Joint Review Committee meeting between McDermott and Surett was contrary to their respective obligations to the public. Surett had a responsibility to forward the files from the WHD investigation and adjudication of Wyeth despite the pressure from McDermott, and it was inappropriate for McDermott to thwart the WHD's responsibility to forward the Wyeth case files to the Regional Solicitor's Office (RSO).

290. By the fall of 2005 at the latest, Closson learned about the WHD's investigation of Wyeth, and their final order regarding the misclassification of Plaintiff along with 150 other employees. He fraudulently concealed this information. Plaintiff did not learn about the WHD investigation of Wyeth until Closson provided him the case files in December of 2018.

291. Wyeth did not appeal the WHD's final agency action through the DOL's appeal process, or through the Administrative Procedure Act. However, they continued to introduce goods into interstate commerce that were made by workers employed in violation of § 207 of the FLSA. The goods were considered contraband and their introduction into commerce was a violation of 29 U.S.C. § 215(a)(1).

## The Department of Labor Poised for Further Action Against Wyeth

292. Soon after issuing a final order for the Wyeth case, Director Surett resigned from the WHD. George A. Rioux became the new District Director in December of 2005.

293. On January 11, 2006, Inspector Cabezas from the Mass. AG's Office sent Plaintiff a letter telling him that the proper agency for him to contact regarding the Wyeth complaint was the U.S. DOL. (Exhibit 59) Plaintiff immediately gave this memo to Closson.

294. On January 25, 2006, Rioux, the new WHD District Director, sent Plaintiff a letter (Exhibit 60) stating in part

> Dear Mr. Arbogast:
>
> The Commonwealth of Massachusetts Office of the Attorney General forwarded your complaint against Wyeth Pharmaceuticals to the Wage and Hour Division in Boston, MA...
> ...In order for us to accept and act upon your complaint, we will need more information about your claim. To that end, please send us your claim along with a phone number so that we can determine what course of action to follow.

As usual, Plaintiff promptly gave Director Rioux's January 25th letter to Closson.

## A Collusive Lawsuit is Filed

295. After giving Closson the inquiry from Rioux, Plaintiff did not hear from him until around March 21, 2006, when they met at FSC's office in Exeter. During the meeting, Plaintiff learned for the first time that a complaint had been filed on his behalf in USDC Mass., Boston. (Exhibit 61)

296. The complaint was filed by Lambert and Sheehan about a month earlier, on February 23, 2006, and stated claims against Wyeth for failing to pay Plaintiff overtime and retaliating against him for asserting his right to overtime compensation under the FLSA. Lambert filed the complaint pursuant to 29 U.S.C. § 216(b).

297. In addition to filing the complaint on February 23, Lambert and Sheehan had a summons issued by the USDC Mass. to Corporation Service Company, at 84 State Street, Boston, MA. (Exhibit 62) In the complaint filed in USDC Mass. the same day, Lambert and Sheehan asserted that Wyeth's filings with the Massachusetts Secretary of State's Office indicated that Corporation Service Company was Wyeth's registered agent.

298. However, pursuant to M.G.L. Ch. 156D § 16.22, Wyeth filed their Annual Report for Domestic and Foreign Corporations with the Massachusetts Secretary of State's Office on March 9, 2006. In that report, Wyeth indicated that their fiscal year ended on December 31,

2005, and that their registered agent was The Prentice-Hall Corporation, not Corporation Service Company. According to § 16.22(b), the information contained in Wyeth's Annual Report was current as of the date the Report was executed on behalf of the corporation. The Annual Report was executed on March 9, 2006.

299. At the time Lambert and Sheehan filed the complaint with USDC Mass. and had a summons issued to Corporation Service Company, no filings in the Massachusetts Secretary of State's Office indicated that Wyeth's registered agent was the Corporation Service Company.

300. Plaintiff had never met or heard of Lambert at the time the complaint was filed on his behalf. No attorney/client relationship existed between Plaintiff and Lambert. Plaintiff did not authorize anyone to file a complaint on his behalf. Nevertheless, Lambert represented to the court that he and Sheehan were Plaintiff's lead and only attorneys in the matter. The complaint closed with the following

> Respectfully submitted,
> Brent Arbogast
> By His Attorneys,
> Sheehan, Phinney, Bass + Green P.A.
> /s/ Michael J. Lambert

301. At the same moment Plaintiff sat in Closson's office reading the closing section of the complaint, which stated that Sheehan and Lambert were his attorneys, Closson presented him with a written contingent fee agreement. The fee agreement stipulated that Lambert and Closson would represent Plaintiff in his claims against Wyeth and their fee was contingent on the outcome of the matter. The contingent fee contract represented a fee-sharing agreement between two attorneys not in the same law firm.

302. By asserting that multiple attorneys and the entire Sheehan firm were behind his course of conduct, Lambert used the same favorite tactic among conmen which Closson had earlier used; convincing the victim of fraud that the conduct is legitimate by making it seem like a larger group of people are behind the proposed course of action than really are. Victims of conmen feel more comfortable if they perceive more people besides themselves are behind the course of action. No other filing in the Wyeth case referred to Plaintiff's attorneys in the plural or placed the Sheehan firm before Lambert's name. All other filings from the Wyeth case were concealed from Plaintiff until November 2018 when he received some electronic documents from Lambert.

303. Nothing in the contingent fee agreement Plaintiff entered into with Lambert and Closson on March 21st, 2006, stipulated a limited scope of representation by either attorney, and no discussion about a limited scope of representation occurred between Plaintiff and Closson or Lambert. No informed consent was given by Plaintiff permitting any attorney to limit their

scope of representation of him. (Exhibit 63). Plaintiff's signature on the agreement was acquired through fraud, without informed consent.

304. At the time, Plaintiff was once again filled with joy about his legal representation. Not only was Closson going to fight for his legal rights, but Lambert and the entire law firm Sheehan, were also on his team. Sheehan was one of the largest and most prestigious law firms in New Hampshire. Lambert mailed an executed copy of the contingent agreement to Closson on March 23, 2006. (Exhibit 64)

Fitzhugh and Lambert Conspire to Sabotage Plaintiff's Claims

305. On the same day Lambert executed the contingent fee agreement with Plaintiff, Wyeth's attorney Michael A. Fitzhugh, and Lambert filed a "Stipulation Extending Time For The Defendant To File A Responsive Pleading". Fitzhugh included the following certification at the end of the stipulation:

> I hereby certify that I filed the above document using the Court's Case Management/Electronic Case Filing System and have served the above document on all counsel of record pursuant to the Administrative Procedures Governing the Filing and Service by Electronic Means on March 23rd, 2006.
>
> /s/ Michael A. Fitzhugh

Fitzhugh only served Lambert with the "Stipulation Extending Time", he did not serve Closson. (Exhibit 65). Multiple employees of Sheehan received NEFs, Closson did not.

306. On April 17th, 2006, Fitzhugh filed Wyeth's answer to Plaintiff's complaint with the court, fourteen days after it was due. (Exhibit 66) Lambert, Closson, and Sheehan fraudulently concealed Wyeth's pleading from Plaintiff, he did not see it until December of 2018.

307. Although Lambert did not register Closson or Plaintiff with the court to receive NEFs, he did register multiple Sheehan associates, and they received electronic copies of all pleadings and NEFs related to the Wyeth case. Sheehan knew that Lambert represented to the court in the complaint that he and Sheehan were Plaintiff's attorneys, they never attempted to clarify that they were not. Plaintiff relied on Lambert's and Sheehan's representations to the court that they were his attorneys. They ratified Lambert's representations to the court through inaction.

Wyeth Admits All Facts Supporting Plaintiff's Claim That He Was Misclassified

308. The gist of Plaintiff's claim for overtime compensation pursuant to § 207 of the FLSA is found in paragraph 10 of the complaint, which states

> After working at Wyeth for a few weeks, it became apparent to Mr. Arbogast that the work he was doing did not fit within any of the categories for exempt employment permitted under the Fair Labor Standards Act. To the contrary, Mr. Arbogast's work consisted almost exclusively of operating a machine that manufactured and packaged agar (a gelatinous substance used as a medium for growing micro-organisms), loading finished agar and other lab products onto a push-cart and delivering those products throughout the Andover facility.

309. In their answer, Wyeth responded to paragraph 10 of Plaintiff's complaint with the following

> Wyeth admits so much of the allegations in paragraph ten of the complaint that assert that the plaintiff's job consisted of operating a machine that manufactured and packaged agar, loading finished agar and other lab products onto a push-cart and delivering those products throughout the Andover facility. Wyeth denies that these responsibilities comprised all of the responsibilities of the position of Technologist, Development Support Services, ("DSS Technologist").

310. Wyeth was represented by a competent legal team that included Fitzhugh and Ms. Sonia Skinner of the law firm Fitzhugh, Parker & Alvaro LLP. In-house labor counsel Kenneth O'Brien also actively participated in the case.

311. The pleading standards of Federal cases are governed by the Federal Rules of Civil Procedure (Fed.R.Civ.P.). Rule 8(d) refers specifically to the consequences of a defendant's failure to deny an averment in a complaint to which a responsive pleading is required. Rule 8(d) states that averments are admitted when not denied.

312. A careful reading of Wyeth's defense to Plaintiff's paragraph 10 averments reveals they did not dispute the accuracy of the description of Plaintiff's duties at Wyeth. They denied that those duties comprised all of the responsibilities of a DSS Technologist, but that denial did not meet the substance of Plaintiff's averment. Pursuant to 29 CFR § 541.2, the exempt or nonexempt status of any particular employee must be determined on the basis of whether an employee's duties meet the requirements for claiming an exemption under the FLSA. The title of a position or even a job description are not determinative.

313. Plaintiff's claim for overtime compensation turned on the veracity of his averments in paragraph 10 of the complaint, and Wyeth was obligated to respond to them. Wyeth admitted that Plaintiff's primary duties, which he spent almost all of his time performing, consisted of operating a machine that manufactured and packaged agar, loading the finished agar and other lab products onto a pushcart, and delivering the products throughout the Andover facility.

314. Plaintiff was entitled to judgment on his claim for overtime compensation based on the pleadings. There was no bona fide dispute; the issue had already been adjudicated by the WHD, and Wyeth failed to appeal the final order with the DOL or through the Administrative

Procedure Act. This was not an adversarial proceeding and Lambert's conspiracy with Fitzhugh to conceal the WHD's investigation and adjudication of Wyeth's labor violations from Plaintiff and the court demonstrates the collusive nature of the suit.

## Further Malicious Attacks on an Innocent Young Professional

315. Let us examine one of Wyeth's assertions in their answer to the complaint that would be comical if it was not part of a cold and calculated plan to preserve their ability to profit from the widespread exploitation of young and vulnerable workers by perpetrating a character assassination against an innocent young professional in retaliation for trying to assert his rights under the FLSA.

316. Keep in mind, Plaintiff did not authorize a suit to be filed on his behalf, Lambert and Sheehan took it upon themselves to sue Plaintiff's former employer for him. Also remember that Lambert, Sheehan, and Closson concealed Wyeth's answer from him, and did not respond to any of their abusive pleading practices. Lambert, Sheehan, and Closson also worked to ensure a trove of dispositive evidence in their possession, which implicated Wyeth in widespread and egregious labor violations, was unavailable for the legal proceeding.

317. Plaintiff's second claim against Wyeth arose from retaliatory discrimination he suffered in response to the complaints he filed related to Wyeth's violations of § 207 of the FLSA. The following is an excerpt of 29 USC § 215(a)(3) which formed the basis of Plaintiff's second claim.

> (a) After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person—
>
> (3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding...

318. Paragraph 12 of Plaintiff's complaint related to his claim of retaliation, and states

> In April 2004, Mr. Arbogast complained to his immediate supervisor that he was misclassified as an exempt employee, and that he was being required to work in excess of forty hours per week without receiving overtime compensation.

319. In their answer, Wyeth responded to Plaintiff's paragraph 12 averments with the following

> Wyeth admits so much of the allegations in paragraph twelve of the complaint as assert that in April 2004, the plaintiff complained to his immediate supervisor that

> his position was misclassified as exempt and that he should instead be compensated for hours he worked in excess of forty hours per week.

320. Paragraph 14 of Plaintiff's complaint also related to his claim of retaliation and states

> At the same time Mr. Arbogast was pursuing his complaint, his supervisor formally reprimanded him for complaining about having to work overtime hours without compensation.

321. Wyeth responded to paragraph 14 of Plaintiff's complaint with the following

> Wyeth denies the allegations in paragraph fourteen of the complaint. In further answering, Wyeth asserts that the plaintiff was reprimanded for: repeated acts of insubordination; his unprofessional communication style; and his inability to complete assigned tasks. These reprimands occurred prior to the plaintiff's voicing any concerns about the exempt status of the DSS Technologist position.

322. Wyeth's accusations against Plaintiff in paragraph 14 of their answer are completely false, there is no evidentiary basis for them, there never will be any evidentiary basis, and Plaintiff's professional reputation was severely harmed because of their misconduct.

323. Wyeth fraudulently induced Plaintiff and hundreds of other young and vulnerable employees into accepting positions that were intentionally misrepresented. When the victims showed up for their first day of work, they learned that not only were they duped into accepting a position they were not interested in, but they were also expected to work overtime for free in violation of a labor law that was established in 1938. These facts could have and should have been established, through judicial notice, within days after Wyeth filed their answer to the complaint.

324. Even if Wyeth's assertions in paragraph 14 were true, which they are certainly not, they are saying that Plaintiff was reprimanded multiple times within his first month of employment. They fraudulently induced Plaintiff into accepting a position that was intentionally misrepresented, then assigned him to work for supervisors who were intentionally misled to believe he was obligated to work overtime for free regardless of his duties. When Plaintiff tried to respectfully assert his rights under the FLSA in an informal manner to preserve as much congeniality in the workplace as possible, they subjected him to multiple reprimands for insubordination, unprofessionalism, and an inability to complete assigned tasks, all within a month of his start date? If anything, this would be a good example of how corrupt and abusive the workplace at Wyeth was.

325. Wyeth's paragraph 14 accusations against Plaintiff were grim, the fact that they were baseless and no evidence existed to support them is a serious violation of the pleading standards of the Fed.R.Civ.P. Making these false accusations in a collusive lawsuit, against an innocent young

professional barely a year out of college is unconscionable. Wyeth would not have included these accusations in their pleading absent an assurance by Plaintiff's attorneys that nobody would hold them accountable, and dispositive evidence exposing the canard would remain concealed and unavailable.

326. Wyeth colluded with Sheehan, Lambert, and Closson to perpetrate a character assassination of Plaintiff using the courts for their own malicious ulterior purposes, and the court did not ask "What is truth?", the court asked, "Who cares about the truth?".

327. The truth is, Plaintiff's first supervisor at Wyeth, Como, was forced to resign for refusing to discipline or reprimand him in the fraudulent manner that Wyeth and Brack wanted her to. The truth is, Plaintiff's first discipline or reprimand at Wyeth came from Lewandowski, a consultant whose job was to work in an illegal labor organization within Wyeth and deceive employees with grievances into trusting her while she laid the groundwork for making their life so unbearable that they quit, or repeatedly subjected them to false and malicious defamation as part of a vile scheme to terminate them for pretextual reasons.

328. Wyeth's Fourth Affirmative Defense is another doozy and states

> The plaintiff cannot establish a prima facie claim for retaliation under the provisions of 29 U.S.C. Sec. 215(a)(3) as pleaded in count II, because that section of the FLSA by its terms, only protects employees who have "filed any complaint or instituted or caused to be instituted any proceeding under or related to" the statute, and plaintiff did not do so prior to his termination by Wyeth.

329. At the time Wyeth filed their answer with the court, they knew that Plaintiff filed complaints with about 10 representatives of Wyeth management regarding the exemption issue, both formally and informally, verbally and in writing. They knew that in response to Plaintiff's concerns, his supervisor presented him with a new job description for a DSS Technologist that did not require a bachelor's degree just nine days after he started working there.

330. Wyeth knew that as a result of Plaintiff's complaint, a sham internal investigation was conducted that lasted several weeks and included multiple meetings between Plaintiff and representatives of management and HR. Wyeth created an entirely new job description that materially altered the terms and conditions of Plaintiff's employment as a result of his complaint. At least four members of Wyeth management were directly involved in the creation of the new job description, in addition to consultants Cowdrick and Lewandowski.

331. Wyeth also knew that Plaintiff filed complaints with the WHD and Mass. AG's Office after he was retaliated against for complaining internally, but before he was terminated. Wyeth had a copy of Plaintiff's complaint to the Mass. AG's Office that was time stamped as received at 1:35 pm on June 25th, 2004; five days before Plaintiff was terminated. The complaint to the

Mass. AG specifically mentions a failure to pay overtime and retaliatory conduct. Plaintiff's complaint to the Mass. AG was related to the FLSA.

## Plaintiff's Attorneys Actions During Legal Proceedings

332. Plaintiff's attorneys concealed Wyeth's answer from him for a reason, they never intended to advocate on Plaintiff's behalf but were intent on furthering Wyeth's interests the entire time. That Plaintiff's attorneys never intended to advocate on his behalf is demonstrated by their actions in light of some extremely important responsibilities they had during the early stages of the legal proceeding.

333. The Civil Justice Reform Act (Reform Act) was passed by Congress in 1990 and required all District Courts to create and implement a civil justice expense and delay reduction plan, with a purpose to

> [f]acilitate deliberate adjudication of civil cases on the merits, monitor discovery, improve litigation management, and ensure just, speedy, and in-expensive resolutions of civil disputes.

334. Under the leadership of Judge Joseph L. Tauro, the District of Massachusetts was an early implementer of a civil justice expense and delay reduction plan (Civil Justice Plan) and received accolades from senior members of Congress who were instrumental in creating and passing the Reform Act. The current President of the United States, Joseph Biden, was a Senator from Delaware at the time and chaired the United States Senate Committee of the Judiciary. The Reform Act is colloquially known as the Biden Bill.

335. On March 6, 1991, then-Senator Biden penned a letter to Judge Tauro (Exhibit 67), praising his progress in implementing the Reform Act. The letter reads:

> Dear Judge Tauro:
>
> I would like to take this opportunity to thank you for the important and positive steps you have undertaken in appointing the advisory group for the District of Massachusetts.
>
> Your appointments to the advisory group are impressive. The group is exactly what I had in mind in drafting the legislation. I, too, am pleased that Professor Arthur Miller of Harvard Law School has agreed to serve as the Reporter of your group. I am sure that his knowledge and expertise will assist you tremendously in your task.
>
> I look forward to following the implementation of the Civil Justice Reform Act in your district. Please contact me if I can be of any assistance.
>
> Sincerely,
> Joseph R. Biden Jr.

Chairman

336. On August 30, 1991, then-Senator Biden sent another letter to Judge Tauro, praising the plan. The letter reads as follows:

> Dear Judge Tauro:
>
> Thank you so much for your recent letter and draft civil justice expense and delay reduction plan. I very much appreciate your sending me a copy.
>
> You and your group are to be congratulated! In drafting and formulating the Civil Justice Reform Act, I could not have imagined a more thorough, comprehensive and thoughtful plan. To see an Act of Congress implemented and applied in this way is truly gratifying. You and your group clearly took the letter and spirit of the Act seriously, and looked upon it as an opportunity to review discovery, case management and all procedural aspects of civil litigation.
>
> Please continue to keep me posted as your work progresses. Indeed, I anxiously await notice of the further comments of your group. Thank you again for your tremendous efforts.
>
> Sincerely,
> Joseph R. Biden Jr.
> Chairman

337. After the Civil Justice Plan was developed and approved, the District of Massachusetts promulgated Local Rules to implement it, which are virtually identical in structure and wording to corresponding Rules of the Plan. This is especially true for Local Rule 16.1 which corresponds to Rule 1.02 of the Plan. For example, both Rule 1.02 and Local Rule 16.1 are titled "Early Assessment of Cases", and they both list the same procedural obligations under subdivisions with the same titles in the same sequential order. The first subdivision for each Rule is "Scheduling Conference in Civil Cases", next is "Obligation of Counsel to Confer", then "Settlement Proposals", "Joint Statement", "Conduct of Scheduling Conference", "Scheduling Orders", and "Modification of Scheduling Order".

338. Adherence to Rule 1.02 of the Civil Justice Plan is critical for meeting the clear intentions of Congress as expressed in the Reform Act and is the only procedure that is mandatory under the Plan's Rules. Local Rule 16.1 acts as the enforcement mechanism for Rule 1.02, and compliance with L.R. 16.1 is crucial for implementing Congress' intentions of the Reform Act.

339. Key objectives of the Reform Act include identifying the principal issues in contention prior to the scheduling conference, and thwarting attempts by wealthy and powerful litigants to impede appropriate discovery by those with more modest resources. To that end, the attorneys of record for both parties must follow certain procedures in the days leading up to the

scheduling conference, which is presided over by a judge. The purpose of having a judicial officer preside over the scheduling conference is to ensure that litigants take their pre-conference responsibilities seriously. During the relevant time period, Wyeth spent about $4 billion per year just in legal costs; Plaintiff was unemployed and bankrupt. Much of the Civil Justice Plan was intended to protect litigants like Plaintiff from abusive legal tactics by organizations like Wyeth.

340. A mandatory scheduling conference is the centerpiece of the District of Massachusetts', Civil Justice Plan. The Plan obligates the attorneys of record for the litigating parties, and the judicial officer to comply with and enforce specific procedures prior to the scheduling conference to ensure the intentions of the Reform Act are met.

341. The following is from the comment section of Rule 1.02 of the Civil Justice Plan regarding the pre-conference procedural obligations of the attorneys of record, and the court's role in the Plan.

> The procedures adopted by the court should be designed to allow the judicial officer to make an early assessment of each case filed and to identify those actions that may be amenable to settlement or other alternative disposition techniques.

342. The comment section for Rule 1.02 of the Civil Justice Plan stresses the importance of the attorneys of record fulfilling their pre-scheduling conference obligations and explains the role of the court in facilitating that objective.

> The attorneys must take seriously their pre-conference obligations under subdivisions (b), (c) and (d) of Rule 1.02. This is critical to the success of the scheduling conference procedure. Unless they come to the conference prepared, as prescribed by this Rule, time will be wasted and the conference will not be fully effective. The court must enforce the performance of these obligations by counsel.

343. It was important for the attorneys of record to follow pre-scheduling conference procedures that would enable a judicial officer to make an early assessment of a case at the scheduling conference and identify those that might be amenable to settlement.

344. What does a judicial officer need to make an early assessment of a case and help determine whether it was amenable to settlement or other disposition technique? Turning to the comment section of Rule 2.02 of the Plan, we read the following

> There are certain basic types of information that are discovered in virtually every case and ordinarily must be disclosed before the parties can enter serious settlement negotiations. This material usually should be readily available to the respective parties without need for formal discovery proceedings, and should be provided automatically at the outset of the litigation...This initial discovery phase should be conducted automatically, without need for a request.

345. The comment section of Rule 2.02 of the Plan touches on the importance of the timely exchange of this information in the following passage

> [S]imilarly, a litigant almost always is entitled to learn the identity of witnesses to or participants in the events that are central to the litigation, the identity of officials who were involved, and whether the opposing party has received statements from any agents or employees...Securing this type of basic information is the essential first step in a litigant's investigation of the merits of the claims and defenses.

346. The District of Massachusetts attains compliance with Rule 2.02 of the Plan through enforcement of L.R. 26.2, which mandates that absent a court order, disclosures required under Fed.R.Civ.P. 26 (a)(1), must be exchanged by the attorneys of record at least a week before the scheduling conference. Exchange of Rule 26 (a)(1) disclosures is one of those pre-conference obligations which the attorneys of record are supposed to take seriously, and which the judicial officer must enforce.

347. As Plaintiff's only attorney of record, Lambert was responsible for all pre-conference activities, the majority of which are found in L.R. 26.2 and 16.1. The first relates to the early exchange of material information considered essential to the first step of determining the merits of Plaintiff's claims and Wyeth's defenses. The second relates to conferences and discussions between opposing attorneys and between attorneys and their clients. These discussions and conferences form the basis of a "Joint Statement" that opposing attorneys file together indicating their positions on important evidentiary and procedural issues.

348. On April 19, 2006, Judge Saris issued a Notice of Scheduling Conference to be held on June 21, 2006, (Exhibit 68) and included the following statement

> The court considers attendance of the senior lawyers ultimately responsible for the case and compliance with sections (B), (C), and (D) of Local Rule 16.1 to be of the utmost importance.

349. Lambert was Plaintiff's only attorney of record and was ultimately responsible for the case, he attended the scheduling conference on Plaintiff's behalf. Plaintiff was not informed of the scheduling conference beforehand or given the opportunity to participate in it. Pursuant to Fed.R.Civ.P. 16(c), Lambert had authority to enter into stipulations and make admissions regarding all matters that he reasonably anticipated may be discussed during the conference.

350. We will examine Lambert's fulfillment of his pre-conference responsibilities, starting with Local Rule 16.1(B) which states

> (B) Obligation of Counsel to Confer. Unless otherwise ordered by the judge, counsel for the parties must, pursuant to Fed.R.Civ.P. 26(f), confer at least 21 days before the date for the scheduling hearing conference for the purpose of:
>
> (1) preparing an agenda of matters to be discussed at the scheduling conference,

(2) preparing a proposed pretrial schedule for the case that includes a plan for discovery, and

(3) considering whether they will consent to trial by magistrate judge.

351. Looking to the Rule to see what it means to confer pursuant to Fed.R.Civ.P. 26(f), it reads

(f) CONFERENCE OF PARTIES; PLANNING FOR DISCOVERY. Except in categories of proceedings exempted from initial disclosure under Rule 26(a)(1)(E) or when otherwise ordered, the parties must, as soon as practicable and in any event at least 21 days before a scheduling conference is held or a scheduling order is due under Rule 16(b), confer to consider the nature and basis of their claims and defenses and the possibilities for a prompt settlement or resolution of the case, to make or arrange for the disclosures required by Rule 26(a)(1), to discuss any issues relating to preserving discoverable information, and to develop a proposed discovery plan that indicates the parties' views and proposals concerning:

(1) what changes should be made in the timing, form, or requirement for disclosures under Rule 26(a), including a statement as to when disclosures under Rule 26(a)(1) were made or will be made;

(2) the subjects on which discovery may be needed, when discovery should be completed, and whether discovery should be conducted in phases or be limited to or focused upon particular issues;

(3) any issues relating to disclosure or discovery of electronically stored information, including the form or forms in which it should be produced;

(4) any issues relating to claims of privilege or of protection as trial-preparation material, including—if the parties agree on a procedure to assert such claims after production—whether to ask the court to include their agreement in an order;

(5) what changes should be made in the limitations on discovery imposed under these rules or by local rule, and what other limitations should be imposed; and

(6) any other orders that should be entered by the court under Rule 26(c) or under Rule 16(b and (c).

The attorneys of record and all unrepresented parties that have appeared in the case are jointly responsible for arranging the conference, for attempting in good faith to agree on the proposed discovery plan, and for submitting to the court within 14 days after the conference a written report outlining the plan. A court

may order that the parties or attorneys attend the conference in person. If necessary to comply with its expedited schedule for Rule 16(b) conferences, a court may by local rule (i) require that the conference between the parties occur fewer than 21 days before the scheduling conference is held or a scheduling order is due under Rule 16(b), and (ii) require that the written report outlining the discovery plan be filed fewer than 14 days after the conference between the parties, or excuse the parties from submitting a written report and permit them to report orally on their discovery plan at the Rule 16(b) conference.

352. The following is not enjoyable reading but necessary to establish a record of Lambert's performance in meeting his pre-conference obligations under L.R. 16.1 and 26.2. Proceeding in order of the obligations as presented in the Rules, occasionally a Rule will refer to another Rule in which case we will jump to the obligations of that Rule and then return to where we left off at the referring Rule. For example, Lambert's first obligation pursuant to Rule 26(f) was to confer with opposing counsel to consider the nature and basis of the claims and defenses. Therefore, that will be the first obligation we examine. Most of these obligations should have been completed before Lambert and Fitzhugh submitted their L.R. 16.1(D) Joint Statement to the court on June 5, 2006.

353. Plaintiff never conferred with anyone to consider the nature and basis of his claims and defenses, or Wyeth's claims and defenses. Closson phoned Plaintiff in June 2006 and advised him that part of the judicial process required him to present a settlement offer to Wyeth. Plaintiff agreed to offer a settlement, which Closson mailed to Fitzhugh on June 9, 2006. (Exhibit 69) Plaintiff's discussion with Closson regarding the settlement offer occurred after Lambert and Fitzhugh filed their Joint Statement on June 5th, 2006, and Wyeth never responded to the offer.

354. Plaintiff never conferred with anyone regarding issues related to preserving discoverable information. He never discussed the development of a proposed discovery plan with anyone, and he never conferred with anyone regarding the subjects on which discovery may be needed.

355. Rule 26(f) required Lambert and Fitzhugh to confer about several important issues before developing a discovery plan that included their views on the issues. Pursuant to Local Rule 16.1 (D) the proposed discovery plan should have been incorporated into the Joint Statement and filed at least 5 business days before the scheduling conference.

356. On June 5th, 2004, Fitzhugh and Lambert filed a discovery plan pursuant to Rule 26(f) and L.R. 16.1 (D). (Exhibit 70) The following refers to Lambert's obligations related specifically to the discovery plan.

357. Plaintiff never conferred with anyone about making or arranging for the disclosures required by Rule 26(a)(1). He never heard about the term "Initial Disclosures" or any other Federal Rule of Civil Procedure until December 2018.

358. In their discovery plan, Lambert and Fitzhugh proposed violating L.R. 26.2 relating to the exchange of information that was essential to the first step of learning the merits of Plaintiff's claims and Wyeth's defenses. Instead of exchanging the information a week before the scheduling conference, they proposed to delay the exchange until after the conference, about six weeks after they were due. No stipulation or motion with cause shown was filed with the court to enlarge the time specified for the exchanging initial disclosures, and no order from a judicial officer was issued that granted an enlargement for the time to exchange initial disclosures. Judge Saris knew that Lambert and Fitzhugh intended to violate Local Rule 26.2 by not exchanging information that was a critical first step in determining the merits of the claims and defenses, she did not enforce compliance with their pre-conference obligations.

359. Plaintiff never conferred with anybody on whether discovery should be conducted in phases or limited to or focused upon particular issues. The discovery plan filed with the court by Fitzhugh and Lambert did not include any views or proposals regarding these issues.

360. Fed.R.Civ.P. 26(f)(3) required Lambert and Fitzhugh to indicate their views and proposals regarding issues related to disclosure or discovery of electronically stored information, including the form or forms in which it should be produced. Plaintiff never conferred with anyone on these issues. The discovery plan Lambert and Fitzhugh filed with the court did not include any views or proposals regarding these issues.

361. Fed.R.Civ.P. 26(f)(4) required Lambert and Fitzhugh to indicate their views and proposals regarding issues related to claims of privilege or of protection as trial-preparation material. Plaintiff never conferred with anyone on these issues. The discovery plan filed by Fitzhugh and Lambert did not include any views or proposals regarding these issues.

362. Fed.R.Civ.P. 26(f)(4) required Lambert and Fitzhugh to indicate their views and proposals about whether to ask the court to include an agreement concerning claims of privilege or of protection of trial preparation materials in an order. Plaintiff never conferred with anyone about these issues. The discovery plan filed by Fitzhugh and Lambert did not include any views or proposals about these issues.

363. Fed.R.Civ.P. 26(f)(5) required Lambert and Fitzhugh to indicate their views and proposals about what changes should be made in the limitations on discovery imposed under the Fed.R.Civ.P. or Local Rules. Plaintiff never conferred with anyone about these issues. The discovery plan filed by Fitzhugh and Lambert reduced the number of depositions allowed by each party in accordance with L.R. 26.1(c).

364. Fed.R.Civ.P. 26(f)(6) required Lambert and Fitzhugh to confer about any orders that should be entered by the court under Rule 26(c), and include in their discovery plan their views and proposals regarding orders related to Rule 26(c). Fed.R.Civ.P. 26(c) states the following:

> (c) PROTECTIVE ORDERS. Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>
> (1) that the disclosure or discovery not be had;
>
> (2) that the disclosure or discovery may be had only on specified terms and conditions, including a designation of the time or place;
>
> (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;
>
> (4) that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters;
>
> (5) that discovery be conducted with no one present except persons designated by the court;
>
> (6) that a deposition, after being sealed, be opened only by order of the court;
>
> (7) that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way; and
>
> (8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court.
>
> If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or other person provide or permit discovery. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion.

365. Fed.R.Civ.P. 26(f)(6) required Lambert and Fitzhugh to include in their discovery plan, Wyeth's and Plaintiff's views and proposals concerning any orders that should be entered by the court which justice required to protect Plaintiff or Wyeth from annoyance, embarrassment, oppression, or undue burden or expense. Plaintiff never conferred with anyone about these issues.

366. Plaintiff never conferred with anyone about whether disclosure or discovery not be had. He never conferred with anyone about whether disclosure or discovery may be had only on

specified terms and conditions, including a designation of the time or place. He never conferred with anyone about whether discovery may be had only by a method other than that selected by the party seeking discovery.

367. Plaintiff never conferred with anyone about certain matters that should not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters. He never conferred with anyone about whether discovery be conducted with no one present except persons designated by the court. He never conferred with anyone about whether a deposition, after being sealed, be opened only by order of the court. Plaintiff never conferred with anyone about depositions in general. He never conferred with anyone about any trade secret or other confidential research, development, or commercial information not being revealed or being revealed only in a designated way.

368. Plaintiff never conferred with anyone about whether the parties should simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court.

369. Plaintiff never conferred with anyone about any of the issues contemplated in Fed.R.Civ.P. 26(c), there is no record of anyone conferring about these issues in a manner for which the Rules were intended, and no views or proposals regarding any of these issues were included in Lambert and Fitzhugh's discovery plan.

370. Fed.R.Civ.P. 26(f)(6) required Lambert and Fitzhugh to confer about and include in their discovery plan, Wyeth's and Plaintiff's views and proposals concerning any orders that should be entered by the court under Rule 16(b), which states the following

> (b) SCHEDULING AND PLANNING. Except in categories of actions exempted by district court rule as inappropriate, the district judge, or a magistrate judge when authorized by district court rule, shall, after receiving the report from the parties under Rule 26(f) or after consulting with the attorneys for the parties and any unrepresented parties by a scheduling conference, telephone, mail, or other suitable means, enter a scheduling order that limits the time:
>
> (1) to join other parties and to amend the pleadings;
>
> (2) to file motions; and
>
> (3) to complete discovery.
>
> The scheduling order also may include
>
> (4) modifications of the times for disclosures under Rules 26(a) and 26(e)(1) and of the extent of discovery to be permitted;
>
> (5) provisions for disclosure or discovery of electronically stored information;

(6) any agreements the parties reach for asserting claims of privilege or of protection as trial-preparation material after production;

(7) the date or dates for conferences before trial, a final pretrial conference, and trial; and

(8) any other matters appropriate in the circumstances of the case.

The order shall issue as soon as practicable but in any event within 90 days after the appearance of a defendant and within 120 days after the complaint has been served on a defendant. A schedule shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge.

371. Plaintiff never conferred with anyone regarding time limits to join other parties or to amend the pleadings. In their June 5th Joint Statement, Fitzhugh and Lambert proposed September 1st, 2006, as the deadline to amend pleadings.

372. Plaintiff never conferred with anyone regarding time limits to file motions. In their June 5th Joint Statement, Lambert and Fitzhugh proposed a deadline of 60 days after discovery to file dispositive motions.

373. Plaintiff never conferred with anyone regarding time limits on completing discovery, or the topic of discovery in general. In their June 5th Joint Statement, Lambert and Fitzhugh proposed March 15, 2007, as the deadline for discovery.

374. Plaintiff never conferred with anyone regarding modifications of the times for disclosures under Rules 26(a) and 26(e)(1) or of the extent of discovery to be permitted. Lambert and Fitzhugh conspired to improperly conceal this evidence and Judge Saris ratified their collusive behavior. She exercised no control over the attorneys in these proceedings.

375. Fed.R.Civ.P. 26(f)(6) required Lambert and Fitzhugh to confer about and include in their discovery plan, Wyeth's and Plaintiff's views and proposals concerning any orders that should be entered by the court under Rule 16(c), which states the following:

(c) SUBJECTS FOR CONSIDERATION AT PRETRIAL CONFERENCES. At any conference under this rule consideration may be given, and the court may take appropriate action, with respect to:

(1) the formulation and simplification of the issues, including the elimination of frivolous claims or defenses;

(2) the necessity or desirability of amendments to the pleadings;

(3) the possibility of obtaining admissions of fact and of documents which will avoid unnecessary proof, stipulations regarding the authenticity of

documents, and advance rulings from the court on the admissibility of evidence;

(4) the avoidance of unnecessary proof and of cumulative evidence, and limitations or restrictions on the use of testimony under Rule 702 of the Federal Rules of Evidence;

(5) the appropriateness and timing of summary adjudication under Rule 56;

(6) the control and scheduling of discovery, including orders affecting disclosures and discovery pursuant to Rule 26 and Rules 29 through 37;

(7) the identification of witnesses and documents, the need and schedule for filing and exchanging pretrial briefs, and the date or dates for further conferences and for trial;

(8) the advisability of referring matters to a magistrate judge or master;

(9) settlement and the use of special procedures to assist in resolving the dispute when authorized by statute or local rule;

(10) the form and substance of the pretrial order;

(11) the disposition of pending motions;

(12) the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems;

(13) an order for a separate trial pursuant to Rule 42(b) with respect to a claim, counterclaim, cross-claim, or third-party claim, or with respect to any particular issue in the case;

(14) an order directing a party or parties to present evidence early in the trial with respect to a manageable issue that could, on the evidence, be the basis for a judgment as a matter of law under Rule 50(a) or a judgment on partial findings under Rule 52(c);

(15) an order establishing a reasonable limit on the time allowed for presenting evidence; and

(16) such other matters as may facilitate the just, speedy, and inexpensive disposition of the action.

At least one of the attorneys for each party participating in any conference before trial shall have authority to enter into stipulations and to make admissions regarding all matters that the participants may reasonably anticipate may be discussed. If appropriate, the court may require that a party or its representative be present or reasonably available by telephone in order to consider possible settlement of the dispute.

376. Plaintiff never conferred with anyone about the formulation or simplification of the issues, including the elimination of frivolous claims or defenses. The discovery plan filed by Fitzhugh and Lambert did not include any views or proposals concerning the contested issues.

377. Plaintiff never conferred with anyone about the necessity or desirability of amendments to the pleadings. The discovery plan filed by Fitzhugh and Lambert proposed a deadline of September 1, 2006, for amending pleadings.

378. Plaintiff never conferred with anyone about the possibility of obtaining admissions of fact or of documents which would have avoided unnecessary proof, stipulations regarding the authenticity of documents, or advance rulings from the court on the admissibility of evidence. The discovery plan filed by Fitzhugh and Lambert proposed a deadline of February 1, 2007, for requests for admissions.

379. Plaintiff never conferred with anyone about the avoidance of unnecessary proof or of cumulative evidence, or limitations or restrictions on the use of testimony under Rule 702 of the Federal Rules of Evidence, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts of data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

380. The discovery plan filed by Fitzhugh and Lambert did not include any views or proposals concerning any orders that should be entered by the court regarding the avoidance of unnecessary proof or of cumulative evidence, or limitations or restrictions on the use of testimony under Rule 702 of the Federal Rules of Evidence. Plaintiff's attorneys knew that officials from the WHD could testify on his behalf regarding their determination that he was misclassified as exempt, but this was not revealed in the June 5th, Joint Statement.

381. Plaintiff never conferred with anyone about the appropriateness and timing of summary adjudication under Rule 56. The discovery plan filed by Fitzhugh and Lambert proposed that all dispositive motions be filed by no later than 60 days after the close of discovery.

382. Plaintiff never conferred with anyone about the control or scheduling of discovery, including orders affecting disclosures or discovery pursuant to Rule 26 and Rules 29 through 37. He never conferred with anyone about the requirements of initial disclosures, including the contents, the timing, or the form.

383. Pursuant to L.R. 16.1(D)(3), Fitzhugh and Lambert were supposed to include in their June 5th Joint Statement, certifications signed by counsel and by an authorized representative of each party affirming that each party and that party's counsel have conferred; with a view to

establishing a budget for the costs of conducting the full course - and various alternative courses - of the litigation, and; to consider the resolution of the litigation through the use of alternative dispute resolution programs such as those outlined in L.R. 16.4.

384. Lambert and Fitzhugh did not include the certifications required by L.R. 16.1(D)(3) in their June 5th Joint Statement. Instead, they included the following clause

> The certifications required by Local Rule 16.1(D)(3) are attached hereto or will be filed separately on or before the day of the scheduling conference.

385. Plaintiff never conferred with anyone with a view to establishing a budget for the costs of conducting the full course, or alternative courses of litigation. Lambert and Fitzhugh's Joint Statement included the following clause

> The parties are interested in mediation through the Court-sponsored process. The parties do not consent to trial by Magistrate

386. Prior to Lambert and Fitzhugh filing their Joint Statement on June 5th, 2006, Plaintiff never discussed any options regarding alternative courses of litigation, including trial by Magistrate. After the Scheduling Conference, Closson convinced Plaintiff to try mediation. Plaintiff was blocked from meaningful participation throughout the entire case.

387. On June 16, 2006, Lambert filed certifications pursuant to Rule 16.1(D)(3). (Exhibit 71) The certification includes a forgery of Plaintiff's signature and falsely claims that he conferred with Lambert regarding establishing a budget for the costs of conducting the full course, or alternative courses of litigation. Forging Plaintiff's signature on legal documents was a technique used by Lambert and Closson to prevent his meaningful participation in the case.

388. Plaintiff remembers communicating with Lambert only once. Lambert phoned him just after he appeared on Plaintiff's behalf at the June 21st scheduling conference. Lambert urged Plaintiff to settle his claims, he said that Judge Saris wanted the case settled quickly and that both he and Judge Saris believed his claims lacked merit. When Plaintiff respectfully declined to settle the case, Lambert raised his voice in sarcasm and said, "yes, she's just a federal judge, what does she know, she's only seen hundreds of cases like this before!" The phone call ended and that was the last time Plaintiff communicated with Lambert until November 2018.

389. Shortly after Plaintiff's phone call with Lambert, Closson phoned and asked if he was open to mediation which he agreed to.

390. On June 21st, the court filed a Scheduling Order, referring Plaintiff's case to mediation A.S.A.P. (Exhibit 72) The Order did not address Rule 26(a)(1) disclosures, this had the effect of waiving the parties' obligations to exchange basic information deemed critical by the Civil Justice Plan in assessing the merits of any claims or defenses. Judge Saris should have known throughout the legal proceedings that no Rule 26(a)(1) disclosures had been exchanged because Rule 5.2(b), required the parties to file proof of service with the court after serving

initial disclosures on the other party. No proof of service was ever filed with the court relating to initial disclosures.

391. On June 26th, Judge Saris filed an order referring Plaintiff's case to mediation (Exhibit 73), the filing was signed on June 21st, and included the following excerpts

> After consultation with counsel and after consideration of the various alternative dispute resolution programs (ADR) available, I find this matter appropriate for ADR and accordingly, refer this case to the ADR program for assignment of the following: Mediation A.S.A.P.; and
>
> Upon notification of the time and place designated for the proceeding, counsel are directed to be present with their clients or with appropriate settlement authority and to provide any written documentation which may be required for the particular ADR program.

392. Rule 1.02(g) of the Plan, as well as Local Rule 16.1(G), required Judge Saris to include in her scheduling order a statement asserting that the provisions, including any deadlines, having been established with the participation of all parties, can be modified only by order of the judge, or the magistrate judge if so authorized by the judge, and only upon a showing of good cause supported by affidavits, other evidentiary materials, or references to pertinent portions of the record. Judge Saris did not include the statement in her Scheduling Order.

393. Judge Saris watched as attorneys Fitzhugh and Lambert conspired to and did violate Rule after Rule after Rule after Rule after Rule after Rule. Most of the Rules were implemented as part of the Civil Justice Reform Act and intended to protect the rights of litigants like Plaintiff whose adversary was wealthy and powerful and had a history of abusing the discovery process. After observing Lambert and Fitzhugh play fast and loose with the Federal Rules of Civil Procedure, Judge Saris gave them a wink and a nod by joining them and violating the Rules herself.

394. Somehow, based on nothing but the pleadings, Judge Saris and Lambert concluded that Plaintiff's claims lacked merit, required no exchange of automatic disclosures, and were ripe for serious settlement discussions through court annexed mediation. This despite a remarkable absence of substance in Wyeth's pleading which consisted mostly of redundant and scandalous accusations that are either irrelevant, too vague for a response, self-contradicting, or just plain foolish.

395. On June 28th, 2006, Judge Saris issued a court order requiring all litigants to follow the Court-wide rules and procedures for Electronic Case Filing. (Exhibit 74) It is unclear why Judge Saris felt the need to issue orders that were redundant of court-wide Local Rules that were promulgated six months earlier, while taking actions that defeated the purpose of other

Rules meant to ensure litigants like Plaintiff received meaningful due process in his civil claims against Wyeth. For example, Local Rule 26.1(A) states that

> The judicial officer should encourage cost effective discovery by means of voluntary exchange of information among litigants and their attorneys.

Judge Saris did not encourage cost effective discovery by Lambert and Fitzhugh. She watched them conspire to violate court-wide Local Rules meant to ensure that basic evidence was available to each party and the judicial officer at least a week before the scheduling conference where she was supposed to make an early assessment of the merits of the claims and defenses. Next, she gave a wink and a nod to the conduct of the recalcitrant attorneys by failing to include the clause in her scheduling ordered required by Local Rule 16.1(G).

396. On July 31, 2006, Closson mailed Fitzhugh what were purported to be Plaintiff's Rule 26(a)(1) initial disclosures and copied them to Lambert. (Exhibit 75) The disclosures were not signed by an attorney of record, instead Closson included a facsimile of Plaintiff's signature. Pursuant to Rule 26(g), it is only appropriate for a party to sign their own initial disclosures if they are not represented by legal counsel: more winking and nodding within the realm of tribunals and courts of justice.

397. On August 22, 2006, Lambert sent Rebecca Tyler, the administrator of the court's ADR program, a fax for the purpose of scheduling mediation, and choosing his preferred mediator. (Exhibit 76) The fax was copied to Fitzhugh and Closson.

398. On September 22, 2006, the court issued an NEF scheduling mediation for October 11, 2006, with mediator Sally Higginbotham, at the Moakley Federal Courthouse in Boston. The NEF was sent electronically to Fitzhugh and Lambert, as well as Wyeth co-counsel, Sonia Skinner. The NEF was also electronically sent to Cathy Leonard, and Sally Brabble of the law firm, Sheehan. The Notice was not sent to Closson or Plaintiff, their names were not included in any NEFs issued by the court.

399. On September 28, Lambert forwarded a copy of the September 22nd NEF to Closson. (Exhibit 77) Lambert copied Ms. Leonard of Sheehan on the email which stated

> Tom,
> The mediation is going to be at USDC MA. See notice below.
> Are you going to take a stab at the confidential mediation statement? Its due 10/4.
> 10-4
> ML

Is it typical for a "local counsel" who supposedly had very little involvement in a case, to relay important court notifications to the lead attorney a week after receiving it themselves,

asking the lead attorney if he's "going to take a stab at the confidential mediation statement", that is due in three business days? It shouldn't be, and in Lambert and Sheehan's case, it was aiding and abetting the unauthorized practice of law and breach of fiduciary duty.

400. On October 2, 2006, Closson mailed Ms. Higginbotham, a confidential mediation statement as required for the October 11th mediation. (Exhibit 78) Plaintiff did not see the confidential mediation statement until December 2018. Closson signed the mediation statement "for Michael Lambert".

401. On October 11, 2006, Plaintiff met Closson for mediation at the John Joseph Moakley Courthouse in Boston, MA. Lambert did not attend the mediation, although he was ordered to by Judge Saris. Wyeth was represented by attorneys Fitzhugh, Skinner, and in-house counsel, O'Brien. No meaningful progress toward settlement was made at mediation.

402. On October 17, 2006, Mediator Higginbotham filed with the court a report on the mediation efforts (Exhibit 79). She indicates that in her judgment, further efforts to settle the case would be unproductive, and recommended returning the case to the trial list.

403. According to Fed.R.Civ.P. 5(a), every offer of judgment pursuant to Rule 68, must be served on another party. If the party is represented by an attorney, service is made on the attorney in accordance with Fed.R.Civ.P. 5(b). In addition, proof of service is supposed to be filed with the court pursuant to Local Rule 5.2(b).

404. On November 3rd, 2006, Fitzhugh mailed Closson a Rule 68 Offer of Judgment and copied Wyeth's in-house counsel O'Brien. (Exhibit 80) Wyeth offered to accept judgment against them for failing to pay Plaintiff overtime. They agreed to pay him $5,320 plus costs accrued to date. They did not include attorney's fees in the offer of judgment. Wyeth had yet to engage in Rule 26(a)(1) disclosures. No proof of service was filed in accordance with L.R. 5.2(b).

405. By serving Closson important papers and not Lambert, Wyeth and Fitzhugh were intentionally aiding and abetting Closson in the unauthorized practice of law in violation of M.G.L. Ch. 221 § 41. They knew that Closson was not an attorney of record in the case, and not licensed to practice law in Massachusetts. Wyeth and Fitzhugh knew legal documents should have been served on Lambert and Sheehan because they were Plaintiff's only attorneys of record.

406. The 2006 contingent fee agreement between Plaintiff, Lambert and Closson contained the following stipulation

> Client will be notified whenever an offer of settlement or compromise is received, along with the attorney's recommendation. Likewise, client agrees to make no compromise or settlement in this matter without first notifying the attorney.

Lambert and Closson concealed Wyeth's Rule 68 Offer of Judgment from Plaintiff until December 2018, further evidencing the collusive nature of the lawsuit, and demonstrating that neither Lambert, Sheehan, or Closson intended to provide Plaintiff with competent legal

representation. Plaintiff was fraudulently induced into signing the 2006 contingent fee agreement and he was eventually fraudulently induced into signing a confidential settlement agreement with terms much more unfavorable than the Rule 68 Offer Wyeth sent Closson.

407. On November 9th, Inspector Colarossi replied to an email inquiry from Closson indicating the WHD determined Plaintiff was misclassified and owed back wages. (Exhibit 81) Closson has not provided Plaintiff with information regarding what prompted Colarossi's response. However, judging by the contents of the email, Closson's communications with Colarossi were not in furtherance of providing Plaintiff competent legal representation, rather, they were in furtherance of the scheme to defraud Plaintiff, the WHD, the USDC Mass. and others.

408. On November 10th, Wyeth and Fitzhugh mailed Closson what were purported to be Wyeth's automatic disclosures pursuant to Rule 26(a)(1) and L.R. 26.2. (Exhibit 82). The disclosures were not signed by an attorney of record or served on an attorney of record, and no proof of service was filed with the court, all violations of the Federal Rules of Civil Procedure.

409. However, there is more, Wyeth actually included the following certification in the faux disclosures they mailed Closson

> I hereby certify that I have served a copy of the above Defendant's Automatic Disclosures on all counsel of record listed below by first class mail, postage prepaid on this 10th day of November, 2006.
>
> Thomas M. Closson, Esq.
> Flygare, Schwarz & Closson, PLLC
> 11 Court Street, Suite 2
> Exeter, NH 03833-2745

The certification only lists Closson's name and address. Wyeth and Fitzhugh knew that Closson was not licensed to practice law in Massachusetts, and was not an attorney of record.

410. Wyeth's faux disclosures were intended to help Lambert and Closson deceive Plaintiff into believing that he had competent legal representation. Wyeth and Fitzhugh dirtied their hands, they knew they were participating in a fraud on the court and that the litigation was collusive and not adversarial.

411. On December 14, 2006, Closson summoned Plaintiff for a meeting at his Court St. office in Exeter, NH. He scurried Plaintiff into a conference room and told him he needed to settle the case against Wyeth because they were threatening to sue him for bringing a frivolous lawsuit. Closson told Plaintiff that he was in danger of owing Wyeth money if he did not settle.

412. During the December 14th meeting, Plaintiff asked Closson about the DOL and was told simply that Investigator Colarossi urged him to settle if he received an offer. He did not mention any investigation or inform him that Colarossi had determined he was misclassified and owed back wages.

413. During the December 14th meeting, Plaintiff asked Closson about the retaliation claim and was told that Wyeth would just say he was being a belligerent jerk and they had a right to terminate him. Closson reminded Plaintiff of his phone call with Lambert and emphasized both Lambert's and Judge Saris' low opinion of the merits of his claims.

414. Plaintiff remembered Lambert's June 2006 phone call vividly. Based on Lambert's recommendations during the call, and Closson's urging, Plaintiff settled for a modest sum. He believed he was the prevailing party in his overtime claim and never authorized the filing of any documents that indicated otherwise.

415. As part of the settlement agreement, Plaintiff had to write a letter to the Mass. AG's Office, stating a full settlement was reached and he was withdrawing his complaint against Wyeth. (Exhibit 83) Plaintiff also agreed to destroy all documents in his possession that were related to the Wyeth litigation.

416. Neither the court nor the DOL supervised the settlement. This was a suit brought pursuant to 29 USC § 216(b) regarding the exploitation of U.S. workers. There was a strong public interest in the case and Judge Saris watched as the attorneys trampled over Rules meant to protect litigants like Plaintiff from abusive discovery practices by wealthy and powerful employers like Wyeth. Not only did she watch, but she gave the unruly officers of the court encouragement and ratified their conduct by violating the Rules herself.

417. On January 22nd, 2007, Fitzhugh and Lambert filed a fraudulent Stipulation of Dismissal with USDC Mass., indicating that Wyeth prevailed on all claims, and each party had to pay their own costs. (Exhibit 84) At the time the stipulation was filed, Fitzhugh knew that Plaintiff was the victim of fraud, and he and Wyeth actively participated in it as principals. Judge Saris knew that the stipulation with prejudice was filed without any discovery being had, including Rule 26(a)(1) disclosures. She intentionally neglected her obligation to encourage cost effective discovery.

418. The Civil Justice Plan for USDC Mass. stresses the importance of attorneys taking their responsibilities before the scheduling conference seriously, the success of the scheduling conference hinged on the fulfillment of their obligations. Judge Saris watched as Lambert and Fitzhugh violated more Federal Rules of Civil Procedure before the scheduling conference than they complied with. She watched as the attorneys informed her of their plan to ensure no evidence was available for her to assess the merits of the claims and defenses at the scheduling conference in a case that she knew had serious public policy implications for our country's vulnerable middle-class workers.

419. According to the comment section for Rule 1.02, of the Plan regarding the responsibilities of the lawyers leading up to the scheduling conference

The court must enforce the performance of these obligations by counsel.

Those instructions pertain to every case being litigated in USDC Mass. Judge Saris knew that she was presiding over a case with serious implications on the rights of vulnerable middle-class workers, she intentionally neglected to perform her duties, tipping the scales of justice in favor of exploitative capital and elitist financial speculators.

420. Judge Saris actively helped ensure that overwhelming evidence of widespread and egregious labor violations was illicitly concealed while presiding over a case with substantial public interests at stake. She was supposed to enforce the Federal Rules of Civil Procedure in a way that enabled her to make an honest assessment of the merits of the claims and defenses in the case. She was supposed to make the assessment based on evidence the attorneys were required to exchange before the scheduling conference. Pursuant to Local Rule 16.1(E), she needed this evidence to determine

(1) the complexity of the case;
(2) the amount of time reasonably needed by the litigants and their attorneys to prepare the case for trial;
(3) the judicial and other resources required and available for the preparation and disposition of the case;
(4) whether the case belonged to those category of cases that:
   (a) involve little or no discovery,
   (b) ordinarily require little or no additional judicial intervention, or
   (c) generally fall into identifiable and easily managed patterns;
(5) the extent to which individualized and case-specific treatment will promote the goal of reducing cost and delay in civil litigation; and
(6) whether the public interest requires that the case receives intense judicial attention.

421. It is unclear how Judge Saris was able to make the determinations in Local Rule 16.1(E), without any evidence to work with.

422. Plaintiff never authorized the filing of the January 22, 2007 stipulation of dismissal filed by Fitzhugh and Lambert. Among the files Plaintiff received from Closson in December 2018 was a complete copy of the settlement agreement, however, the "Exhibit A" that Plaintiff supposedly authorized was not included.

## Plaintiff Moved On

423. Plaintiff had an exceedingly difficult time finding employment after being terminated by Wyeth. As a result of unemployment and underemployment, he and his family were forced to downsize and move apartments twice by December 2006. Plaintiff had moved three times since first accepting Wyeth's offer of employment in 2004. When his wife moved out and divorced him around 2007, he was forced to downsize and move a fourth time.

424. Plaintiff became a father in December 2006, and after his wife moved out, they split custody of their son 50/50. He had to move an additional three times due to unemployment and underemployment.

425. Plaintiff believed his inability to find employment as a chemist was related to the poor economy. For a while, he lived in a small one-bedroom apartment with his son and needed food stamps to feed himself and his son.

426. Plaintiff's last move in 2018 was especially stressful because the property manager where he lived would not renew his lease but gave no reason why. There were very few apartments available, and Plaintiff was turned down several times. He was usually told he did not meet the standards required of their tenants. After being turned down at least 4 times for 4 different apartments, Plaintiff found someone who would rent to him on Maple St. in Exeter, NH.

Serendipity Leads Plaintiff to Request Files

427. Soon after moving to Exeter, Plaintiff noticed he could see the conference room at Closson's old FSC law office on Court St., from several windows in his apartment. Plaintiff's son was maturing and at this point he was about 12 years old. Plaintiff thought about the Wyeth case and realized that neither Lambert nor Closson returned any of the files he gave them. He resolved to try and get the Wyeth case files to use for teaching his son how not to act at school or work when faced with a difficult situation.

428. The settlement agreement Plaintiff entered into with Wyeth required him to destroy all files associated with the case. Plaintiff's attorneys were also supposed to destroy all files. After the settlement of the case, Plaintiff gladly complied with the terms and moved on with his life. He should have assumed that Closson, Lambert, and Sheehan did as well. However, through the years Plaintiff forgot about that condition of the settlement, otherwise he would never have requested any files. As bad as Closson's actions were at the time, he deserves some credit for holding on to the case files and providing them to Plaintiff. Plaintiff has informed Closson that he forgave him and thanked him for providing the files, for whatever reason, he did a very good thing.

429. On November 20, 2018, Plaintiff sent an email to Lambert asking for any files he or Sheehan still had related to the Wyeth case. (Exhibit 85) Plaintiff's email to Lambert stated in part

> Do you still have the case files pertaining to my lawsuit against my employer Wyeth Pharmaceuticals which occurred around 2004, you were acting as my attorney?

430. Lambert responded on November 21, 2018, stating he might have some electronic documents but did not think Sheehan held paper copies for longer than 10 years. Lambert did not mention a limited scope of representation as the reason he never returned Plaintiff's files.

431. Plaintiff emailed Lambert again asking if he could make sure any files, he or Sheehan had regarding the Wyeth case were provided to him. After not receiving a response, Plaintiff emailed Lambert again to specifically ensure Sheehan did not have any files related to the Wyeth suit they were not providing him.

432. On November 21, 2008, Lambert responded to Plaintiff's third email with the following statement

> Brent,
>
> As I recall, I was local counsel for Tom, and therefore had a very limited role. I don't recall any discovery in this case, and certainly wasn't involved in any depositions. You should check with Tom about the files your looking for.

433. Plaintiff was perplexed at Lambert's statement that he "had a very limited role" in the Wyeth case. He never heard the term "local counsel" and believed Lambert and Sheehan were his lead attorneys. Lambert was his only attorney to appear before Judge Saris on his behalf. Lambert's unsolicited phone call to Plaintiff played a significant role in his decision to settle.

434. Lambert sent another email to Plaintiff on November 21, 2018, that included the following statement

> Respectfully, I have cooperated with you; much more so than any other firm would that was paid $1,000 to act as local counsel on a case 14 years ago.

435. Another email Lambert sent to Plaintiff on November 21, 2018, includes the following statement

> I do recall Judge Saris ordering the parties to mediation and expressing concerns about the merits of your case. I'm sure I communicated that to you.

436. After revealing to Plaintiff his limited scope of representation and role of "local counsel", Lambert copied Closson on their correspondence and requested Plaintiff not contact him anymore.

437. Closson subsequently phoned Plaintiff and reiterated what Lambert said via email. Closson said he was Plaintiff's lead attorney in the Wyeth case, and that he hired Lambert to act as local counsel. He told Plaintiff not to contact Lambert anymore because he had little to do with the case and was working for Closson, not Plaintiff.

438. Closson told Plaintiff that his case files were in archive. He asked why he wanted the Wyeth files, and Plaintiff responded that he wanted to use the experience to teach his son how not to handle situations he may face in the future at school or work. Closson agreed to get the files out of archive.

439. Meanwhile, Plaintiff followed Lambert's suggestion and applied for a PACER account to see all of the court's electronic files for the Wyeth case. He received his passcode in the mail about a week later.

440. Plaintiff researched the meaning of "local counsel" and learned that it refers to a limited scope of representation whereby the local counsel sponsors an attorney who is not licensed to practice in that jurisdiction. The local counsel must file a motion with the court seeking permission for the unlicensed attorney to appear "pro hac vice" in a specific case. The term "pro hac vice" is Latin, meaning "for or on this occasion only".

441. Plaintiff searched the case files on PACER and could not find any record of Closson as his attorney in the Wyeth case. There was no motion from Lambert to the court requesting permission for Closson to appear "pro hac vice". Lambert was invariably listed as "Lead Attorney" on every document in PACER. (Exhibit 86).

442. Plaintiff asked Lambert and Closson why there was no record of a motion for pro hac vice if Lambert was acting as local counsel for Closson. Neither Closson nor Lambert responded to Plaintiff's questions.

443. Based on Lambert and Closson's statements in November 2018 regarding Lambert's limited scope of representation in the Wyeth case, Plaintiff began investigating the possibility that he was harmed by their conduct. Absent a confession, there was no way for him to learn that a repudiation of trust had been committed, and that he was harmed by their actions.

444. The practice of law in federal court by persons not members of the bar is governed by USDC Mass. Local Rule 83.5.3. The unlicensed attorney must adhere to numerous procedures ensuring they are familiar with the Local Rules of the court and submit to the court's disciplinary jurisdiction. They must also provide references to the court, and demonstrate they have a clean disciplinary record in the jurisdictions they are licensed to practice in.

445. Because attorneys not members of the bar of USDC Mass. can only practice and appear on behalf of a client through motion from an actual member of the bar (the local attorney), Local Rule 83.5.3 also governs who is considered "local counsel". Pursuant to Local Rule 83.5.3, Lambert was required to motion the court to allow Closson to appear and practice on Plaintiff's behalf "pro hac vice". Unless he followed the procedures of Local Rule 83.5.3, and the court granted the request, he could not act as local counsel for Closson. It is not reasonable

to limit a client's representation to one attorney acting as "local counsel" for a "lead" attorney who is not licensed to practice law in the jurisdiction and not granted pro hac vice admission.

446. Lambert knew that it was important for an attorney to be admitted pro hac vice in order to provide competent legal representation to their client. While serving as Plaintiff's attorney, Lambert filed a motion with USDC Mass. on May 8, 2006, to admit an attorney to appear and practice pro hac vice on behalf of a different client of his. (Exhibit 87)

447. On or around December 7, 2018, Plaintiff went to Closson's Jackson Lewis office in Portsmouth, NH, and retrieved files related to the Wyeth case. In the ensuing days, he went through the files and was shocked at the trove of documents he never saw before. One of those documents was an email from Inspector Colarossi indicating that the WHD issued a final agency order determining that Plaintiff was misclassified as exempt.

448. After seeing Colarossi's email, Plaintiff phoned her in early 2019. Inspector Colarossi informed him about the investigation she led at Wyeth as a result of his complaint, and the extensive labor violations she found. She said that at Wyeth, it was common practice for exempt workers to be working next to non-exempt workers under the same working conditions and performing the same tasks. Ms. Colarossi said that both she and Director Surrett were upset that the Regional Solicitor would not accept the Wyeth investigation files.

449. Plaintiff followed Ms. Colarossi's advice and submitted a Freedom of Information Act (FOIA) request to the DOL, for records relating to the investigation of Wyeth. Around September 20th, 2019, he received two redacted reports created in relation to the investigation, adjudication, and final order regarding Wyeth's labor violations.

450. One of the reports received from the DOL seems to originate early in the investigation of Wyeth and was added to as the investigation progressed. The following are some important excerpts from the document:

> I. Reason for Investigation
>
> This investigation was initiated on the basis of a complaint made by a former ee alleging that he had erroneously been classified as exempt. In addition, this ee is alleging a wrongful termination under Sec. 15(a)(3). Sec.7 and 11 violations were disclosed throughout the company.
>
> III Identity/Coverage
>
> Subject firm operates as a pharmaceutical company and is publicly traded company. The federal ID # for the subject firm is 23-1491453. The gross sales for the subject firm is in the multimillions in both 2004 and 2003. The company regularly receives and ships goods involved in interstate commerce. Coverage is asserted under 3(s)(1)(A) of the Act.
>
> Exemptions

For a breakdown of all salaried exempt positions, see E exhibits. The firm has hundreds of salaried exempt positions. The writer did an initial review of the job positions and determined that Labor Grades 7 and up would not be analyzed under Regulation 541 since the salary range for a Grade 7 is $44,400-67,100. The writer did not determine that these positions are exempt but felt that there was a cutoff needed. The writer has notified the firm of this methodology.

V. Exemptions denied

541.3-The firm had several positions that had been erroneously classified as exempt under 541.3. The writer determined the following positions did not meet the criteria under 541.3. The firm requires a bachelor's degree in some type of science for these positions, but the writer determined that the degree is not essential to be able to do the job. Many of the ee interviews indicate that they could still perform their job without a bachelor's degree. Most of these positions are the employees first position when they are hired by the company and they are promoted after a six to 12 month period in these jobs. They are all considered Grade level 5 and six positions.

QC Associate
QC Associate I
QC Associate II
Facilities Associate II
Sr. Tech CTS
Tech CTS
Tech Associate II
Tech Associate I
General Ledger Accountant
IT Analyst
Human Resource Associate I

VI. Status of Compliance

Sec.7- The firm had erroneously paid many of its salaried ees as exempt. Back wages were computed based on the taking the ees' salary and applying the coefficient formula using a Microsoft excel spreadsheet. The writer found 157 ees due $163,7313. The firm has agreed to pay 22 ees back wages in the amount of $40,187.00. The remainder of the ees will be notified of their 16(b) private rights.

Sec.11-The firm failed to maintain daily and weekly accurate record of hours worked for all of its ees who were erroneously classified as exempt. Ee interviews disclosed all levels of QC Associates as well as Dev. Associate I, and Stab Associates averaged 42 hours a week. The employees in the IFile No: 04-133-01765

Disposition

a. conference-The writer was held on Wednesday, March 30m 2005 at the subject firm. Present at the meeting were Tonia Socha, Human Resources Manager, Eileen

Blazek, Compensation Planning, Ken O'Brien, In House Labor Counsel, and the writer. The provisions of the FLSA were reviewed and discussed in relation to the subject firm. Special emphasis was placed on Regulation 541. The writer provided the firm with a WH-56 as well as the Microsoft Excel spreadsheets used to calculate the back wages due. The firm has asked for some time to review the provisions and has agreed to sign a "Waiver of the Statute Limitations."

Addendum

On Thursday, June 09, 2005, the firm came into the BDO to meet with both the writer and DD Surett. Present at the meeting were Ken O'Brien, Labor Counsel, Tonia Socha, Human Resources Manager, Eileen Blazek, Compensation Staff, District Director Corey Surett, and the writer. The firm had forwarded a written overview as to the positions and question. The firm has agreed that several of the positions the writer found to be erroneously classified as exempt should be nonexempt in the future. These positions include, Analyst IT Services, DSS Associate Scientist-G-SL, Facilities Associate, General Ledger Accountant, HR Associate, Tech Associate II (Validation), Tech Associate I (MFG Tech) and Tech Associate II (Mfg. Tech). The writer and DD Surett also explained, after reviewing the information provided, that Wage and Hour believes the following positions can continue to be exempt. The Associate Scientist Micro, GMP Coordinator, QC Associate (Scheduling and Planning), Tech Associate II (Documentation), Training Associate, and Training Specialist.

The firm and Wage and Hour cannot agree on the some and Wage and Hour will not forward the case to the Regional Solicitor's Office but notify the employees of their private rights. The positions include the QC Associate, QC Associate I, QC Associate II, DSS Associate Scientist GMP (formerly CTS Tech), DSS Associate Scientist Non-GMP (formerly CTS Tech), and DSS Associate Scientist I Chemistry (formerly Sr. CTS Tech). The firm has agreed to update the positions that they agree on up until July 2005 since there is such a gap in the back wage calculation. The writer has amended the WH-56 and the remaining employees in question should be notified of their private rights under Sec. 16 (b).

Recommendations-In view of the fact the firm and Wage and Hour cannot agree on 135 of the 157 ees, and the case law in the first circuit is week, it is recommended that these ees be notified of their 16(b) rights. The firm will be forwarding the payroll for the 22 ees that it has agreed to pay.

451. The other record received from the DOL is called a WHISARD (Wage and Hour Investigative Support and Reporting Database) Compliance Action Report. The Compliance Status was given as "Refuse to Comply". The Report indicates that Wyeth admitted to 28 instances of failing to pay their workers overtime due to misclassifying them as exempt. For the 28 violations admitted, the Report indicates that the WHD computed $44,356.00 in back wages owed, but Wyeth only agreed to pay $40,187.00.

452. The Report indicates an additional 129 violations for failing to pay overtime, with back wages owed of $119,375.00. Wyeth refused to comply with these 129 violations. The "Conclusions & Recommendations" section of the Report states:

> 156 hrs: Sec. 7. Firm had many positions erroneously classified as exempt. Firm and Wage and hour agreed on some positions and disagreed on some. Recommend employees that the firm has not agreed to pay be notified of their 16(b) rights.

The Report is dated 9/1/05 and indicates that Wyeth only agreed to pay $40,187.00 out of $163,731.73 owed to their employees.

453. Frank V. McDermott was the Northeast Regional Solicitor for the DOL at the time. In 1974 McDermott published a paper in the Boston College Law Review, titled "The Equal Pay Act of 1963: A Decade of Enforcement." The article is about the enforcement of violations of 29 U.S.C. § 207. In the first paragraph of page 11, McDermott states the following regarding those found in violation of the Act after an investigation but refuse to voluntarily come into compliance

> If compliance cannot be achieved, investigative files suitable for potential litigation will be transmitted to the appropriate regional Office of the Solicitor, United States Department of Labor, for further action.

454. On April 15th, 2021, Plaintiff spoke with former Director Surett on the phone. Surett informed him of a Joint Review Committee where the Regional Solicitor's Office (RSO), headed by McDermott at the time, met with the District Director of the WHD, headed by Surett at the time, to determine whether any case files from a particular investigation should be forwarded from the WHD to the RSO. Surett explained that at the time, the RSO was in the same building as the WHD, separated only by a floor or two. Surett said that during one of these Joint review Committee meetings, and before the WHD had issued their final agency order, McDermott obstructed their attempt to forward the Wyeth case files to his office.

455. Within two months of the Joint Review Committee meeting regarding the Wyeth case, Surett retired as Director of the WHD, and George Rioux became his successor. The Wyeth case files went missing and became unavailable to Rioux. As a result, he was unaware of the WHD's investigation, adjudication, and final agency action taken against Wyeth while Surett was Director.

456. On January 11, 2006, the Mass. AG's Office wrote a letter to Plaintiff informing him that the proper agency to contact in relation to his complaint against Wyeth, was the WHD. The Mass. AG's Office forwarded a copy of the letter to the WHD but did not include a copy of Plaintiff's original complaint.

457. On June 28th, 2021, Plaintiff spoke with former District Director Rioux on the phone. Rioux informed Plaintiff that while he was District Director, it was common practice for

representatives of the WHD and RSO to meet and decide whether case files generated by a WHD investigation should be forwarded to the RSO.

458. During the phone call with Rioux, Plaintiff asked why he did not have access to Plaintiff's original complaints against Wyeth in 2006. Rioux could not explain what happened to Plaintiff's original complaints, or any other files associated with the Wyeth case. Rioux said that he closed the case after receiving no response to his letter.

459. On August 6th, 2021, Plaintiff spoke with McDermott on the phone regarding the Wyeth case. McDermott stated that while he was Regional Solicitor, his office never got involved in a case before the WHD concluded their investigation and forwarded the case files to his office. McDermott said it would be inappropriate for the RSO to influence the WHD's decision to forward their investigation files. He insisted that no meetings took place between representatives of the RSO and WHD to decide whether the WHD should forward the Wyeth case files. McDermott said there was never such a thing as a Joint Review Committee or anything similar. McDermott could not explain why the Wyeth case files were not available to Rioux just weeks after the WHD issued their final order regarding Wyeth's widespread labor violations.

460. On August 31st, 2021, Plaintiff spoke with current WHD District Director, Carlos Matos. Director Matos informed Plaintiff that it is common for the RSO to get involved in WHD cases for the purpose of influencing whether or not case files from investigations are forwarded to their office. Plaintiff asked Matos about the waiver of statute of limitations Wyeth agreed to and Matos believes that file was destroyed.

461. Upon information and belief, McDermott had a relationship with Brack which should have disqualified him from participating in the Wyeth case because Brack was the leader of various schemes at Wyeth to exploit hundreds of young employees by forcing them to work overtime for free in violation of the FLSA. The RSO is ultimately responsible for deciding whether FLSA violations are prosecuted.

462. Brack and McDermott live less than half a mile from each other in a small coastal New Hampshire town. They have both been involved in local politics since at least 2004. The relationship between Brack and McDermott, and McDermott's role in the Wyeth case needs further investigation. McDermott's unqualified denial that meetings occur between the RSO and WHD, similar to the Joint Review Committee described by Surett, contradicts what three consecutive WHD District Directors say is common practice. Two of those District Directors served when McDermott was the Regional Solicitor.

463. During a phone conversation with Surett in August 2021, Surett wondered why Plaintiff was still interested in the Wyeth investigation. He believed Plaintiff had signed a release relating to the case in 2005. Plaintiff never signed any such release and never authorized anyone to sign a release on his behalf.

464. After Lambert and Closson's December 2018 confession that Lambert's representation of Plaintiff was limited in scope, and Closson acted as his lead attorney, Plaintiff filed a grievance against Closson with the New Hampshire Supreme Court Professional Conduct Committee (NHPCC) on July 9, 2019 (Exhibit 88)

465. In the grievance, Plaintiff explained that Closson initially procured control of his legal claims against Wyeth through a contingent fee agreement in March 2005. He explained that the agreement with Closson was never written down, in violation of Rule 1.5 of the New Hampshire Rules of Professional Conduct (NHRPC) and New Hampshire Revised Statute (NHRSA) 508:4-e (I).

466. Plaintiff informed the NHPCC that Lambert filed a complaint on his behalf in USDC Mass. without ever meeting or communicating with him, and without disclosing to the court or Plaintiff that his representation was limited in scope.

467. Plaintiff explained to the NHPCC how Lambert negotiated stipulations with opposing counsel and was Plaintiff's only attorney to appear before the judge on his behalf when it was imperative that the lead attorney ultimately responsible for the case attend.

468. Plaintiff informed the NHPCC that Lambert filed a false certification with the court pursuant to L.R. 16.1(D)(3) claiming that he and Plaintiff conferred about establishing a budget for the cost of conducting the full course, and various alternative courses of litigation. Plaintiff said he never conferred with anyone about a budget for the trial and did not know how his signature got on the certification.

469. Plaintiff informed the NHPCC, that he did not learn a complaint had been filed on his behalf until a month after Lambert and Sheehan filed it. Plaintiff informed them that Closson presented the contingent fee agreement at a very opportune moment while he was reading Lambert and Sheehan's representations to the court that they were Plaintiff's attorneys, and that he relied on their representations regarding their role as Plaintiff's lead attorneys in the case.

470. Plaintiff noted that Closson and Lambert never sought or received informed consent to limit their scope of representation. He also stated that the arrangement was not reasonable because Plaintiff was left without competent legal representation. The arrangement required Closson to violate multiple laws and Rules governing the legal profession. Furthermore, the agreement with Closson conflicted with his interests because he was not eligible to receive attorney's fees statutorily provided by § 216(b). Congress included these fees for victims of labor violations to ensure they have access to competent legal representation.

471. Plaintiff explained to the NHPCC, that a significant reason he settled the case was because of Lambert's unsolicited phone call urging him to settle after he and Judge Saris somehow determined his case lacked merit based on no evidence.

472. On July 12th, 2019, the NHPCC responded to Plaintiff's grievance by stating they would not docket it as a complaint (Exhibit 89). In their decision, the NHPCC asserted that Lambert acted as local counsel for Plaintiff and that it appeared Closson was the lead attorney. The NHPCC also scrutinized Plaintiff's claim that he recently just learned he was a victim of fraud. They implied that Plaintiff should have accessed the case files on PACER and if he did, he would have been alerted to his attorneys' fraudulent conduct earlier.

473. On July 19, 2019, Plaintiff appealed the NHPCC's decision not to docket his grievance as a complaint. (Exhibit 90) In his appeal, he explains that a layman should not be expected to search the PACER database if he didn't know he was harmed. He said he didn't even know the PACER database existed. Plaintiff cited New Hampshire Supreme Court case McKee v. Riordan, 116 N.H. 729 (1976). In that case the Supreme Court stated

> The "discovery rule" for accrual time of the action in malpractice cases finds its justification in the necessary reliance of the layman on the professional in his field and the mystery to the layman of the professional's work. It follows that the client may not recognize negligent professional acts when they occur and should not be expected to.

474. As part of the contingent fee contract with Lambert and Closson, Plaintiff was responsible for costs associated with legal research using subscription services such as PACER. Plaintiff was not aware that PACER existed, but even if he was, he cannot be expected to subscribe to a fee based legal research service which he is already responsible for reimbursing his attorneys for. Plaintiff did obtain a subscription to the service after Lambert suggested it in 2018. The database is very confusing and was designed for those in the legal profession. While researching his case on PACER in 2018, Plaintiff somehow accrued a bill of $350.70 within two months of use. (Exhibit 91)

475. Plaintiff also cited Big League Entertainment, Inc., d/b/a Chunky's Cinema Pub v. Brox Industries, Inc. & a. 149 N.H. 480 (2003). In that case the Supreme Court states

> This is a two-pronged rule requiring both prongs to be satisfied before the statute of limitations begins to run. First, a plaintiff must know or reasonably should have known that it has been injured; and second, a plaintiff must know or reasonably should have known that its injury was proximately caused by conduct of the defendant.

Plaintiff argued that the statute of limitations should be tolled because he never knew and could not reasonably have known that he was harmed by Closson and Lambert's actions. It

wasn't until Lambert informed him that his representation of Plaintiff in the Wyeth case was limited in scope, and that Closson served as the lead attorney, that Plaintiff began investigating whether or not he was harmed. Absent a confession, there was no way for Plaintiff to know that Lambert and Closson breached their contract and fiduciary duties.

476. On August 2, 2019, the NHPCC sent Plaintiff a letter informing him that his appeal had been denied based on the same reasons laid out in their initial decision. (Exhibit 92)

477. The NH Supreme Court ruled in Petition of Burling 139 N.H. 266, 268 (N.H. 1994)

> [T]he task of supervising and disciplining attorneys within this State falls squarely upon the shoulders of this court.

478. In State v. Decker, the New Hampshire Supreme Court ruled in part

> As a separate and coequal branch of government, the judiciary is constitutionally authorized to promulgate its own rules. N.H. CONST. pt. I, art. 37, pt. II, art. 73-a. Attorney conduct rules are self-imposed internal regulations prescribing the standards of conduct for members of the bar. State v. Decker, 138 N.H. 432, 439, 641 A2.d 226, 230 (1994).

479. The contingent fee agreement Plaintiff entered into with Lambert and Closson in March of 2006 included the following terms

> Attorneys may terminate representation of the client for any just reason as permitted or required under the Rules of Professional Conduct or as permitted by the Rules of Court of the State of New Hampshire.

480. The NHPCC is a government entity responsible for interpreting and enforcing the Rules of Professional conduct. Plaintiff's March 2006 contingent fee agreement with Lambert and Closson is void for public policy reasons; Sheehan, Closson, Lambert, and Wyeth knew or should have known their conduct was unlawful and the agreement was void.

481. The NHPCC should have recognized Lambert and Closson violated their obligations under the contingent fee agreement, and in the process engaged in fraudulent and illicit behavior. Instead, they endorsed Lambert and Closson's concealed repudiation of trust. At the time, they had full knowledge of their role in regulating contingent fee agreements, and knew that Plaintiff's contingent fee agreement with Lambert and Closson was governed by the NHPCC's interpretation of Lambert and Closson's obligations to Plaintiff under the contract.

482. Multiple reasons support the conclusion that Lambert, Sheehan, and Closson acted under the color of New Hampshire's state laws and customs as interpreted and enforced by the New Hampshire Supreme Court. Pursuant to NH RSA 508:4-e (I), all contingent fee contracts with attorneys are governed by Rule 1.5 of the New Hampshire Rules of Professional Conduct. The Court also determines who can practice law, and Plaintiff's options for legal representation were limited to their choice. In passing the FLSA, Congress recognized that victims of wage

theft and retaliatory conduct are usually in rough shape financially, their effort to ensure these victims have access to attorneys through contingent fee contracts are limited by the Supreme Court's opinion on who can practice law, as well as their interpretation of contingent fee contracts.

483. As we saw in State v. Decker, Id. the regulations governing a private victim's ability to contract for services to petition his government for redress are "self-imposed internal regulations prescribing the standards of conduct for members of the bar." Plaintiff's contract with Lambert and Closson specifically stated it was governed by the New Hampshire "Rules of Professional Conduct, or the Rules of Court of the State of New Hampshire".

484. It is doubtful that the conduct of Sheehan, Closson, and Lambert would have occurred without the expectation that the NHPCC would not punish them but endorse their behavior instead. It is inconceivable that men would set about doing what these officers of the court did to Plaintiff unless they believed they were protected from the state. Indeed, Plaintiff's contract with Lambert and Closson for legal services relied heavily on rules promulgated by the Supreme Court and enforced by the NHPCC. The endorsement of Lambert, Sheehan's, and Closson's illegal and fraudulent conduct by the NHPCC, twice, support the conclusion that Plaintiff's attorneys were acting under the color of law to deprive Plaintiff of various constitutional rights, such as his right to petition the government for redress under the First Amendment of the U.S. Constitution.

## Claim I Civil RICO in Violation of 18 U.S.C. § 1962 (a)

Plaintiff brings this claim against Pfizer (as successor to Wyeth), for violations of the Federal RICO statute and predicate acts of; 18 USC § 1343 wire fraud, 18 USC § 1341 mail fraud, 18 USC § 1503 obstruction of justice, 18 USC § 1510 obstruction of a criminal investigation, 18 USC § 1512 witness tampering, 18 USC § 1513 retaliating against a witness, 18 USC § 1589 forced labor, 18 USC § 1590 trafficking related to forced labor, 18 USC § 2314 transportation of stolen goods, 18 USC § 2315 receipt of stolen goods, 18 USC § 1951 extortion, and attempted extortion in violation of M.G.L. Ch. 265 § 25.

485. Pursuant to 18 U.S.C. § 1962 (a)

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

## Introduction

486. Plaintiff incorporates the entire complaint into this Claim I for the defendant's violation of 18 U.S.C. § 1962 (a).

487. In 2003, there was a tight labor market for workers with the technical skills necessary for success in a manufacturing environment in the biotechnology industry. Many biotechnology companies in the greater Boston region solved their staffing issues by recruiting the right candidates and investing in them through training. These companies risked losing their investment in training employees who would not start earning money for them until after several months on the job.

488. Wyeth took a different approach. They formed a business partnership with Brack whereby he would assemble a team of associates and operate their Andover, MA, HR department through a pattern of racketeering activity with at least three specific goals in mind: preventing the formation of a collective bargaining unit in Andover; reducing labor costs by eliminating overtime compensation; and reducing training costs by recruiting recent college graduates who specialized in science.

489. Brack and Wyeth used a multifaceted approach. From 2003 at the latest, until 2008 at the earliest, Brack led a group of associates-in-fact within Wyeth's HR department, and together they engaged in a pattern of racketeering activity in furtherance of various schemes to defraud the NLRB, Plaintiff, and hundreds of other employees.

490. For the purposes of Claim I, and until further discovery enables an honest inclusion of others, Brack and his associates; Lewandowski, and Cowdrick, formed an enterprise as defined in 18 USC § 1961(4). This enterprise will be referred to as Brack's enterprise for Claim I only. The fraudulent and illegal actions of Cowdrick and Lewandowski as described in this claim were done at the direction of Brack and in their capacity as associates within Brack's enterprise.

491. Wyeth also knowingly engaged in the racketeering activity through employees such as Bonnie Schwamb, Tonia Socha, Kevin Hanley, and attorney Ken O'Brien. Other senior members of Wyeth management who either participated directly in the racketeering activity or knowingly ratified it include Eileen Blazek, Hubert Scoble, Christopher Perley, Michael Kamarck, and Charles Portwood.

492. For the purposes of Claim I, Wyeth was a person who received income derived directly and indirectly from a pattern of racketeering activity which they participated in as principals. Wyeth used the financial gains derived from racketeering activity to fund and expand the operation of Brack's enterprise, which generated income for Wyeth through racketeering activity in furtherance of various schemes to defraud.

493. Brack's enterprise affected interstate commerce in many ways. For example, they recruited employees from outside of Massachusetts to work in their Andover, MA facility. Brack and

Lewandowski lived in New Hampshire during all times relevant to this complaint, and they either traveled to Massachusetts to work or worked from home using interstate wires and the federal mail system.

494. Cowdrick lived in Massachusetts during all times relevant to this complaint. Her role as an HR Consultant in coaching and mentoring the Wyeth management team, providing guidance on policy interpretation, leading headcount management activities, and approving EANs sufficiently affected interstate commerce for the purposes of Claim I. (Exhibit 15)

495. Within the biotechnology industry, there was virtually unanimous agreement that most manufacturing positions only required a high school diploma or GED to be successful. A bachelor's degree was not only unnecessary, but many employers believed college graduates were poor candidates for the positions because of the factory-like working conditions and minimal opportunity to use the knowledge acquired while attaining their degree. As one HR executive put it "New college grads often don't want to work in this type of environment, since it is physical work." Another opined "Many graduates aren't looking to finish their senior year in college and walk into a plant". (See Exhibit 1)

496. In the same article quoting various HR managers, Brack is quoted as saying that Wyeth had to hire about 200 manufacturing workers and "That's a lot of people, which is why you have to get creative about how you're going to find these folks." Brack and Wyeth did get creative in their recruitment of manufacturing technicians.

497. Brack understood that recent college graduates were not interested in hourly positions in a production facility that consisted primarily of manual labor. He knew that college graduates preferred working in positions with higher levels of responsibility and opportunities to use independent discretion and judgment. He also knew that these positions usually qualified for a professional exemption pursuant to § 213(a)(1) of the FLSA. Brack knew that the manufacturing positions Wyeth was trying to fill did not qualify for any exemptions available under the FLSA.

498. Brack and Wyeth got creative by recruiting employees with positions that were intentionally misrepresented as requiring a bachelor's degree and qualifying for a professional exemption under the FLSA. The advantages of this scheme were many, and furthered Wyeth's goals of preventing the formation of a union and decreasing the costs of labor and training.

## Defrauding the National Labor Relations Board By Misclassifying Employees

499. At first glance, the benefits of misclassifying employees as exempt from overtime seem obvious. Benefitting from thousands of hours of free overtime labor per week is good for the bottom line.

500. However, misclassifying employees as exempt professionals was also beneficial in other ways. Through a combination of other unlawful tactics, it was virtually impossible for their employees to successfully engage in concerted action as defined by 29 USC § 157.

501. At the time Plaintiff was recruited and hired by Wyeth, they were in a bitter fight against the formation of a union in their EVM department. About 70 employees were petitioning the NLRB to certify a proposed collective bargaining unit. A hearing was set for May 19th, and Wyeth management appeared before the NLRB and objected to the composition of the proposed bargaining unit.

502. By itself, there is nothing wrong with Wyeth appearing before a tribunal and objecting to the proposals of a union trying to establish a collective bargaining unit within their Company. However, in anticipation of the hearing, Wyeth engaged in pervasive and egregious unfair labor practices that included the intentional manipulation and misrepresentation of various material terms and conditions of their employees' positions. Wyeth knew the terms and conditions of employment they intentionally manipulated are relied on by the NLRB to perform their government function pursuant to 29 USC § 159(b) in identifying appropriate shared communities of interests eligible for certification as a collective bargaining unit.

503. The classification of employees as either exempt professionals, or non-exempt hourly workers, substantially affects the employees' ability to engage in collective action with a shared community of interests. Pursuant to § 159(b), the NLRB cannot certify a collective bargaining unit that includes both exempt professionals, and non-exempt hourly employees, without forcing the professional employees to engage in additional burdensome steps. Through unlawful means, Wyeth ensured that these additional steps were nearly impossible to accomplish.

504. Misclassifying employees as exempt professionals was only one of several terms of employment that Wyeth intentionally manipulated and misrepresented in order to impede the ability of the NLRB to perform their governmental function. Wyeth also manipulated job titles, job descriptions, work department, and supervisor status of their employees for the purpose of restraining their employees' ability to engage in concerted action. Wyeth intended to and did unlawfully obstruct the NLRB's ability to function.

505. Wyeth's actions were different than common unfair labor practices employers use to prevent the formation of a union. Wyeth manipulated and misrepresented terms of employment relevant to the certification of a collective bargaining unit with the intention of appearing before the NLRB and arguing their position based on facts they intentionally manipulated. Wyeth knew the information they provided at the certification hearing did not reflect the lawful reality needed by the NLRB to function properly, yet they presented the information as though it were a lawful reality, and the NLRB accepted the information as true.

506. The situation is similar to the conspiracy in Dennis v. United States, 384 U.S. 855, 862 (1966), where Justice Fortas stated

> But the essence of their alleged conduct was not merely the individual filing of false affidavits. It was also the alleged concert of action — the common decision and common activity for a common purpose. The conspiracy was not peripheral or incidental. It lay at the core of the alleged offense. It is the entire conspiracy, and not merely the filing of false affidavits, which is the gravamen of the charge. This conspiratorial program included, as prime factors, not only those who themselves filed the false statements, but others who were equally interested in the conspiratorial purpose and who were directly and culpably involved in the alleged scheme.

507. As in Dennis Id., Wyeth's conspiracy to defraud the NLRB in violation of 18 USC § 371, did not hinge on whether false statements were uttered during the certification hearing. The entire conspiracy to impair, obstruct, and defeat the lawful function of the NLRB lays at the core of the offense. Each of the defendant's listed in this cause of action were equally interested in the conspiratorial purpose and were directly and culpably involved in the scheme.

## Additional Unlawful Labor Practices Used to Defraud the NLRB and Others

508. It was previously mentioned that Wyeth and Brack's enterprise strategically mixed exempt professionals with non-exempt hourly employees for the purpose of impairing the employees' ability to engage in concerted activities. Pursuant to 29 USC § 159(b) the NLRB could not certify a collective bargaining unit that included both professional exempt employees and non-exempt hourly employees without forcing the professional employees to engage in further burdensome steps.

509. Wyeth and Brack's enterprise implemented strategies to prevent professional employees from successfully completing the additional steps required for certification of a bargaining unit that consisted of mixed non-exempt employees and exempt professionals.

510. For example, the lab unit Plaintiff worked in consisted of three exempt professionals with the title of DSS Technologist, and one non-exempt employee with the title of Glass Washer. One of the DSS Technologists, the "team leader", assigned everyone else their production tasks for the day, usually by posting a sheet in the lab in the morning. He spent the rest of the day in an office larger than the supervisor's. He constantly created memos that were disciplinary in nature and management relied on these memos without question. It was made clear by HR and management that Walsh's instructions were to be followed, and any hesitancy to do so was considered insubordination.

511. Plaintiff and Coworker B (the other exempt production worker) formed a bond over their concerns about certain practices by Wyeth management that seemed unfair, such as forcing them to work 10-20 hours a week in overtime without compensation, while allowing Coworker A (the non-exempt employee without a college education) to go home after eight hours every day.

512. Around April 2, 2004, when Plaintiff informed Coworker B that he was meeting with Como the following Monday regarding the misclassification of their position, Coworker B asked Plaintiff if she could also attend the meeting. Due to concerns about both of them drawing the ire of management, it was agreed that Plaintiff would attend the meeting alone but communicate to their supervisor on Coworker B's behalf that she shared his concerns.

513. Whenever Plaintiff met with a representative of Wyeth regarding the misclassification of his position, he informed the representative that Coworker B had the same concerns. When Plaintiff met with Lewandowski, he shared Coworker B's concerns as well as his own. After meeting with Lewandowski, Plaintiff paused his concerted activity because she promised to investigate their concerns about the misclassification of the DSS Technologist position.

514. The evidence clearly demonstrates that Lewandowski had no intention of investigating whether the DSS Technologist was misclassified as exempt. Through deception, she lulled Plaintiff into a false sense of security while working behind the scenes to rid Wyeth of his presence.

515. In the meantime, during Lewandowski's sham investigation, a worker from a different production lab was transferred into Plaintiff's lab; we will call her Coworker C. This worker was classified as exempt, and informed Plaintiff about regular meetings she had with an Assistant Vice President of Wyeth, named Brian Harrison. At these lunch appointments, Harrison and Coworker C would discuss the "employee climate" in the areas Coworker C worked in.

516. The transfer of Coworker C into the laboratory was in direct response to Plaintiff's concerted activity with Coworker B. At this point, if Plaintiff and Coworker B wanted to engage in concerted activity together, they would have to hold a vote. Coworker C would be eligible to vote and was a reliable "no".

517. The team leader of the lab, Walsh, shared no community of interest whatsoever with Plaintiff and Coworker B. He should have been excluded from a collective bargaining unit because supervisors are not "employees" pursuant to 29 USC § 152(3). However, Wyeth intentionally misrepresented his status as a supervisor, and he was therefore eligible for inclusion in a collective bargaining unit with Plaintiff and Coworker B. As a result, a majority vote in favor of collective bargaining was shrewdly prevented by Wyeth through unlawful means.

518. On the other hand, Coworker A did share a community of interest with Plaintiff and Coworker B, but she was not eligible for inclusion in a collective bargaining unit with them because she was classified as non-exempt.

519. Coworker A received special treatment from Wyeth. She usually only worked forty hours a week, was assigned the most preferable tasks in the lab, and received compensation if she did work overtime.

520. Coworker A's uncle started working in the maintenance department for Wyeth's predecessor start-up, Genetics Institute from the beginning. Coworker A's uncle worked in the same EVM department that was trying to form a collective bargaining unit. Both Coworker A, and her uncle were reliable "no" votes on unionizing.

521. Although Coworker A worked alongside Plaintiff in a production lab for the DPO department, her employee records indicated she worked as a Glass Washer in the EVM department and Wyeth argued for her inclusion in the proposed bargaining unit before the NLRB. In fact, in mid-May of 2004, around the same time the EVM petition certification hearing was scheduled, Coworker A was transferred out of the laboratory for a short time and returned to the laboratory after the EVM employees withdrew their petition in the face of Wyeth's disingenuous objections.

522. We have learned about some of the tactics Wyeth and Brack's enterprise used in anticipation of appearing before the NLRB and providing them an unlawful false reality in place of the lawful true reality they needed to perform their government function.

523. This is a single basic example of pervasive tactics within Wyeth's Andover facility that were meant to restrain the ability of their employees to exercise their rights under 29 USC § 157. These tactics were done with an eye towards appearing before the NLRB and deceiving them with information they intentionally misrepresented. However, Wyeth engaged in other unfair labor practices that inflicted severe harm on their victims that was clearly foreseeable.

## The Cruel Roles of Lewandowski and Cowdrick

524. Wyeth and Brack knew that the systematic fraudulent inducement of hundreds of recruits for positions that were intentionally misrepresented would eventually lead to some friction, particularly within a victim's first weeks of employment. This was where Brack's associates, Lewandowski and Cowdrick got involved. The end result was a cruel but effective method of quickly differentiating between recruits who were easily victimized and willing to waive their rights under the FLSA, and those that were not.

525. In order for Wyeth and Brack to succeed at this stage of the scheme, certain well-established Company policies such as their Disciplinary Action policy and Assurance of Fair Treatment

(AFT) policy were disregarded. Corporate executives implemented these policies and expected every employee and member of management to follow them to ensure Wyeth maintained compliance with government regulations meant to protect vulnerable employees from illegal and exploitive practices. As consultants working at the direction of Brack, Lewandowski and Cowdrick usurped sensitive roles reserved for high level management in their Disciplinary Action and AFT policies.

526. For example, when Plaintiff met with his supervisor, Como, to express his concerns about the misclassification of his position as exempt from overtime, she was completely unaware about a duties requirement for classifying a position as exempt from the overtime requirements of the FLSA. She told Plaintiff she would consult with HR and get back to him. Pursuant to Wyeth's AFT policy, Como should have consulted with the location head of HR, Chris Perley, regarding Plaintiff's concerns. Instead, she was directed to consult with Cowdrick and Lewandowski, who intentionally provided her with false information about Plaintiff's obligation to work overtime for free regardless of his actual duties.

527. Weeks later, after Plaintiff appealed the counseling through multiple layers of management pursuant to the AFT policy, he was fraudulently induced into engaging Lewandowski's services as his advocate who would maintain strict confidentiality of their communications and serve as a neutral source of information. Plaintiff wasn't aware that Como had already consulted Lewandowski and was advised by her to issue the verbal counseling.

528. When Plaintiff met with Lewandowski on April 23, 2004, she claimed that neither she nor anyone else at the Andover location were qualified or authorized to determine if a position met the requirements for an exemption under the FLSA. She then proceeded to conduct a sham investigation, and with the help of corporate compensation executives at Wyeth's headquarters in Collegeville, PA, surreptitiously created a new job description that would seem like it met the requirements for an exempt position.

529. The initial usurpation of a sensitive HR function by Brack's enterprise occurred when Cowdrick approved of the EAN related to the creation of a new position and its classification of exempt pursuant to the FLSA. The function of approving the creation of new positions and classifying them as exempt was reserved for high-level management, not a self-interested consultant without the qualifications to approve an exempt classification. Cowdrick did not even have a job description at the time she made the exempt determination and approved of the EAN.

530. The next usurpation of a sensitive HR function by Brack's enterprise occurred when Como consulted with Lewandowski and Cowdrick for advice on Plaintiff's concerns about the misclassification of his position. Como should have met with Perley, not an unqualified self-interested consultant.

531. The next usurpation of a sensitive HR function by Brack's enterprise occurred when Plaintiff was appealing the verbal counseling he received at Lewandowski's direction. He was badgered by three levels of management, and Lewandowski herself, to forgo the AFT process which provided him an opportunity to meet with successively higher levels of management. Eventually, Hanley convinced him to meet with Lewandowski, and Plaintiff was enticed by the promise of a confidential relationship with a person who would advocate on his behalf and serve as a neutral source of information.

532. Plaintiff never should have met with Lewandowski; he should have continued to appeal the exempt classification through successively higher levels of management. Lewandowski and Wyeth were actually violating 29 USC § 158(a)(2), by forming and dominating the administration of a labor organization, which Lewandowski was a representative of. Neither Wyeth nor Lewandowski intended to fulfill the promises they offered Plaintiff to entice him to meet with her instead of sticking with the AFT process.

533. As Plaintiff's fiduciary, Lewandowski had a duty to inform him that she participated in creating the verbal counseling he was appealing. Which leads us back to her fraudulent and criminal responsibilities in the scheme Wyeth and Brack used to quickly and cruelly rid them of burdensome employees who refused to waive their rights under the FLSA.

534. When Como went to Lewandowski and Cowdrick for advice on handling Plaintiff's concerns regarding the misclassification of his position, they intentionally misled her into believing that Plaintiff was obligated to work overtime for free, and his refusal to do so was "aggressive, unprofessional, and uncollaborative", and if he continued to behave in such manner, he would be disciplined and eventually terminated.

535. Yet, about a week later, she informed Plaintiff that she was unsure whether his position qualified for an exemption, and nobody at the Andover facility could determine whether his position was properly classified as exempt. Lewandowski and Cowdrick engaged in a process that took several weeks and involved multiple meetings in order to conclude that he was properly classified as exempt.

536. The process that Lewandowski and Cowdrick engaged in was a sham investigation while they created a new fraudulent job description for the DSS Technologist position. However, what is important to realize here, is that Lewandowski had previously directed Como to issue a scathing verbal counseling that was entirely based on the false premise that Plaintiff was obligated to work overtime for free.

537. If Lewandowski was truly unaware of the requirements for classifying a position as exempt under the FLSA, and needed several weeks to investigate and determine that he was properly classified, why would she direct Como to issue such a damaging and threatening verbal counseling that was entirely dependent on something she was unknowledgeable about? Furthermore, if Lewandowski was unknowledgeable about the exempt issue, why were Como

and Plaintiff coerced into consulting her instead of adhering to the AFT policy and consulting with the location head of HR?

538. The reason Lewandowski advised Como to issue the verbal counseling is sinister. The system that Brack and Wyeth developed to quickly rid them of employees who refused to waive their rights under the FLSA, also involved the manipulation and misrepresentation of facts in preparation of appearing before a tribunal and obstructing their ability to find the truth. The genius of the shrewd scheme lay in the avoidance of initial liability by couching false, uncorroborated, defamatory, and threatening language in a "verbal counseling", not a formal discipline.

539. Even though the verbal counseling was in retaliation of Plaintiff asserting his rights under the FLSA, it did not rise to the level of an adverse employment action, and therefore Plaintiff had no legal claim. Management and Lewandowski's repeated assurances that a verbal counseling was informational only and not considered discipline was backed up by their written Disciplinary Action policy.

540. Furthermore, although Plaintiff was duped into accepting a position that was intentionally misrepresented, he was aware that Wyeth reserved the right to change the terms and conditions of his employment, and therefore, he had no cause of action for fraudulent misrepresentation; yet.

541. Probably the most perverse part of Wyeth and Brack's scheme to quickly rid them of employees who refused to waive their right to overtime compensation was that serious friction between a recruit and their supervisor was inevitable during the first weeks of employment if the recruit had even a basic understanding of labor laws. A recruit who was aware of the requirements for classifying a position as exempt under the FLSA would arrive at Wyeth on his first day, innocently expecting to benefit from all of the perks associated with an exempt position. This friction was intentional or at least a foreseeable result of intentionally misrepresenting the position as qualifying for a professional exemption, and deceiving supervisors into believing that positions are correctly classified as exempt if employees are paid a salary, regardless of their duties.

542. Part of Wyeth's scheme was to exploit this initial friction they and Brack's enterprise intentionally created and use it as a pretext to retaliate against the unsuspecting recruit. As previously mentioned, this was all done in preparation of appearing before a tribunal and deceiving them, and that is exactly what Wyeth did in their answer to the complaint that Lambert and Sheehan filed.

543. In paragraph 14 of Wyeth's answer, they assert that Plaintiff was "reprimanded" multiple times for insubordination, an unprofessional communication style, and an inability to complete assigned tasks. The words used by Fitzhugh and Wyeth in their pleading are very inflammatory. Although vague, there is a certain element of conviction that gives them

credibility. Unless one scratches the surface and realizes that Wyeth and Brack created a workforce with supervisors that were intentionally led to believe the ridiculous notion that employees were obligated to work overtime for free regardless of their actual duties; and they recruited employees by fraudulently misrepresenting positions, creating a certainty that recruits who had a basic understanding of the FLSA would be subject to unfair scorn and ridicule based on their innocent assumption that Wyeth conducted their business through good faith and fair dealing and in accordance with the law.

544. In Plaintiff's case, friction arose early, his supervisor was not happy when Plaintiff asked for a copy of the job description for a DSS Technologist because he believed it was misrepresented as requiring a bachelor's degree. In addition, friction arose based on issues such as denying Plaintiff access to the user's manual for the machine he operated all day or rebuffing his attempts at creating an efficient delivery system. Plaintiff's supervisor and team leader believed an exempt position simply meant that he was paid a salary, while Plaintiff believed an exempt position was related to his duties and level of responsibility.

545. In wrapping up this section on the primary roles Lewandowski and Cowdrick served in callously enticing unsuspecting young professionals into an extremely abusive situation that compelled them to work overtime for free without complaint or be subject to severe harm; we examine Lewandowski's usurpation of Wyeth management's responsibility for ensuring the fair and uniform administration of discipline according to the Disciplinary Action policy.

546. After Plaintiff met with Lewandowski on April 21, 2004, she promised him many things which we now know was just part of the whole fraudulent operation conducted by business partners Wyeth and Brack. On April 23rd, 2004, Lewandowski called a meeting between herself, Plaintiff, and Como; ostensibly for the purpose of explaining her efforts to investigate his concerns about the misclassification of his position. At first blush, the meeting seemed to have no useful purpose. However, Lewandowksi did have a purpose, and consistent with her modus operandi, her intentions were evil.

547. After the April 23rd meeting with Lewandowski and Como, a few days passed, and Plaintiff was concerned about being forgotten. On April 26, 2004, he sent Lewandowski an email explaining again why he believed he was misclassified, and he attached the same WHD Fair Pay Factsheet that he sent to Como previously. The next day, Lewandowski issued Plaintiff his first reprimand at Wyeth, and it was a doozy. She accused him of being insubordinate to her and Como during the April 23rd meeting by calling them both incompetent. The truth is that Plaintiff did no such thing, and the words Lewandowski accused him of using during the April 23rd meeting were actually used during his April 21st meeting with her which she was supposed to keep confidential.

548. Lewandowski might have had multiple nefarious reasons for calling the April 23rd meeting, but Plaintiff asserts that the primary reason was to set him up for a fraudulent discipline which she expected his supervisor, Como, to endorse. Thankfully, Como had integrity and refused to

participate in the fraudulent scheme. Although she was present for the entire meeting Lewandowski based the discipline on, and it was her responsibility to discipline employees under her direct jurisdiction, she did not endorse Lewandowski's accusations whatsoever.

549. Como was eventually forced to resign for not cooperating with Wyeth and Brack's various fraudulent schemes, but not before Lewandowski and Cowdrick directed her to create a new job description for the DSS Technologist position that seemed like it would qualify for a professional exemption under the FLSA.

550. Files that Plaintiff received in December 2018 show Lewandowski and Cowdrick in the act of using interstate wires to create a fraudulent job description in furtherance of various schemes to defraud Plaintiff and others. They were assisted by Eileen Blazek, a corporate compensation expert located at Wyeth's headquarters in Pennsylvania. Lewandowski and Cowdrick intended to use the new job description as a substitute for the investigation into Plaintiff's duties which Lewandowski previously promised. Multiple emails between Lewandowski, Cowdrick, and Blazek went back-and-forth from Massachusetts and Pennsylvania in furtherance of their scheme.

551. The job description that Cowdrick and Lewandowski worked on was fraudulent because it was not intended to accurately reflect the true educational requirements or the primary duties of the DSS Technologist position. Plaintiff's supervisor, Como, once again demonstrated her integrity by refusing to endorse the description by signing it.

552. But Como would soon be on her way out for refusing to cooperate with the fraudulent schemes of Wyeth and Brack. Galina Szakacs, Como's replacement as Plaintiff's supervisor was one of the persons Lewandowski and Cowdrick wished to deceive with the new job description. Szakacs had no problem doing the dishonest dirty work that Como refused to do. She had difficulty empathizing with Plaintiff's situation, and could not understand why he did not just quit if he was unhappy with the way Wyeth did business.

553. When Plaintiff realized he was duped into a position that was misrepresented, he could not just up and quit for several reasons: he had student loans of about $40,000 (a burden not shared by hourly employees with a high school diploma), and a default would cost thousands more; after being hired, he entered a long term lease for an apartment with substantially higher rent and utility costs; he was only at his previous position for about a year and was concerned that such a short stint at a company immediately after a relatively short stint in his previous position would have negative repercussions on his employability; and he genuinely believed he could work things out at Wyeth and make valuable contributions to the Company and society once a responsible person became aware of his situation.

554. It is doubtful the reasons that prevented Plaintiff from quitting Wyeth soon after learning his position was misrepresented are unique only to him. Wyeth knew for at least eight months that they might be the subject of an investigation based on Plaintiff's complaint. After eight

long months, they still had 150 employees who were misclassified. How many victims of Wyeth were in a similar position as Plaintiff and could not just up and quit but had to withstand a long and arduous campaign of harassment and character assassination before enough false and abusive allegations were created to terminate the employee under pretextual reasons that could survive scrutiny in a legal proceeding?

Conclusion of RICO Claim I

555. Wyeth formed a business partnership with Brack's enterprise for the purpose of operating their HR functions in Andover through a pattern of racketeering activity that involved various schemes to defraud the NLRB, Plaintiff, and hundreds of other young professionals.

556. Wyeth benefited financially from the racketeering activity which they participated in directly and indirectly. Some of the financial gains acquired through the racketeering activity were used to maintain and expand the operation of Brack's enterprise.

557. Most of the predicate acts committed by Wyeth and Brack's enterprise consist of mail fraud and wire fraud in violation of 18 USC §§ 1341, and 1343 respectively. However, Wyeth also induced Plaintiff and others to engage in interstate travel for the purpose of defrauding them in violation of 18 U.S. Code § 2314. They also threatened Plaintiff with severe harm in an attempt to extort him in violation of M.G.L. Ch. 265 § 25.

558. Through severe harm and threatening severe harm, Brack's enterprise and Wyeth attempted to and did benefit from labor and services they were not entitled to in violation of 18 USC § 1589. When Plaintiff filed complaints with law enforcement, and Wyeth and Brack's enterprise became aware of an impending investigation, they retaliated against him in violation of 18 U.S. Code § 1513(e).

559. Wyeth and Brack's enterprise had a duty to provide Plaintiff with a complete personnel file upon his termination. In anticipation of future legal proceedings, Wyeth and Brack's enterprise concealed evidence that conclusively implicated them in the fraudulent schemes described in this claim. The unlawful concealment of Plaintiff's personnel records was in violation of 18 U.S. Code § 1512(c).

560. It is worth noting that while the defendants were engaged in the widespread exploitation of young and vulnerable recent graduates, who spent tens of thousands of dollars engaging in a prolonged course of rigorous advanced instruction and studies focused on science, many of our best and brightest were overseas fighting for freedom in two different wars or ensuring civilians in this country and across the world were safe from heinous terrorist attacks. This is relevant because Congress passed a law which tolls the statute of limitations under such circumstances and Plaintiff believes the Wartime Suspension of Limitations Act is applicable under Claim I and any other claim he asserts that involves a conspiracy to defraud the U.S. Government.

561. The scheme to defraud the NLRB, Plaintiff, and others continued for years after Plaintiff was terminated. Much of the racketeering activity and other malfeasance was committed in fraudulently concealing their various schemes, further retaliating against Plaintiff, and ensuring the victims, which number at the very least over 150, did not receive justice. The various schemes involved conspiracies to defraud the DOL, the Mass. AG, and the USDC Mass. Whether the racketeering activity was carried out by Brack's enterprise, by Wyeth, by a different enterprise in cooperation with Wyeth and Brack's enterprise or some other combination, the defendants all had the same goals and they all engaged in a pattern of racketeering activity.

562. We will stop here and list the predicate acts of racketeering activity which Brack, Lewandowski, Cowdrick, and Wyeth engaged in thus far.

## Predicate Acts Which Helped Fund the Operation of Brack's Enterprise

563. Predicate Act One: Wire Fraud in violation of 18 USC § 1343

a. On February 3rd, 2004, Wyeth recruiter Bonnie Schwamb responded to Plaintiff's inquiry for the position of Solution Chemistry Technologist which was advertised on MonsterJobs.com. Schwamb phoned Plaintiff from Andover, MA to his home in Portsmouth, NH, and encouraged him to apply for the position of DSS Technologist instead.
b. Brack's enterprise conspired with Wyeth to create the position of DSS Technologist with the purpose of finding employees willing to waive their rights under the FLSA, thereby creating a workplace where it was virtually impossible for their employees to engage in concerted action. A crucial aspect of the scheme to defraud the NLRB involved appearing at a certification hearing and objecting to the composition of a unit proposed by employees within their EVM department based on the factors they intentionally misrepresented. This had the effect of defeating the Board's ability to identify an appropriate community of interest that was certifiable pursuant to 29 USC § 159(b).

564. Predicate Act Two: Wire Fraud in violation of 18 USC § 1343

a. After speaking with Plaintiff on the phone, on February 3rd, 2004, Schwamb emailed him a job description which she represented as belonging to the position of DSS Technologist. The description actually belonged to the position of GMP Solution Chemistry Technologist. No job description for a DSS Technologist existed at Wyeth at the time.

b. The manipulation of job titles, job descriptions, educational requirements, and exempt classification was done under Brack's leadership with Wyeth's approval, in furtherance

of their scheme to defraud Plaintiff, the NLRB, and many others. Schwamb's email was sent through interstate wires from Massachusetts to New Hampshire.

565. Predicate Act Three: Mail Fraud in violation of 18 USC § 1341

a. On February 5th, 2004, Wyeth used the federal mail service to send Plaintiff an application for employment as a DSS Technologist. The position was made up at the local Andover facility in furtherance of various schemes to defraud the NLRB, Plaintiff, and others. It was intentionally misrepresented as requiring a bachelor's degree and qualifying for a professional exemption pursuant to 29 USC § 213(a)(1).

566. Predicate Act Four: Mail Fraud in violation of 18 USC § 1341

a. On February 5th, Plaintiff used the federal mail service to send Wyeth a filled-out application for employment as a DSS Technologist back to Wyeth. The actions of Brack's enterprise and Wyeth caused Plaintiff's use of the federal mail service in furtherance of various schemes to defraud.

567. Predicate Act Five: Inducement of interstate travel in violation of 18 USC § 2314

a. Between February 5th and March 3rd, 2004, Plaintiff traveled from New Hampshire to Massachusetts to interview for the position of DSS Technologist. Said position was created by Brack's enterprise and Wyeth in furtherance of various schemes to defraud the NLRB, Plaintiff, and others. If successful, Wyeth would benefit financially by stealing overtime wages from Plaintiff worth over $5000.00.

568. Predicate Act Six: Wire fraud in violation of 18 USC § 1341

a. On March 4th, 2004, Wyeth phoned Plaintiff from Massachusetts to his home in New Hampshire and offered him employment in the position of DSS Technologist. The position was misrepresented as requiring a bachelor's degree and qualifying for a professional exemption pursuant to 29 USC § 213(a)(1), in furtherance of their scheme to defraud the NLRB, Plaintiff, and others.

569. Predicate Act Seven: Mail Fraud in violation of 18 USC § 1341

a. On March 4th, 2004, after speaking with him on the phone, Wyeth mailed Plaintiff an Employment Offer Letter for the position of DSS Technologist. At the time, Wyeth knew that the position did not require a bachelor's degree or qualify for an exemption under the FLSA, but they intentionally misrepresented it in furtherance of their scheme to defraud the NLRB, Plaintiff, and others.

570. Predicate Act Eight: Mail Fraud in violation of 18 USC § 1341

a. On March 4th, 2004, Plaintiff mailed Wyeth a filled-out Employment Offer Form for the position of DSS Technologist. The position was intentionally misrepresented as requiring a bachelor's degree and qualifying for a professional exemption under the FLSA. The actions of Brack's enterprise and Wyeth caused the use of the federal mail system in furtherance of their scheme to defraud the NLRB, Plaintiff, and others.

571. Predicate Act Nine: Attempted extortion in violation of M.G.L. Ch. 265 § 25

a. After Plaintiff complained to his supervisor, Como, that he was misclassified as exempt, she consulted Lewandowski and Cowdrick for guidance. Cowdrick and Lewandowski were experts in matters related to Human Resources and knew that Plaintiff's position only required a high school diploma. They possessed an overwhelming amount of evidence demonstrating Plaintiff was misclassified as exempt and not obligated to work overtime for free. More importantly, they possessed no evidence to support a classification of his position as exempt. They also knew that Plaintiff had worked over twenty hours of overtime when Como consulted them, and that Wyeth owed Plaintiff at least $600 in back wages.

b. Nevertheless, Lewandowski and Cowdrick maliciously directed Plaintiff's supervisor to issue him a written verbal counseling that characterized his attempt to assert his rights under the FLSA as "aggressive, unprofessional, and uncollaborative" and threatened to discipline and/or terminate his employment if he continued to assert his rights. The actions of Lewandowski and Cowdrick constituted attempted extortion and was prosecutable under the laws of the Commonwealth of Massachusetts.

572. Predicate Act Ten: Forced Labor in violation of 18 USC § 1589

a. The April 12th verbal counseling Plaintiff received at the direction of Lewandowski and Cowdrick was in furtherance of a scheme to benefit from free labor and services by means of severe harm and threats of severe harm, as well as the threatened abuse and actual abuse of law and legal process.

b. As a result of the verbal counseling, Plaintiff believed he would be terminated from Wyeth unless he waived his rights under the FLSA. As time went on and he continued to resist waiving his rights, Lewandowski and Wyeth escalated the harm and threats of harm to Plaintiff. He continued to be the subject of harassment and false accusations. Wyeth eventually terminated Plaintiff, but the harm continued. Over a year after Wyeth terminated Plaintiff, they were still monitoring his job search activities on MonsterJobs.com and would print out his resume whenever he made a new one.

c. Eventually, Wyeth decided to abuse the legal system and use Plaintiff as an example of the severe harm their other employees would suffer if they refused to work overtime for

free. They colluded with attorneys to unlawfully gain control over Plaintiff's claims against them. Then they conspired to file an action in USDC Mass. on Plaintiff's behalf without authorization. They conspired to use the trust Plaintiff placed in attorney Closson to deceive Plaintiff into believing that his and his co-conspirator attorneys' actions were appropriate and in his best interest. In reality, Plaintiff was being set up for libel through Wyeth's court pleadings which severely harmed his personal reputation and professional career.

573. Predicate Act Eleven: Wire fraud in violation of 18 USC § 1341

a. After Lewandowski lulled Plaintiff into a false sense of security by assuring him that she would investigate his concerns and be his advocate to management, she and Cowdrick led a scheme to create a fraudulent job description for the DSS Technologist position that would seem like it qualified for an exemption under the FLSA, if it accurately represented the educational requirements and duties of the position.

b. Lewandowksi and Cowdrick were not interested in the accuracy of the new job description, they were only interested in deceiving others, including Plaintiff's supervisors, by using the job description to convince them that Plaintiff had always been properly classified as exempt and was expected to continue to work 10-20 hours per week in overtime for free regardless of his duties.

c. Lewandowski and Cowdrick knew their actions would lead to Plaintiff being subjected to unfair ridicule and scorn, in fact, that was their intention. They also knew that Wyeth owed Plaintiff over $600 in back wages for overtime and their fraudulent actions were meant to force Plaintiff to forfeit his claim to the back wages.

d. While creating the fraudulent job description, emails went back and forth from Pennsylvania to Massachusetts. Lewandowski and Cowdrick either sent or caused to be sent these emails in furtherance of their scheme to defraud.

e. On May 12th, 2004, Cowdrick emailed Blazek asking for advice on creating a job description that seemed like it would qualify for a professional exemption.

574. Predicate Act Twelve: Wire fraud in violation of 18 USC § 1341

a. On May 12, 2004, Blazek responded to Cowdrick's inquiry regarding the fraudulent job description. Brack's enterprise and Wyeth management knew that the job description was intended to deceive Plaintiff and others into falsely believing that he was always properly classified as exempt, and that Wyeth did not owe him any back wages.

b. The job description was created to threaten Plaintiff with severe harm if he refused to work overtime for free in violation of 29 USC § 207. Brack's enterprise and Wyeth

management knew that the job description did not accurately reflect the duties or educational requirements of a DSS Technologist and planned to use the job description to defraud the NLRB, DOL, Plaintiff and others.

575. Predicate Act Thirteen: Wire fraud in violation of 18 USC § 1341

a. On May 13th, 2004, Como sent an email through interstate wire to Blazek, Cowdrick, and Lewandowski, confirming that she made the necessary changes to the newly created job description to make it look like it would qualify for a professional exemption under the FLSA. Como tells Lewandowski that she provided her a copy of the job description in preparation for their meeting with Plaintiff. Although Como helped create the new job description, she refused to endorse its accuracy by signature because it was fraudulent. Upon information and belief, Como was forced to resign shortly afterwards for refusing to fully cooperate in the various fraudulent schemes perpetrated by Brack's enterprise and Wyeth.

576. Predicate Act Fourteen: Wire fraud in violation of 18 USC § 1341

a. On May 11th, 2004, Lewandowski called a meeting to inform members of Wyeth management that an investigation into Plaintiff's concerns regarding the exempt classification of his position had concluded, and the determination, based on the fraudulent job description, was that Plaintiff had always been properly classified as exempt and was obligated to work overtime for free. Those who attended the meeting included Plaintiff's supervisor, Como; Plaintiff's soon-to-be supervisor, Galina Szakacs; Como and Szakacs' supervisor, Sexton; HR consultant, Cowdrick; and Eileen Blazek participated by phone from Pennsylvania.

577. Predicate Act Fifteen: Attempted extortion in violation of M.G.L. Ch. 265 § 25

a. On May 17th, 2004, Lewandowski called a meeting between herself, Plaintiff, and Como, to inform Plaintiff that her "investigation" was over, and it was concluded that he had always been properly classified as exempt. Lewandowski offered the newly created job description as proof that Wyeth did not owe back wages to Plaintiff, and that he was expected to continue working overtime for free or be subject to further malicious and fraudulent accusations that would lead to termination and severe harm to his professional reputation.

b. Lewandowski ignored the March 24th job description Plaintiff and his supervisor agreed to which accurately depicted the educational requirements of the DSS Technologist position as being met with a high school diploma; she knew that both Plaintiff and Como signed the job description to attest to its accuracy. Lewandowski never investigated Plaintiff's actual duties or took them into consideration as she promised she would. Lewandowski knew that the senior coworker in Plaintiff's lab had

successfully performed the duties of a DSS Technologist for close to a year, was classified as non-exempt, and had no further formal education past high school.

c. Lewandowski and Cowdrick knew that Plaintiff was misclassified as exempt from overtime and had previously directed Como to maliciously retaliate against him with a verbal counseling that was entirely based on the false premise that he was obligated to work overtime for free. By falsely claiming that an investigation into his duties resulted in the conclusion that Plaintiff was properly classified as exempt, Lewandowski ratified the malicious accusations in the verbal counseling, following through on her threat of severely harming Plaintiff's professional reputation at Wyeth if he continued to assert his right to overtime compensation.

d. Lewandowski's ratification of the false premise that Plaintiff was properly classified as exempt served to further threaten Plaintiff with severe harm if he persisted in asserting his rights under the FLSA. When Szakacs became Plaintiff's new supervisor on June 10th, she made it clear to him that she knew he was a troublemaker and she expected him to work overtime for free based on Lewandowski's fraudulent charade. Although Plaintiff provided Lewandowski with contact information for the local Wage and Hour Division to help her determine whether he was properly classified as exempt, Lewandowski never contacted them. In addition, there is no record of Lewandowski seeking legal advice from any of Wyeth's attorneys in concluding that Plaintiff was properly classified as exempt.

578. Predicate Act Sixteen: Wire fraud in violation of 18 USC § 1341

a. On June 15th, Plaintiff complained to his new supervisor, Szakacs, that he was misclassified as exempt and expected Wyeth to compensate him for overtime. Szakacs became very upset and told Plaintiff he could not work for her anymore because she only wanted happy workers, and he was not happy. The next morning, Szakacs summoned Plaintiff to her office where her supervisor, Sexton was waiting. Plaintiff was informed he was suspended. Plaintiff was suspended for insisting he be compensated for overtime pursuant to § 207 of the FLSA.

b. The following day, on June 16th, a meeting was had to discuss Plaintiff's suspension. Those present at the meeting included Socha, Sexton, Szakacs, Cowdrick, and Lewandowski participated by phone from New Hampshire. Hand notes taken during the meeting indicate that Plaintiff had an issue with his exempt classification, and his supervisor, Szakacs, could not understand why he would not just quit.

c. The notes also indicate that Lewandowski did have or would have a conversation with Wyeth's in-house labor counsel, Ken O'Brien. In addition, Socha was going to review to see if Plaintiff was insubordinate. At the time of the meeting, Lewandowski, Cowdrick, and Socha knew that Plaintiff was misclassified as exempt, and that

Lewandowski was breaching contractual and fiduciary duties in furtherance of a scheme to defraud Plaintiff and others.

579. Predicate Act Seventeen: Wire fraud in violation of 18 USC § 1341

a. On June 17th, after speaking with attorney O'Brien, Lewandowski authored a memo recommending the termination of Plaintiff. In the memo, Lewandowski included statements that she knew were materially false, such as her assertion that Como discussed the contents of the verbal counseling with Plaintiff before issuing it. Lewandowski also left out materially important information regarding the fact that Plaintiff's position was classified as exempt without a job description, and that the job description he agreed to with his supervisor did not require any formal education past high school. Lewandowksi also repeated her false accusation that Plaintiff used words in their April 23rd meeting that qualified as insubordination, knowing that Plaintiff actually used those words in a meeting with her and that she was supposed to keep those words confidential.

b. As a result of Lewandowski's fraudulent and illegal conduct, Socha faxed several memos from Massachusetts to Pennsylvania recommending Plaintiff's termination. Socha's memo was virtually identical to the memo Lewandowski wrote on June 17th. In addition, Socha included the discipline memo Lewandowski issued Plaintiff on April 27, 2004, knowing that it was fraudulent and in breach of contractual and fiduciary obligations Lewandowski had towards Plaintiff. Socha also included the verbal counseling Plaintiff received from Como knowing that it was based on the false premise that he was obligated to work overtime for free and issued at the direction of Lewandowski and Cowdrick. It also violated Wyeth's promise not to include the counseling in Plaintiff's personnel file.

c. Plaintiff was repeatedly assured that the counseling would not be included in his personnel file, and during his meeting with Lewandowski on April 21st, Plaintiff asked to see his personnel file but was told one did not exist because yet because he was so new. The fax was in furtherance of a scheme to defraud Plaintiff and others.

580. Predicate Act Eighteen: Mail fraud in violation of 18 USC § 1341

a. After Plaintiff was terminated on June 30, 2004, he requested a complete copy of his personnel file from Wyeth. The following is an excerpt from M.G.L. Ch. 149 § 52C

> Any employer receiving a written request from an employee shall provide the employee with an opportunity to review his personnel record within five business days of such request. The review shall take place at the place of employment and during normal business hours. An employee shall be given a copy of his personnel

record within five business days of submission of a written request for such copy to his employer.

If there is a disagreement with any information contained in a personnel record, removal or correction of such information may be mutually agreed upon by the employer and the employee. If an agreement is not reached, the employee may submit a written statement explaining the employee's position which shall thereupon be contained therein and shall become a part of such employee's personnel record. The statement shall be included when said information is transmitted to a third party as long as the original information is retained as part of the file. If an employer places in a personnel record any information which such employer knew or should have known to be false, then the employee shall have remedy through the collective bargaining agreement, other personnel procedures or judicial process to have such information expunged. The provisions of this section shall not prohibit the removal of information contained in a personnel record upon mutual agreement of the employer and employee for any reason.

b. According to § 52C, the following defines the term "personnel record"

"Personnel record", a record kept by an employer that identifies an employee, to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation or disciplinary action. A personnel record shall include a record in the possession of a person, corporation, partnership or other association that has a contractual agreement with the employer to keep or supply a personnel record as provided in this section. A personnel record shall not include information of a personal nature about a person other than the employee if disclosure of the information would constitute a clearly unwarranted invasion of such other person's privacy. Without limiting the applicability or generality of the foregoing, all of the following written information or documents to the extent prepared by an employer of twenty or more employees regarding an employee shall be included in the personnel record for that employee: the name, address, date of birth, job title and description; rate of pay and any other compensation paid to the employee; starting date of employment; the job application of the employee; resumes or other forms of employment inquiry submitted to the employer in response to his advertisement by the employee; all employee performance evaluations, including but not limited to, employee evaluation documents; written warnings of substandard performance; lists of probationary periods; waivers signed by the employee; copies of dated termination notices; any other documents relating to disciplinary action regarding the employee. A personnel record shall be maintained in typewritten or printed form or may be handwritten in indelible ink.

c. On July 8, 2004, in response to a request for a complete copy of his personnel file, Cowdrick mailed some documents to Plaintiff which she claimed represented a copy of his complete personnel file. (Exhibit 93) The letter accompanying the personnel file was signed by Cowdrick on Socha's behalf. The personnel record Plaintiff received was missing a substantial number of records which Wyeth was supposed to maintain, and evidently did maintain based on the files Plaintiff received from Closson in 2018.

d. The records which Plaintiff did not receive in Cowdrick's mailing, but were included in the files provided by Closson include

  i. An Employee Record Card indicating that Plaintiff's title at Wyeth was Tech CTS.

  ii. A copy of the job description Plaintiff and his supervisor agreed to on March 24, 2004.

  iii. Pages of notes taken by Lewandowski and others during meetings related to Plaintiff's appeal of the verbal counseling he received.

  iv. An employee information form filled out by someone in HR indicating Plaintiff's position was Tech CTS.

  v. All of the files faxed by Socha on June 30th to Pennsylvania recommending the termination of Plaintiff.

e. Wyeth had a duty to disclose these files to Plaintiff and their failure to do so while claiming they did, was a violation of M.G.L. Ch. 149 § 52C, and an act of fraudulent concealment in furtherance of their scheme to defraud Plaintiff and others. Lewandowski and Cowdrick believed legal action was imminent, and their concealment of the files was done to prevent their use in an official proceeding before a government agency such as the WHD.

581. Predicate Act Nineteen: Retaliating against a victim in violation of 18 U.S. Code § 1513(e)

a. When Cowdrick mailed Plaintiff an incomplete personnel file, it was known by Wyeth management and Brack's enterprise that he had filed complaints against them with the WHD as a result of their labor violations. The fraudulent concealment of records Plaintiff was legally entitled to was in retaliation of him providing truthful information to law enforcement about Wyeth committing a federal offense.

582. Predicate Act Twenty: Tampering with a victim in violation of 18 U.S. Code § 1512(c)

a. Wyeth and Brack's enterprise knew that the personnel file Cowdrick mailed to Plaintiff was incomplete though Cowdrick claimed it was complete. The concealment of important personnel records from Plaintiff was a violation of M.G.L. Ch. 149 § 52C, and they corruptly concealed the records in furtherance of a scheme to impair the availability of the records for use in an official proceeding before a government agency such as the WHD.

583. Predicate Act Twenty-One: Retaliating against a victim in violation of 18 U.S. Code § 1513(e)

a. On July 23rd, 2004, Plaintiff was supposed to meet with Hubert Scoble privately as part of Wyeth's AFT policy. However, Brack directed Socha to attend the meeting for the purpose of hindering the effectiveness of the appeals process. In addition, Scoble had a duty to uphold Wyeth's Disciplinary Action policy and recognize Lewandowski's contractual and fiduciary responsibilities towards Plaintiff. Instead, Scoble elected to uphold the violations of Wyeth's Disciplinary Action policy and ratify Lewandowski's breach of contractual and fiduciary duties, and unlawful retaliation against Plaintiff.

b. Socha's and Scoble's actions during the July 23rd meeting with Plaintiff in depriving him of his right to meet privately with Scoble, facilitating Lewandowski's breach of contractual and fiduciary duties, and ratification of the malicious campaign to rid Wyeth of Plaintiff through unlawful, fraudulent, and dishonest actions was in retaliation of his providing truthful information to the WHD about Wyeth's Federal offenses under the FLSA.

584. Predicate Act Twenty-Two: Retaliating against a victim in violation of 18 U.S. Code § 1513(e)

a. On November 2, 2004, Plaintiff was supposed to meet privately with Michael Kamarck as part of Wyeth's AFT policy. However, Brack attended the meeting for the purpose of hindering the effectiveness of the appeals process. During the meeting, Kamarck asked Plaintiff what he wanted as a result of his appeal and Plaintiff stated that he wanted to work at Wyeth in a professional position. Kamarck told Plaintiff it was impossible for him to work at Wyeth anymore because he filed complaints against them with outside law enforcement.

b. Kamarck had a duty to uphold Wyeth's Disciplinary Action policy and recognize Lewandowski's contractual and fiduciary responsibilities towards Plaintiff. Instead, Kamarck elected to uphold the violations of Wyeth's Disciplinary Action policy and ratify Lewandowski's breach of contractual and fiduciary duties, and unlawful retaliation against Plaintiff.

Claim II Civil RICO in Violation of 18 U.S.C. § 1962 (b)

585. Plaintiff incorporates the entire complaint in asserting the defendants in Claim I violated the RICO provisions of 18 U.S.C. § 1962 (b) which states

> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

586. Pursuant to 18 U.S.C. § 1961(4) the following defines an enterprise

> (4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

587. Plaintiff was and is an enterprise that is engaged in and whose activities affect interstate commerce.

588. Pursuant to 18 U.S.C. § 1961(3) the following defines a person

> (3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property;

589. Wyeth (now Pfizer) was and is a person capable of holding a legal or beneficial interest in property.

590. The confidential settlement agreement related to this lawsuit, that Plaintiff was fraudulently induced into signing, was for the benefit of Wyeth, as well as any and all present and former parent corporations, subsidiaries, divisions, affiliated entities, predecessor entities, successor entities, and their respective officers, directors, trustees, administrators, executors, agents, owners, shareholders, attorneys, employees, former employees, successors and assigns, both present and former, individually and in their official capacities, as well as all persons acting for or on behalf of Wyeth.

591. Pursuant to the confidential settlement agreement, Plaintiff agreed to maintain absolute confidentiality concerning any and all matters relating to his employment with Wyeth which were at issue in the lawsuit, and any information Plaintiff obtained during the course of discovery. He also agreed not to divulge any information regarding the cited matters and information, and/or the existence or substance of the settlement agreement, including but not limited to the terms and conditions of the agreement, the circumstances that led up to

the agreement, the existence, substance, or consideration for the agreement, and the amount paid under the agreement to any person or entity whatsoever, including, without limitation, any members of the media, including, but not limited to, print journalists, newspapers, radio, television, cable, satellite programs, or internet media (including, but not limited to, web pages, e-mail and/or "chat rooms"). If Plaintiff received any inquiry regarding the proceeding, Plaintiff and any representative of his, shall state only that it has been resolved to the satisfaction of the parties.

592. In addition, Plaintiff is required to contact Wyeth within five business days if he is contacted by any third parties or compelled by subpoena or court order to appear and testify concerning matters related to the lawsuit.

593. Pursuant to the confidential settlement agreement with Wyeth, Plaintiff agreed that he and all those acting for or on his behalf, including but not limited to his investigators and attorneys, must refrain from disseminating any copies of any and all documents received during the lawsuit that relate to the claims asserted, and return any documents to Wyeth's counsel of record, (Fitzhugh and Skinner) or certify that the documents have been destroyed.

594. As part of the settlement agreement with Wyeth, Plaintiff was required to covenant that he would forever not apply for, nor otherwise seek employment with Wyeth. Plaintiff agreed that if he ever applied for or sought employment of any sort with Wyeth, his application and inquiry could be refused for any reason, whether stated or not, and the confidential settlement agreement could be interposed or pleaded as a bar to any claim, cause of action or administrative action lawsuit, whether brought at law or equity, arising out of Wyeth's refusal to grant him employment, or consider him for employment.

595. The confidential agreement Plaintiff signed in December 2006, compelled him to admit that he was represented by Thomas Closson, Esq., and that he sought and obtained the benefit of "such counsel's" advice prior to the execution of the agreement.

596. As part of the confidential settlement with Wyeth, Plaintiff agreed that if he breached the agreement, including brining claims that accrued prior to the agreement, he must immediately return any and all benefits outlined in the agreement to Wyeth. In any action brought by Wyeth to enforce any provisions of the agreement, and they are the prevailing party, Plaintiff is liable for reasonable costs of enforcement, including without limitation costs and reasonable attorneys' fees incurred, in addition to other relief granted.

597. Wyeth acquired and maintained, directly and indirectly, an interest in and control of Plaintiff through a pattern of racketeering activity, and they maintain an interest in Plaintiff and control of his pursuit of a chosen profession "forever".

## Claim III Civil RICO in Violation of 18 U.S.C. § 1962 (c)

598. Plaintiff incorporates the entire complaint in asserting the defendants in Claim I violated the RICO provisions of 18 U.S.C. § 1962(c) which states

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

599. Brack, Lewandowski, Cowdrick, and Wyeth were associated with the Wyeth enterprise and/or Brack's enterprise. The activities of the Wyeth enterprise and Brack's enterprise affected interstate commerce.

600. Brack, Lewandowski, Cowdrick, and Wyeth participated directly and indirectly in conducting the affairs of the Wyeth enterprise, and Brack's enterprise through a pattern of racketeering activity.

## Claim IV Civil RICO in Violation of 18 U.S.C. § 1962 (d)

601. Plaintiff incorporates the entire complaint in asserting the defendants in Claim I violated the RICO provisions of 18 USC § 1962(d) which states

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

602. Wyeth, Cowdrick, Lewandowski, and Brack conspired to and did violate the provisions of 18 USC §§ 1962(a), (b), and (c).

603. As a result of the unlawful conduct of Wyeth, Brack, Lewandowski, and Cowdrick, Plaintiff is entitled to and hereby requests a jury trial on all claims so triable and an award of:

    a. Back pay and benefits in an amount equal to the difference between the value of his earnings and benefits since Wyeth terminated him and the value of earnings and benefits he would have received if Wyeth, Brack, Lewandowski, and Cowdrick honored their responsibilities to conduct their business in accordance with federal and state labor laws, and the common law requirement of good faith and fair dealing implied in every contract entered into in Massachusetts;

    b. Lost future wages and benefits in an amount equal to the difference between the value of Plaintiff's projected future earnings after his professional reputation was severely

damaged by the malicious and unlawful campaign of fraudulent and retaliatory conduct carried out by Brack, Wyeth, Lewandowski, and Cowdrick, and the value of wages and benefits Plaintiff would have earned if the aforementioned defendant's conducted their business operations in accordance with state and federal labor laws, and the common law requirement of good faith and fair dealing implied in every contract entered into in Massachusetts;

c. Liquidated damages, legal costs, and attorney's fees pursuant to 18 USC § 1964(c);

d. Punitive damages in an amount that will discourage similar unlawful and fraudulent conduct by large multinational corporations in partnership with independent HR consultants and attorneys;

e. Profit disgorgement in an amount equal to the financial gains Wyeth benefitted from through the misclassification of at least 135 employees similarly situated with Plaintiff and who the WHD issued a final order that required Wyeth to re-classify as non-exempt and pay back wages; an order Wyeth refused to comply with;

f. Profit disgorgement equal to the financial gains that Wyeth benefitted from by employing workers in violation of 29 USC § 207, and introducing hot goods made by those workers into interstate commerce in violation of 29 USC § 215(a)(1);

g. Medical costs associated with treatment Plaintiff received and will receive in the future for ailments incurred as a result of the malicious conduct of Wyeth, Lewandowski, Cowdrick, and Brack;

h. Financial charges Plaintiff incurred as a result of his inability to pay down his student loan debt because of unemployment and underemployment that was caused by his unlawful termination and other retaliatory conduct Wyeth, Lewandowski, Cowdrick, and Brack subjected him to;

i. Compensation for mental anguish Plaintiff suffered as a result of the malicious acts of Wyeth, Cowdrick, Lewandowski, and Brack;

j. Compensation for the loss of enjoyment of life;

k. Striking all records and pleadings associated with the collusive lawsuit perpetrated by Wyeth and certain associates that were not supported by any evidence made available to Plaintiff or the court during the legal proceeding;

l. Such other relief as the court deems appropriate.

Claim V Civil RICO in Violation of 18 U.S.C. § 1962 (a)

Plaintiff brings this claim against Pfizer (as predecessor for Wyeth), attorney Thomas Closson, attorney Michael Lambert, and the law firm Sheehan Phinney Bass + Green P.A. (Sheehan) for violations of the Federal RICO statute and predicate acts of; 18 USC § 1343 wire fraud, 18 USC § 1341 mail fraud, 18 USC § 1503 corruptly influencing a judicial officer, 18 USC § 1510 obstruction of a criminal investigation, 18 USC § 1512 witness tampering, 18 USC § 1513 retaliating against a witness, 18 USC § 1589 forced labor, 18 USC § 1590 trafficking related to forced labor, 18 USC § 2314 transportation of stolen goods, 18 USC § 2315 receipt of stolen goods, 18 USC § 1951 extortion, and attempted extortion in violation of M.G.L. Ch. 265 § 25.

Introduction

580. Plaintiff incorporates all of the facts within this action into this Claim V for the defendant's violation of 18 U.S.C. § 1962 (a).

581. Plaintiff has separated his claims against the defendants for damages incurred as a result of their violation of the federal RICO statutes into two phases for clarity. During the first phase, Wyeth and Brack formed a business partnership that involved conducting Wyeth's HR business functions through a pattern of racketeering activity in furtherance of various schemes to defraud the NLRB, Plaintiff, and others.

582. The second phase of Wyeth's racketeering activity begins around the time Plaintiff was terminated on June 30th, 2004 and consists substantially of furthering their original schemes to defraud the NLRB, Plaintiff and others by fraudulently concealing their illicit schemes carried out in the first phase.

583. In the first phase, Wyeth partnered with an enterprise consisting of their business partner John Brack, and his associates, Lewandowski and Cowdrick. In the second phase, Wyeth partnered with another enterprise of associates-in-fact which consisted of Sheehan, Lambert, and Closson.

584. During the first phase, Wyeth participated as a principal in the racketeering activity through employees Schwamb, Socha, Hanley, Scoble, Perley, Blazek, Kamarck, Portwood, and O'Brien. In the second phase of racketeering activity, Wyeth participated as a principal through O'Brien, and attorney Michael Fitzhugh, as well as other agents who are currently unknown.

585. Wyeth used the illicit gains earned through a pattern of racketeering activity in phase one, to finance a second enterprise in phase two. The phase two enterprise consisted of Sheehan, Lambert, and Closson, who operated as associates-in-fact and engaged in a pattern of

racketeering activity in furtherance of various schemes to defraud the NLRB, Plaintiff, the DOL, USDC Mass. and others.

586. The second phase of Wyeth's racketeering activity begins around March of 2005, during an investigation and adjudication of Wyeth's widespread illegal labor practices at their Andover, MA, location. During the investigation and adjudication by the WHD, Wyeth was represented by Blazek, Socha, and in-house labor counsel O'Brien.

587. While the WHD was investigating and adjudicating federal offenses committed by Wyeth, Blazek, Socha, and O'Brien altered and concealed records, documents, and other evidence with the intent to impair their integrity and availability in an official proceeding, in violation of 18 USC 1512(c).

588. For example, Wyeth concealed a job description for the DSS Technologist position that Plaintiff and his supervisor agreed to on March 24, 2004. Wyeth also provided to the WHD fraudulent job descriptions they knew did not represent the true educational requirements or duties associated with the position but were meant to deceive the WHD into believing they were accurate.

589. Wyeth also attempted to and did obstruct and impede an official proceeding before the WHD by providing false information during the adjudication of their federal offenses. For example, Wyeth provided a false Employer Identification Number (EIN) to WHD investigators. This is the equivalent of a person providing a false social security number after being arrested and charged with a federal offense. Just as the arrested person, Wyeth's intentions were to escape justice, and Wyeth has escaped justice partly because of their corrupt actions during the adjudication of their offenses.

590. When it became clear that Wyeth was facing extensive sanctions for pervasive violations of federal law, they conspired with Sheehan, Lambert, and Closson to unlawfully procure control of legal claims they believed Plaintiff intended to bring against them on behalf of himself and others similarly situated, depending on the outcome of the investigation by the WHD.

591. Wyeth was found by the WHD to have misclassified Plaintiff and at least 150 similarly situated employees as exempt from overtime. Plaintiff had repeatedly engaged in concerted activity in the past on behalf of his coworkers, he also had extensive evidence demonstrating Wyeth's actions were intentional and part of various schemes to defraud the NLRB, Plaintiff, and others through a pattern of racketeering activity.

592. Following the suggestion of the WHD District Director, Surett, Plaintiff searched diligently for a private attorney. During his search, Plaintiff was given a list of local labor attorneys and immediately recognized Closson's name through personal relationships he had with his family. Plaintiff first met with Closson in late 2004 and declined to represent Plaintiff. He told

Plaintiff that he could not take his case because he was not licensed to practice law in Massachusetts.

593. In March of 2005, after it became clear that Wyeth was facing extensive sanctions from the WHD, Closson had a change of heart and summoned Plaintiff back to his office in Exeter, NH. During the meeting, he informed Plaintiff that he could represent him in his claims against Wyeth because a friend was going to sponsor him so he could practice in federal court in Massachusetts. Plaintiff was unaware of it at the time, but the friend Closson was talking about was Lambert.

594. During Plaintiff's initial 2004 meeting with Closson, he expressed an awareness of his inability to procure control of Plaintiff's claims because he was not licensed to practice law in Massachusetts. During Plaintiff's second meeting with Closson, he provided two reasons why he believed it was okay for him to procure control of Plaintiff's claims. First, he stated that Plaintiff's claims fell entirely under federal regulations, and federal laws were the same regardless of which state they were litigated in. Second, he stated that a friend was going to sponsor him so he could practice law in Massachusetts.

595. Closson's first reason is not credible for many reasons, but the most obvious is that by deciding Plaintiff did not have any claims under Massachusetts law, and advising him as such, he had to apply his knowledge of the laws of Massachusetts. He could only provide a competent assessment if he was sufficiently knowledgeable of those laws. The method of determining whether someone has sufficient knowledge of the laws in a particular jurisdiction is through admission to the bar of that jurisdiction and obtaining a license to practice law in that jurisdiction.

596. Closson's second reasons is equally unavailing. As a member of the bar of New Hampshire, Closson was supposed to adhere to New Hampshire Rules of Professional Conduct, which prohibited him from practicing law in another jurisdiction in violation of that jurisdiction's regulations governing the legal profession. The representation of a client in relation to claims arising out of Massachusetts necessarily requires the practice of law in the jurisdiction of Massachusetts. Pursuant to M.G.L. Ch. 221 § 41

> [N]o individual, other than a member, in good standing, of the bar of this commonwealth shall practice law, or, by word, sign, letter, advertisement or otherwise, hold himself out as authorized, entitled, competent, qualified or able to practice law...

597. Members of the bar of New Hampshire are expected to understand and adhere to the New Hampshire Rules of Professional Conduct. Closson knew or should have known it was unlawful for him to hold himself out as authorized or competent to practice law in Massachusetts. Closson did know this, but Sheehan, Lambert, and Wyeth believed their

various schemes to defraud required the trust Plaintiff placed in Closson and wanted to exploit that trust.

598. Sheehan had offices in Massachusetts, and many lawyers on their staff were licensed to practice law in Massachusetts, including Lambert. They either knew or should have known that pursuant to M.G.L. Ch. 221 § 46A

> [w]hoever, not having been lawfully admitted to practice as an attorney at law...holds himself out or represents or advertises himself as having authority or power in behalf of persons who have claims for damages to procure settlements of such claims for damages either to person or property, or whoever, not being an attorney at law, solicits or procures from any such person or his representative, either for himself or another, the management or control of any such claim, or authority to adjust or bring suit to recover for the same...shall be punished...

599. The purpose of both Massachusetts statutes cited are to protect the public, including Plaintiff, from incompetent legal representation, and are not waivable. Sheehan, Lambert, Closson, and Wyeth knew or should have known that Closson's procurement of control of Plaintiff's claims against Wyeth in March 2005 was unlawful and void due to public policy reasons.

600. Closson gained control of Plaintiff's claims through a contingent fee agreement that was never put in writing. Closson knew or should have known that pursuant to NH RSA 508:4-e (I)

> Contingent fee agreements between attorney and client shall be governed by Rules of Professional Conduct, Rule 1.5 as it may be amended by the supreme court from time to time and by any other rules regarding fees which are adopted or amended by the court.

601. Closson also knew or should have known that pursuant to Rule 1.5 of the New Hampshire Rules of Professional Conduct

> (c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by law or these rules. A contingent fee agreement shall be in writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses for which the client will be liable whether or not the client is the prevailing party, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

602. Closson never put in writing the contingent fee agreement he entered into with Plaintiff in March 2005, because he knew his actions were unlawful and any such contract would be void anyway.

603. After unlawfully procuring control of Plaintiff's claims against Wyeth, Closson began to take actions that were illegal and contrary to Plaintiff's interests. He instructed Plaintiff not to speak with anyone about the Wyeth matter, including law enforcement authorities. Closson directed Plaintiff to provide him with all inquiries and other communications with law enforcement so that he could communicate with them on Plaintiff's behalf.

604. Plaintiff had briefly communicated with Inspector Colarossi of the WHD before it was decided to investigate Wyeth. Closson informed Plaintiff not to communicate with her any more and instead allow him to communicate on his behalf.

605. Plaintiff received an inquiry from the Mass. AG's Office on July 12, 2005, which he immediately gave Closson expecting him to communicate with them in his best interests.

606. On July 21, 2005, Closson summoned Plaintiff to his office on Court St. in Exeter, NH. He showed Plaintiff a letter he intended to send Wyeth stating that the office of FSC was retained to represent Plaintiff's legal interests. He asked Plaintiff to sign an authorization for Wyeth to release "all employment records, benefit records, attendance records, pay records, and any other records kept with regard to [Plaintiff's] employment with you..." In the letter, Closson also requested a complete copy of Plaintiff's personnel file, including any and all documents related to Wyeth's investigation into his complaint of misclassification under the FLSA.

607. Plaintiff did not know that Closson's conduct was illegal and that he was engaged in the unauthorized practice of law. His actions seemed like the actions any attorney would take during the course of their representation of a client. However, Closson was not communicating with law enforcement on Plaintiff's behalf in furtherance of his legal interests; he was furthering Wyeth's interests by ensuring Plaintiff and law enforcement did not communicate with each other.

608. Closson did not request Plaintiff's files from Wyeth in an effort to further his legal interests; he requested the files to ensure the concealment and unavailability of a trove of evidence that would expose Wyeth's practice of conducting their HR operations through a pattern of fraud and racketeering activity.

609. Plaintiff learned in December 2018 that Wyeth responded to Closson's request for documents on August 2, 2005. Closson concealed the documents from Plaintiff, ensuring they were unavailable to law enforcement and Plaintiff during various tribunals before government agencies Wyeth expected to appear before, including the WHD and USDC Mass.

610. Closson was not the only one whose improper conduct led to the disappearance of files incriminating Wyeth. Towards the end of the WHD's adjudication of Wyeth, and just weeks before the District Director of the WHD resigned, a meeting was had between the WHD District Director, Corey Surett, and the Regional Solicitor of the Department of Labor, Frank McDermott. Wyeth had refused to comply with the WHD's sanctions relating to 137 of their victims, including Plaintiff. However, during McDermott's meeting with Surrett, it was decided that the WHD would not forward any Wyeth case files to the RSO for possible prosecution. Both McDermott's and Surett's actions were contrary to the obligations of their public office. McDermott should not have influenced the WHD's decision to forward the case files to the RSO, and Surett should have forwarded the files to the RSO in spite of pressure from McDermott.

611. Surett resigned just weeks after the Wyeth case closed and George Rioux, became the new District Director of the WHD. By the time Rioux took office in December, all the files related to the Wyeth case had disappeared. Rioux did not learn about the case until the Mass. AG's Office copied him on a letter they sent to Plaintiff on January 11, 2005, indicating that the proper place for him to file his complaint against Wyeth was the WHD.

612. Two weeks later, on January 25, 2005, Rioux sent Plaintiff a letter indicating that his office received a letter from the Mass. AG's Office regarding Plaintiff's complaint against Wyeth, but he did not have any information regarding the complaint and requested Plaintiff to provide him with further information about his complaint so the WHD could decide what action to take.

613. Plaintiff has spoken with Corey Surett, George Rioux, and Frank McDermott, and none of them know where the Wyeth case files went, but all agreed that they should have been available to Rioux. Attached is a schedule related to the obligations of the RSO and WHD regarding the preservation of case records. (Exhibit 94)

614. But there is more. When Plaintiff spoke with Surett on the phone on April 15, 2021, Surett explained the practice of having "Joint Review Committee" meetings between his office and the RSO in order to decide whether or not the WHD should forward case files of offenders who refused to comply with the WHD's determinations. He described how the WHD and RSO was located in the same building, separated by a floor or two. He said that McDermott was involved in deciding whether or not case files from the Wyeth investigation were forwarded to the RSO.

615. Plaintiff spoke with Surett's successor, Rioux, on June 28, 2021. Rioux also described the practice of meeting with the RSO to decide whether or not WHD case files for offenders who refused to comply should be forwarded to the RSO.

616. Plaintiff spoke with current WHD District Director, Carlos Matos, in August 2021, Matos also described a practice of meeting with the RSO in determining whether case files for offenders who refused to comply with the WHD's orders should be forwarded to the RSO.

617. Surett and Rioux are former District Directors who worked in the WHD while McDermott was Regional Solicitor for the DOL. They both described a process where a meeting between leaders of the WHD meet with the RSO to decide whether case files for an offender who refused to comply with the WHD's orders should be forwarded to the RSO. Director Matos is Rioux's successor and described a similar practice of the RSO influencing a decision by the WHD to forward case files of offenders who refused to comply with the WHD's orders.

618. When Plaintiff spoke on the phone with McDermott on August 25, 2021, he asked him about the "Joint Review Committee" meetings between leaders of the WHD and RSO. McDermott denied that any such process exists. McDermott stated that it would be improper for the RSO to get involved in a case before the WHD forwarded case files to the RSO. Indeed, McDermott wrote a legal paper in his early years at the RSO describing the proper procedure when an offender refused to comply with final orders from the WHD. The case files are forwarded to the RSO who then decides whether or not to prosecute based on the files.

619. If it was not true, why would three consecutive District Directors for the Boston WHD assert that it was standard practice for leaders of the WHD to meet with the RSO to decide whether case files for offenders who refused to comply were forwarded to the RSO? Two of the District Directors were in office at the same time McDermott was Regional Solicitor.

620. There is currently not enough evidence to accuse either McDermott or Surett of misconduct, however, the inconsistent statements between McDermott and three District Directors for the Boston WHD are troubling. It seems too coincidental that McDermott was close neighbors in a small coastal New Hampshire town with Brack, the leader of an aggressive and bold racketeering enterprise that profited from pervasive violations of labor laws that McDermott was responsible for deciding whether or not to prosecute. Taken altogether, including the WHD's reason for not forwarding the case files "case law in the first circuit is weak", something seems amiss.

621. Plaintiff was never informed of the Wyeth investigation or their final determination that he was misclassified. The final WHD report states that he should have been notified of their conclusions and his right to bring a suit pursuant to 29 USC 216(b), but he never was.

622. Wyeth's deceitful conduct, such as providing a false EIN to the WHD, was intended to frustrate the functioning of the WHD, and their actions helped cause the disappearance of the case files related to the WHD investigation. As a result of the disappearance of the Wyeth case files, Rioux mailed Plaintiff a letter that had the effect of convincing him that no investigation into Wyeth had ever occurred. This furthered Wyeth's scheme to fraudulently conceal the investigation and evidence of widespread illicit behavior from Plaintiff and others.

623. Wyeth conspired with Sheehan, Lambert and Closson to file a collusive lawsuit on Plaintiff's behalf. The evidence demonstrates that Sheehan and Lambert had contact with an agent from Wyeth before they filed the unauthorized lawsuit. Sheehan, Lambert, and Closson knew or should have known that any attorney/client agreement Plaintiff had with Closson and resulted in Closson procuring control of his claims against Wyeth was void. In addition, the lack of any written agreement between Closson and Plaintiff should have precluded an assumption that Closson was authorized to file suit on his behalf, or help Sheehan and Lambert file one.

624. Lambert and Sheehan filed the complaint on Plaintiff's behalf in furtherance of various conspiracies to defraud him and others. Plaintiff had never met Lambert, and only vaguely heard of Sheehan. Neither Lambert nor Sheehan were Plaintiff's attorneys when they filed the suit, and public policy prevented them from being Plaintiff's attorneys in the Wyeth case because Closson unlawfully procured control of the claims for them.

625. Nevertheless, Sheehan and Lambert represented to the court that they were Plaintiff's attorneys authorized to bring suit on his behalf pursuant to 29 USC § 216(b). At the time, Sheehan, Closson, and Lambert knew that Wyeth was engaged in racketeering activity in furtherance of various schemes to defraud the NLRB, DOL, Plaintiff, and hundreds of other vulnerable and young professionals. They knew that Plaintiff was retaliated against for engaging in concerted action, and that he had expressed a desire to advocate on behalf of Wyeth's other victims who were similarly situated.

626. Lambert, Sheehan, and Closson knew that filing an action on Plaintiff's behalf would preclude him from representing the class of similarly situated individuals that the WHD determined were victims of wage theft . They also knew the WHD would end their investigation of Wyeth after a complaint was filed on Plaintiff's behalf in USDC Mass.

627. The actions of Sheehan, Lambert, Closson, Fitzhugh, and Wyeth during the litigation of Plaintiff's complaint against Wyeth are described in detail elsewhere in this action. There are several combinations of enterprises, individuals, and associates-in-fact for the purpose of establishing a RICO claim against the defendants. However, for now we will focus on the pattern of racketeering activity these individuals engaged in with the same intentions of carrying out various schemes to defraud Plaintiff and others. For clarity, Sheehan, Lambert, and Closson will be referred to collectively as Sheehan's enterprise.

## Predicate Acts of Racketeering Activity Claim V

628. Predicate Act One: Conspiring to tamper with a witness, victim or informant in violation of 18 USC § 1512(k)

a. Between the dates of January 1, and March 21, 2005, Sheehan's enterprise conspired with Wyeth to exploit Plaintiff's personal relationship with Closson's family and the trust that went with it to unlawfully procure control of Plaintiff's claims against Wyeth for the purpose of corruptly persuading him to withhold testimony, records, and documents from an official proceeding within the U.S. Department of Labor in relation to Wyeth's labor violations, as well as USDC Mass. for an action brought pursuant to 29 USC § 216(b).

629. Predicate Act Two: Tampering with a witness, victim or informant in violation of 18 USC § 1512(b)

a. On or around March 21, 2005, Closson unlawfully gained control of Plaintiff's claims against Wyeth through fraud. Closson did not intend on providing Plaintiff competent legal representation. Rather, he intended to influence, delay, and prevent Plaintiff's testimony in an official proceeding at the DOL, and in USDC Mass. for an action brought against Wyeth pursuant to 29 USC § 216(b).

630. Predicate Act Three: Tampering with a witness, victim or informant in violation of 18 USC § 1512(b)

a. On July 21, 2005, Closson fraudulently induced Plaintiff into authorizing Wyeth to release his personnel records and employment history to employees and associates to him and his associates at FSC. During the meeting Closson implied that the entire FSC firm was representing him by showing him the letter he sent to Wyeth that said as much. Closson knew that his actions were unlawful and in violation of regulations meant to protect the public from incompetent legal representation. Closson's corrupt actions were in furtherance of a scheme to influence, delay, and prevent Plaintiff's testimony in an official proceeding at the WHD and a federal court proceeding.

631. Predicate Act Four: Tampering with a witness, victim or informant in violation of 18 USC § 1512(b)(2)(B)

a. On July 21, 2005, Closson fraudulently induced Plaintiff to authorize Wyeth to release his personnel records and employment history to himself and his associates at FSC. The files requested by Closson contained material evidence implicating Wyeth in pervasive and egregious violations of federal law. Closson's corrupt actions were in furtherance of a scheme to cause Plaintiff to withhold records, documents, and other objects from an official proceeding.

632. Predicate Act Five: Mail Fraud in violation of 18 USC § 1341

a. On July 21, 2005, Closson used the federal mail system to send Wyeth a letter unlawfully representing himself as having the authority to adjust or bring suit for claims

for damages Plaintiff had against Wyeth. His use of the federal mail system was in furtherance of various schemes to defraud the DOL, Plaintiff, and others.

633. Predicate Act Six: Mail Fraud in violation of 18 USC § 1341

a. On August 2, 2005, Socha used the federal mail system to send Closson the files he requested on July 21, 2005. Closson's actions caused Socha to use the federal mail service, and her providing him with the requested files was in furtherance of a scheme to defraud Plaintiff by enabling Closson to conceal and prevent the availability of material evidence in an official proceeding.

634. Predicate Act Seven: Mail Fraud in violation of 18 USC § 1341

a. On January 25, 2006, the District Director of the WHD, George Rioux, mailed Plaintiff a letter requesting more information about his complaint against Wyeth so his office could take further action. False information given to the WHD by Wyeth in an attempt to impede the lawful government function of the WHD caused Rioux to send the letter, which furthered various schemes to defraud Plaintiff and others. Closson's corrupt communications with Plaintiff and the WHD during their investigation of Wyeth, also caused Rioux to send the inquiry to Plaintiff. Rioux's letter deceived Plaintiff into believing that no investigation of Wyeth had occurred and furthered various schemes to defraud Plaintiff and others.

635. Predicate Act Eight: Mail Fraud in violation of 18 USC § 1341

a. On February 16, 2006, Closson used the federal mail system to send Lambert documents to aid and abet Lambert and Sheehan's fraudulent filing of an unauthorized complaint on Plaintiff's behalf in USDC Mass. Closson's actions were in furtherance of various schemes to defraud the NLRB, DOL, Plaintiff, and others.

636. Predicate Act Nine: Influencing or injuring officer or juror generally in violation of 18 USC § 1503

a. When Closson mailed Lambert the materials on February 16, 2005 he knew it was in furtherance of a scheme to corruptly deceive a presiding judicial officer into believing that Sheehan and Lambert were Plaintiff's attorneys and authorized to file the complaint on his behalf. It is important for a judge to know whether or not a party to a case has competent legal representation, especially in an action brought pursuant to § 216(b), because of public policy considerations. As a result, the judicial officer presiding over the case believed Plaintiff had competent legal representation which facilitated the collusive abuse of legal proceedings in a federal court that furthered various schemes to defraud Plaintiff and others.

637. Predicate Act Ten: Mail Fraud in violation of 18 USC § 1341

a. On February 23, 2006, Lambert and Sheehan used the federal mail system to file a complaint on Plaintiff's behalf with USDC Mass. without authorization. They had no intention of providing competent legal representation to Plaintiff, rather, their intentions were in furtherance of various schemes to defraud Plaintiff and others.

638. Predicate Act Eleven: Influencing or injuring officer or juror generally in violation of 18 USC § 1503

a. The complaint that Sheehan and Lambert filed on February 23, 2006, falsely represented to the court that they were Plaintiff's attorneys and authorized to file the action on his behalf. Plaintiff had never met or heard of Lambert and was vaguely familiar with Sheehan. At the time, Lambert and Sheehan knew that they were not and could not have been Plaintiff's attorneys because of public policy concerns. The actions of Sheehan and Lambert were in furtherance of various schemes to defraud Plaintiff and others by deceiving the judicial officer into believing he had competent legal representation in an action brough pursuant to 29 USC § 216(b).

639. Predicate Act Twelve: Tampering with a witness, victim or informant in violation of 18 USC § 1512(b)

a. Sheehan's enterprise conspired to fraudulently induce Plaintiff into signing a contingent fee agreement a month after they filed a complaint on his behalf without authorization. Part of the scheme involved making representations to the court that Lambert and the entire Sheehan law firm were Plaintiff's attorneys. Sheehan's enterprise conspired to present the contingent fee agreement just as Plaintiff was reading the fraudulent representations Sheehan and Lambert made to the court. Plaintiff relied on Lambert and Sheehan's representations to the court when he signed the contingent fee agreement. It was foreseeable and reasonable for Plaintiff to rely on Lambert and Sheehan's representations to the court in deciding whether or not to sign the contingent fee agreement. Their actions were in furtherance of a scheme to corruptly persuaded Plaintiff to withhold testimony and evidence against Wyeth in an official proceeding.

640. Predicate Act Eleven: Wire Fraud in violation of 18 USC § 1343

a. On February 23, 2006, the USDC Mass. issued an NEF to Lambert and multiple employees of Sheehan indicating that a complaint had been filed on Plaintiff's behalf. The NEF falsely represented that Plaintiff had competent legal counsel through Lambert and Sheehan. The information communicated to Sheehan employees by the USDC Mass. was in furtherance of various schemes to defraud Plaintiff and others.

641. Predicate Act Twelve: Tampering with a witness, victim or informant in violation of 18 USC § 1512

a. On March 21, 2006, Closson met with Plaintiff and revealed for the first time that a complaint was filed on his behalf by Sheehan and Lambert a month prior. As Plaintiff was reading Sheehan's and Lambert's representations to the court that they were his attorneys, Closson presented a contingent fee agreement indicating that both he and Lambert would represent him in his claims against Wyeth without limitation. Plaintiff relied on the representations Sheehan and Lambert made to the court, as well as Closson's advice, and signed the contingent fee agreement. Closson, Lambert, and Sheehan knew their actions were unlawful, and they had no intention of providing Plaintiff competent legal representation. Their actions were in furtherance of various schemes to defraud Plaintiff and others.

642. Predicate Act Thirteen: Mail Fraud in violation of 18 USC § 1341

a. On March 23, 2006, Lambert used the federal mail service to send Closson an executed copy of the contingent fee agreement Plaintiff was fraudulently induced into signing. Lambert, Closson, and Sheehan knew that the agreement was unlawful and void for public policy reasons. Lambert's use of the federal mail service to send the document was in furtherance of various schemes to defraud Plaintiff and others.

643. Predicate Act Fourteen: Retaliating against a witness, victim or informant in violation of 18 USC § 1513(f)

a. Between the dates of February 23, and April 1st, 2005, Sheehan's enterprise conspired with Wyeth to retaliate against Plaintiff for providing federal law enforcement truthful information related to pervasive violations of federal law committed by Brack's enterprise and Wyeth. As Wyeth's attorney, Fitzhugh was assured that any false, defamatory, or scandalous assertions included in Wyeth's answer to the complaint would not be subject to any scrutiny normally associated with an adversarial proceeding. They agreed to use the legal process for the ulterior purpose of engaging in a character assassination of Plaintiff.

b. On March 23, 2005, Fitzhugh and Lambert filed an improper stipulation to enlarge the time Wyeth had to answer the complaint. Had Plaintiff refused to sign the fraudulent contingent fee agreement on March 23, Fitzhugh would have filed a different answer to the complaint because he lacked assurance of no retribution. However, because Plaintiff signed the contingent fee agreement, Fitzhugh believed he was free to pummel him with false and baseless accusations without fear of reprisal.

644. Predicate Act Fourteen: Influencing or injuring officer or juror generally in violation of 18 USC § 1503

a. On March 23, 2006, Lambert filed a stipulation in USDC Mass. extending the time Wyeth had to answer the complaint he filed on Plaintiff's behalf. Lambert's actions violated the Fed.R.Civ.P. because pursuant to Rule 6(b), an enlargement of time must be done by motion for cause shown. In addition, Lambert once again represented to the court that he was Plaintiff's attorney in the case, which was false and meant to deceive the judicial officer into believing Plaintiff had competent legal representation in an action brough pursuant to 29 USC § 216(b).

b. In the First Circuit, actions brought pursuant to § 216(b) face heightened scrutiny by a judicial officer because of the public's interest. It is important for a judicial officer to know whether a party plaintiff has competent legal representation in the suit, and Lambert's representations were intended to deceive the judicial officer into thinking Plaintiff did.

645. Predicate Act Fifteen: Wire Fraud in violation of 18 USC § 1343

a. As a result of Lambert's stipulation to enlarge the time Wyeth had to answer the complaint, an NEF was issued through interstate wires to multiple Sheehan employees, and agents of Wyeth. The NEF issued by the court in response to Lambert's stipulation contained false information and furthered various schemes to defraud Plaintiff and others.

646. Predicate Act Sixteen: Wire Fraud in violation of 18 USC § 1343

a. On April 17, 2006, Wyeth filed an answer to the complaint Lambert and Sheehan filed on Plaintiff's behalf. The answer included false and malicious accusations intended to severely damage Plaintiff's reputation. Those accusations would not have been included in the answer if Sheehan's enterprise did not assure Fitzhugh and Wyeth that they would not be held accountable as though it was an adversarial process.

b. Plaintiff's attorney/client agreement with Closson was void for public policy reasons. Lambert and Sheehan's complaint on Plaintiff's behalf was void for public policy reasons. The contingent fee agreement Plaintiff signed in March 2006, was void for public policy reasons. Neither Lambert, Closson, or Sheehan were or could have been Plaintiff's attorneys in the Wyeth case because of public policy reasons.

c. Lambert, Closson, and Sheehan knew they were not engaged in an adversarial process. They knew they were engaged in a collusive lawsuit, and that they were perpetrating a fraud on the court. Their actions caused Wyeth and Fitzhugh to file a sham pleading with accusations that had no basis in law or fact but were meant to shape case law in the First Circuit in favor of exploitative capital and financial speculators. The actions of Wyeth, Sheehan, Lambert, and Closson caused the USDC Mass. to issue NEFs in

furtherance of various schemes to defraud Plaintiff and others. The false information in the NEFs severely damaged Plaintiff's professional reputation.

d. Each time Wyeth's pleading is transmitted over interstate wires, Sheehan, Lambert, Closson, and Wyeth commit wire fraud, because they caused the fraudulent and injurious signal, in furtherance of their intentions to defraud.

e. The defendant's intended to ensure that any of Plaintiff's potential future employer's conducting a background check for screening purposes would access the civil case files that contained the false, baseless, and malicious assertions in the pleading, in addition to the fraudulent stipulation of dismissal that indicated Plaintiff sued his employer in federal court and lost.

647. Predicate Act Seventeen: Wire Fraud in violation of 18 USC § 1343

a. On April 19, 2006, the court issued a notice that a scheduling conference would be held on June 21st, 2006, at the John Joseph Moakley Courthouse in Boston, MA, at 2:00 pm. The fraudulent conduct of Wyeth, Sheehan, Lambert, and Closson, caused the court to assume jurisdiction over Plaintiff and his claims against Wyeth. Their fraudulent conduct caused the court to broadcast through interstate wires their acquisition of jurisdiction over Plaintiff and his claims against Wyeth, said broadcast furthered various schemes of Wyeth, Sheehan, Lambert, and Closson to defraud Plaintiff and others.

648. Predicate Act Eighteen: Influencing or injuring officer or juror generally in violation of 18 USC § 1503

a. On or around June 5, 2006, Lambert conspired with Wyeth, Closson, and Sheehan to corruptly persuade Judge Saris that Plaintiff had competent legal representation hoping to get her to agree with their plan to prevent the availability of material evidence for her to make a legitimate early assessment of the merits of Plaintiff's legal claims and Wyeth's defenses, as expressed in the June 5, Joint Statement.

649. Predicate Act Nineteen: Wire Fraud in violation of 18 USC § 1343

a. On June 5th, 2006, Lambert and Fitzhugh filed a Joint Statement with USDC Mass. pursuant to Fed.R.Civ.P. 26(f) and Local Rule 16.1. The Joint Statement indicated their intentions of violating Local Rule 26.2 by failing to provide each other with evidence and information they used to support their assertions in their pleadings. Earlier we learned that Lambert, Sheehan, Closson, and Wyeth conspired to retaliate against Plaintiff by assuring Wyeth and Fitzhugh, that no recriminations would result if they included false and malicious accusations against Plaintiff in their answer to the complaint.

b. The joint statement filed by Lambert and Fitzhugh on June 5th, caused interstate wires to be used in furtherance of a conspiracy to retaliate against Plaintiff by corruptly ensuring that the judicial officer would not have any evidence to assess the merits of each parties claims and defenses.

650. Predicate Act Twenty: Influencing or injuring officer or juror generally in violation of 18 USC § 1503

a. On June 5, 2006, Sheehan received an NEF indicating that Lambert had conspired with Wyeth to violate several Rules of Civil Procedure meant to protect their client from abusive discovery tactics in furtherance of preventing the court from establishing truth and justice. Sheehan encouraged Lambert to use their name in the initial court filing in furtherance of various schemes to defraud Plaintiff. They knew or should have known that the court, Plaintiff, and others relied on the representations to the court that Sheehan was Plaintiff's attorney. Sheehan ratified the representations by failing to take action to clarify they were not Plaintiff's attorneys. The law firm Sheehan made an appearance on Plaintiff's behalf in the complaint filed on February 23, 2006. Sheehan had a duty to inform the court that Lambert had engaged in unauthorized litigation, was not Plaintiff's attorney, and his actions were inimical to Plaintiff's legal interests. By failing to inform the court of Lambert's various criminal and fraudulent activities, they corruptly influenced the judicial officer into believing that Plaintiff had competent legal representation, and that Lambert's actions were authorized by Plaintiff.

651. Predicate Act Twenty-One: Tampering with a witness, victim or informant in violation of 18 USC § 1512

a. On or around June 5, 2006, Lambert, Closson, and Sheehan conspired to have Closson phone Plaintiff and inform him that he was obligated to present a settlement offer to Wyeth pursuant to Local Rule 16.1(C). At the time, Lambert had secretly repudiated his fiduciary duties towards Plaintiff and was engaged in a course of action that was unlawful and injurious to him and his legal claims. Lambert, Closson, and Sheehan agreed that during his phone call to Plaintiff, Closson would violate his duty to disclose material facts to him, such as Lambert's repudiation of trust, his conspiring with Wyeth to ensure no evidence is available for the judicial officer at the scheduling conference, his failure to ask the court for Closson to be permitted to appear and practice on Plaintiff's behalf pro hac vice, and his concealment of Wyeth's answer to the complaint.

b. Closson failed to inform Plaintiff that Wyeth's answer contained false and injurious accusations against Plaintiff that Sheehan Lambert had no intention of contesting, and which Closson could not contest on Plaintiff's behalf. Closson had a duty to disclose

these material issues but instead he conspired to and did deal corruptly with Plaintiff to influence and prevent his testimony in an official proceeding.

652. Predicate Act Twenty-Two: Tampering with a witness, victim or informant in violation of 18 USC § 1512

a. On or around June 8th, 2006, Closson phoned Plaintiff and told him that the court required him to present Wyeth with a settlement offer. Closson knew that Lambert and Sheehan were not providing competent legal counsel to Plaintiff, contrary to their representations to the court, and their contractual obligations.

b. Closson knew that Lambert was engaged in a pattern of conduct inimical to Plaintiff and his legal interests. He knew Lambert was violating his fiduciary responsibilities to Plaintiff and was intentionally deceiving him and the court into believing he had competent legal representation. Closson understood that Lambert's actions violated the Federal Rules of Civil Procedure, Local Rules, criminal statues, and Rules of Professional Conduct, and were done in furtherance of a scheme to defraud and injure Plaintiff.

c. Closson had a duty to disclose to Plaintiff the actions that Lambert and Sheehan were taking that harmed him and were in violation of their fiduciary and contractual obligations. Instead, Closson deceived Plaintiff into believing he had competent legal representation in the case against Wyeth.

d. Closson violated his fiduciary duties towards Plaintiff, and intentionally deceived him into believing he had competent legal representation in an effort to ensure Plaintiff did not testify or provide evidence in the legal proceeding against Wyeth.

653. Predicate Act Twenty-Three: Mail Fraud in violation of 18 USC § 1341

a. On June 9th, 2006 Closson used the federal mail service to send Wyeth's attorney, Fitzhugh, an offer of settlement pursuant to Local Rule 16.1(c) of USDC Mass. Closson was not licensed to practice law in Massachusetts and pursuant to M.G.L. Ch. 221 § 41, it was unlawful for him to represent himself as having power or authority on behalf of Plaintiff to procure settlements for his claims against Wyeth.

b. Closson's unlawful conduct was in furtherance of various schemes to defraud Plaintiff and others.

654. Predicate Act Twenty-Four: Wire Fraud in violation of 18 USC § 1343

a. On June 16, 2006, Lambert filed a certification with the USDC Mass. falsely stating that he conferred with Plaintiff regarding a budget for the full cost of litigation and various alternative courses. Plaintiff had yet to communicate with Lambert or Sheehan, and never communicated with anyone about a budget for litigation. Lambert included a forgery of Plaintiff's signature in the fraudulent certification.

b. An NEF was produced by the court as a result and sent through interstate wires to multiple employees of Sheehan as well as Wyeth's agents. Lambert was not Plaintiff's attorney and could not have lawfully been Plaintiff's attorney. Neither he nor Sheehan had any intention of performing any lawyerly functions that would benefit Plaintiff.

c. Lambert's fraudulent actions caused false information to be sent over interstate wires in furtherance of various schemes to defraud Plaintiff and others.

655. Predicate Act Twenty-Five: Corruptly influencing a judicial officer in violation of 18 USC § 1503

a. The certification Lambert filed with the court on June 16, 2006, was fraudulent. Lambert's assertion in the certification, that he had conferred with Plaintiff, was meant to deceive the judicial officer into believing Plaintiff had competent legal representation. Lambert signed the certification indicating he was Plaintiff's attorney, while knowing he was not. Lambert never had any intention of providing Plaintiff competent legal representation, and that is why he forged Plaintiff's signature on the court filing instead of performing his lawful duties as an attorney of record.

b. Lambert's June 16, 2006 certification was in furtherance of various schemes to defraud Plaintiff and others by corruptly influencing a judicial officer.

656. Predicate Act Twenty-Six: Corruptly influencing a judicial officer in violation of 18 USC § 1503

a. On or around June 21, 2006, Lambert appeared at a scheduling conference on Plaintiff's behalf, with Fitzhugh and Judge Saris. The notice for the scheduling conference indicated that it was of the utmost importance that the attorney for Plaintiff who was ultimately responsible for the case be present. In addition, attorneys at the scheduling conference were supposed to be authorized to make admissions about matters expected to be discussed at the conference.

b. As in his previous filings with the court, Lambert was making a false statement that Plaintiff had competent legal representation in his case against Wyeth. At the time, Lambert had repudiated his fiduciary duties towards Plaintiff and fraudulently concealed that fact from him. In addition, he was in breach of the contingent fee agreement he had with Plaintiff and had no intention of performing his obligations under the agreement.

c. Lambert's intentions in appearing at the scheduling conference was to ensure Plaintiff never had an opportunity to provide testimony or present evidence in an official proceeding. This included deceiving both Plaintiff and the judicial officer into believing Plaintiff had competent legal representation. Because this was a case brought pursuant to 29 USC § 216(b), and involved a claim associated with at least 150 similarly situated employees, it was a material issue whether Plaintiff was represented by competent counsel. Settlements for claims brought pursuant to § 216(b) must be supervised by the DOL or a judicial officer, even when a plaintiff has competent representation.

d. Lambert's actions were in furtherance of a scheme to defraud Plaintiff and others by corruptly influencing a judicial officer.

657. Predicate Act Twenty-Seven: Tampering with a witness, victim or informant in violation of 18 USC § 1512

a. On or around June 21, 2006, Sheehan's enterprise conspired to have Lambert phone Plaintiff after the scheduling conference and inform him that he should settle the case because both he and Judge Saris believed his claims lacked merit. Their actions were in furtherance of various schemes to defraud Plaintiff and others by dealing corruptly with Plaintiff to prevent him from giving testimony in a legal proceeding.

b. Closson, Lambert, and Sheehan knew that Plaintiff believed Lambert was zealously advocating on his behalf without any limitation on the scope of his representation. They also knew that Lambert had repudiated his contractual and fiduciary duties towards Plaintiff and was actively engaged in a course of conduct that severely damaged him and his claims against Wyeth.

c. Closson, Lambert, and Sheehan had a duty to inform Plaintiff that they were in possession of a trove of evidence that would have helped the judicial officer assess the merits of his claims against Wyeth, but Lambert conspired with Wyeth to ensure none of the evidence was available for the judge to make an assessment of the merits of his claims at the scheduling conference; and that no evidence was available for the judge to assess the merits of Plaintiff's claims when she made her assessment that they lacked merit and requested the case be settled quickly.

658. Predicate Act Twenty-Eight: Wire Fraud in violation of 18 USC § 1343

a. On or around June 21, 2006, Lambert phoned Plaintiff after he appeared on his behalf at a scheduling conference presided over by Judge Saris. He called from Massachusetts to New Hampshire and implored Plaintiff to settle the case quickly because both he and

Judge Saris strongly believed his claims lacked merit. At the time, Lambert believed his representation of Plaintiff was limited in scope and that Closson was the lead attorney, although he did not inform Plaintiff that his representation was limited in scope. Lambert's use of interstate wires was in furtherance of a scheme to defraud Plaintiff and others.

659. Predicate Act Twenty-Nine: Tampering with a witness in violation of 18 USC § 1512

a. On or around June 21, 2006, Lambert phoned Plaintiff after appearing on his behalf at a scheduling conference presided over by Judge Saris. Lambert implored Plaintiff to settle the case because both he and Saris believed his claims lacked merit. Lambert believed his representation of Plaintiff was limited in scope but did not inform him. Lamberts actions were in furtherance of a scheme to defraud Plaintiff and others and he dealt corruptly with Plaintiff to prevent him from giving testimony in an official judicial proceeding.

660. Predicate Act Thirty: Wire Fraud in violation of 18 USC § 1343

a. On June 26, 2006, Judge Saris issued a court order compelling Plaintiff and Wyeth to participate in court annexed mediation. Saris stated that she consulted with counsel for both parties before coming to her conclusion. Saris believed that Lambert was representing Plaintiff without limitations because of Lambert's previous false statements.
b. Lambert's fraudulent and illegal conduct caused Judge Saris to issue the order for mediation in furtherance of a scheme to defraud Plaintiff and others. Several NEFs were issued through interstate wires as a result of the court order.

c. Although the judge ordered Lambert to be present at the court annexed mediation, he had not intentions of doing so. Judge Saris would not have ordered Plaintiff to attend mediation if she knew that Lambert's representation of Plaintiff was limited in scope, that he did not intend on being present for mediation, and that he intended on an unlicensed attorney to serve as Plaintiff's lead attorney in the case, and be the only attorney present at mediation in Massachusetts.

661. Predicate Act Thirty-One: Mail Fraud in violation of 18 USC § 1341

a. On July 31, 2006, Closson used the federal mail system to send Wyeth's attorney Fitzhugh, what were purported to be initial disclosures pursuant to Fed.R.Civ.P. 26(a)(1). Closson copied Lambert in the mailing. The disclosures indicated that Closson intended to use officials from the WHD as witnesses. Closson could not properly serve the disclosures because they required a signature of an attorney of record, and he was not an attorney of record. Closson included a forgery of Plaintiff's signature with the

disclosures. Plaintiff did not see the disclosures until Closson provided him a copy on December 2018.

b. Pursuant to Fed.R.Civ.P. 26(g), the only time it is appropriate for a litigant to sign their own Rule 26(a)(1) disclosures is if they have no legal representation. Closson's actions violated regulations prohibiting the unauthorized practice of law. Closson intended to communicate to Wyeth that Plaintiff did not have legal representation, to reassure them that their various plans to defraud Plaintiff and others was still on track.

662. Predicate Act Thirty-Two: Corruptly influencing a judicial officer in violation of 18 USC § 1503

a. On August 22, 2006, Lambert faxed the Director of Alternative Dispute Resolution for USDC Mass. a message indicating his preference for the date and time of court annexed mediation. Lambert fraudulently represented himself as Plaintiff's attorney in the fax, though he was not and could not lawfully be Plaintiff's attorney. His actions were in furtherance of various schemes to defraud Plaintiff and others. Lambert knew the judge would learn of his fax and be deceived into believing that Plaintiff had competent legal representation.

663. Predicate Act Thirty-Three: Wire Fraud in violation of 18 USC § 1343

a. On September 28, 2006, Lambert used interstate wires to email Closson a court NEF laying out certain terms related to the court annexed mediation. Lambert selected Sally Higginbotham as the mediator and it was scheduled for October 11, 2006, at the John Joseph Moakley Courthouse in Boston, MA.

b. Lambert informed Closson that a confidential mediation statement needed to be submitted to Higginbotham by October 4, 2006. Lambert encouraged Closson to prepare the confidential mediation statement knowing that it was a violation of Massachusetts regulations regarding the unauthorized practice of law.

c. Lambert's actions were in furtherance of various schemes to defraud Plaintiff and others by ensuring Plaintiff believed he had competent legal representation which he knew was false.

664. Predicate Act Thirty-Four: Tampering with a witness in violation of 18 USC § 1512

a. Sometime between September 28, and October 4, 2006, Sheehan's enterprise conspired to corruptly persuade Plaintiff not to provide testimony or evidence in the official proceeding by concealing from him the confidential mediation statement Closson submitted in preparation of court annexed mediation. Closson signed for Lambert on

the mediation statement and submitted it to Higginbotham without disclosing to Plaintiff that such a document existed.

b. Closson had a duty to disclose to Plaintiff that Wyeth was in violation of the Federal Rules of Civil Procedure which required them to provide Rule 26(a)(1) disclosures, because those disclosures were a critical first step of a litigant's investigation into the merits of the claims and defenses in the pleadings. The whole point of mediation was to engaged in settlement negotiations, and Wyeth's failure to adhere to Local Rule 26.2 and Fed.R.Civ.P. 26(a)(1) prevented serious settlement negotiations at mediation.

c. Closson's actions were in furtherance of a scheme to deceive Plaintiff into believing he had competent legal representation and prevent him from giving testimony or introducing evidence in court.

665. Predicate Act Thirty-Five: Mail Fraud in violation of 18 USC § 1341

a. On October 2, 2006, Closson used the federal mail service to send mediator Higginbotham a confidential mediation statement. Closson concealed the mediation statement from Plaintiff until December 2018. Closson's actions were in violation of regulations regarding the unauthorized practice of law and were in furtherance of a scheme to defraud Plaintiff by deceiving the court into believing Plaintiff had competent legal representation in his claims against Wyeth.

666. Predicate Act Thirty-Six: Transportation of stolen goods in violation of 18 USC § 2314

a. Closson was prohibited from practicing law in Massachusetts or representing himself as having the power or authority to procure settlements for Plaintiff's claims against Wyeth. Nevertheless, as part of a scheme to defraud him out of his choses in action against Wyeth, Sheehan's enterprise conspired to cause Plaintiff to travel from New Hampshire to Massachusetts for court annexed mediation with the intention of deceiving him into believing he had competent legal representation in preparation of fraudulently inducing him to relinquish his claims against Wyeth that were worth over $5,000.

667. Predicate Act Thirty-Seven: Tampering with a witness in violation of 18 USC § 1512

a. Closson knew that the contingent fee agreement he entered into with Plaintiff in March 2006, was void for public policy reasons because he was not licensed to practice law in Massachusetts and therefore prohibited from representing himself as qualified to represent Plaintiff in his claims against Wyeth. Moreover, at the time Plaintiff signed the contingent fee agreement, a month had passed since a complaint was filed on his behalf by Lambert and Sheehan. At this time, Closson knew that Sheehan and Lambert had no intentions of "sponsoring" him so he could competently represent Plaintiff.

b. Closson's appearance with Plaintiff at the court annexed mediation on October 11, 2006, was meant to deceive him into believing he had competent legal representation. His actions were part of a pattern of corruptly dealing with Plaintiff to prevent his testimony in a legal proceeding.

668. Predicate Act Thirty-Eight: Tampering with a witness in violation of 18 USC § 1512

a. After Plaintiff and Closson attended court annexed mediation on October 11, 2006, Closson, Fitzhugh, Lambert, Sheehan, and Wyeth conspired to have Closson engage in misleading conduct towards Plaintiff for the purpose of influencing, delaying, and preventing his testimony in an official proceeding.

b. The scheme required Closson to breach his fiduciary and contractual obligations towards Plaintiff by fraudulently concealing Lambert's repudiation of trust, as well as Wyeth and Fitzhugh's failure to furnish Rule 26(a)(1) disclosures. The scheme also required Closson to breach his fiduciary duty to inform Plaintiff of his limited ability to represent his legal interests as an unlicensed attorney who did not make an appearance on his behalf, and did not seek or receive pro hac vice admission. Closson was also responsible for concealing Wyeth's violations of Rule 11 regarding pleading standards, and the WHD's investigation and adjudication of Wyeth's labor violations.

c. For their part, Wyeth and Fitzhugh agreed to stop serving papers on Lambert, Plaintiff's only attorney of record, and instead create faux legal papers and send them to Closson, who would use them to deceive Plaintiff into believing he had competent legal representation and that the legal proceeding was adversarial in nature.

d. For example, it was agreed that Wyeth and Fitzhugh would send Closson a Rule 68 Offer of Judgment, but not serve Lambert. It was agreed that the Offer of Judgment would be used to induce Plaintiff to settle his claims through fear of economic harm. Wyeth, Fitzhugh, Closson and Lambert knew that the Offer of Judgment was made in bad faith because it did not include attorney's fees and was not served on an attorney of record. In addition, the Offer of Judgment was made before Wyeth provided any evidence they intended to use to support their assertions in their pleading.

e. It was also agreed that Wyeth and Fitzhugh would send Closson what were purported to be initial disclosures pursuant to Rule 26(a)(1) of the Fed.R.Civ.P. and Local Rule 26.2, but were intended to be used for the ulterior purpose of deceiving Plaintiff into believing he had competent legal representation in an adversarial proceeding.

f. The fake initial disclosures did not include a signature from an attorney of record as required by Fed.R.Civ.P. 26(g), and included a deceitful certification stating that they

were served on the listed attorneys of record, which only listed Closson's name, who Wyeth and Fitzhugh knew was not an attorney of record.

g. Wyeth and Fitzhugh conspired to and did aid and abet the scheme of Sheehan's enterprise to corruptly deal with Plaintiff and prevent him from providing testimony or giving evidence in an official proceeding.

669. Predicate Act Thirty-Nine: Mail fraud in violation of 18 USC § 1341

a. On November 2, 2006, Fitzhugh used the federal mail service to send Closson what he purported to be an Offer of Judgment pursuant to Rule 68 of the Fed.R.Civ.P. Wyeth had not engaged in Rule 26(a)(1) initial disclosures yet. Fitzhugh and Wyeth knew that Closson was not Plaintiff's attorney of record and prohibited from practicing law in Massachusetts. They also knew that Lambert was Plaintiff's only attorney of record and only attorney licensed to practice law in Massachusetts who could respond to the Offer of Judgment without violating various regulations governing the legal profession. Fitzhugh's Offer of Judgment did not include statutorily provided attorney's fees because it was not made in good faith.

b. Wyeth and Fitzhugh used the federal mail service to send the faux offer of judgment in furtherance of various schemes to defraud Plaintiff and others.

670. Predicate Act Forty: Tampering with a witness in violation of 18 USC § 1512

a. After receiving Wyeth's Offer of Judgment from Fitzhugh, Closson conspired with Lambert and Sheehan to conceal the offer from Plaintiff in violation of their fiduciary and contractual obligations. Closson and Lambert knew that Wyeth's misclassification of Plaintiff as exempt from overtime were critically important to his claim for retaliation pursuant to 29 USC § 215(a)(3).

b. Although Plaintiff denies the false accusations against him in Wyeth's pleading related to being "approached" or reprimanded during his first several weeks, any friction Wyeth tried to prove was the reason for Plaintiff being "approached" or "reprimanded" during his first weeks at Wyeth could have been refuted by demonstrating that the friction was caused by Wyeth's misclassification of his position as exempt, and the false belief of his supervisor that he was obligated to work overtime for free regardless of his actual duties. The verbal counseling Plaintiff received on April 12th, clearly demonstrated that it was in response to him trying to assert his rights under the FLSA and completely based on the false premise that he was obligated to work overtime for free regardless of his actual duties.

c. Sheehan's enterprise, conspired to conceal the offer of judgment from Plaintiff was aided and abetted by Wyeth and Fitzhugh because they knew Closson could not file the offer with the court indicating Plaintiff's acceptance of it. The offer was made in bad faith to use as leverage after the 10 day acceptance period to corruptly influence Plaintiff in not testifying or presenting evidence in an official proceeding through the threat of economic harm.

671. Predicate Act Forty-One: Wire fraud in violation of 18 USC § 1343

a. On or around November 9, 2006, Closson emailed an inquiry to Patty Colarossi, the lead inspector of the WHD responsible for investigating Wyeth. Although Closson knew for over a year that the WHD determined Plaintiff had been misclassified, along with 150 similarly situated employees, he concealed this information in furtherance of various schemes to defraud Plaintiff and others.

b. In December 2018, Closson provided Plaintiff a copy of the email from Colarossi. However, he did not provide his correspondence to her that invoked her response.

c. Closson's communications with the WHD on Plaintiff's behalf violated various regulations prohibiting the unauthorized practice of law in Massachusetts. His intentions were to deceive the WHD into believing that Plaintiff had competent legal representation.

d. Closson also planned on using the email from Colarossi to deceive Plaintiff into settling his case on unfavorable terms and defraud him out of the damages he was entitled to.

672. Predicate Act Forty-Two: Tampering with a witness in violation of 18 USC § 1512

a. Wyeth and Sheehan's enterprise knew that the official reason given by the WHD for not forwarding the Wyeth case files to the RSO for prosecution was because the case law in the First Circuit was weak. Part of the conspiracy between Wyeth, and Sheehan's enterprise was to ensure that case law in the First Circuit remained weak so Wyeth and Brack's enterprise could continue their racketeering activities.

b. Closson knew that Wyeth refused to comply with the WHD's determination that Plaintiff and over 130 similarly situated employees had been misclassified and due back wages. He also knew that it was important to the WHD whether or not Plaintiff had competent legal representation in his case.

c. Closson's inquiry to Colarossi on or around November 9, 2006, was unlawful and in furtherance of various schemes to defraud Plaintiff and others by preventing her testimony or providing other information in an official proceeding. Closson intended to prevent and delay Colarossi's testimony or furnishing of evidence with his inquiry.

673. Predicate Act Forty-Three: Tampering with a witness in violation of 18 USC § 1512

a. Closson's inquiry to Colarossi was also intended to prevent or influence Plaintiff's testimony in an official proceeding as well. He intentionally withheld information from the WHD and caused Plaintiff to do so also.

b. Closson intended to use Colarossi's response regarding the low amount she estimated he was due, which he knew was based on false information, to convince Plaintiff to settle his case with Wyeth or be subject to economic damages for bringing a frivolous lawsuit against them.

674. Predicate Act Forty-Four: Mail fraud in violation of 18 USC § 1341

a. On November 10, 2006, Fitzhugh used the federal mail system to send Closson what were purported to be Initial Disclosures pursuant to Rule 26(a)(1) and Local Rule 26.2. The disclosures were extremely incomplete and several months late pursuant to the Fed.R.Civ.P. They were not signed by an attorney of record. Fitzhugh did not serve the disclosures to Lambert, rather he sent them to Closson who he knew was engaged in a course of conduct that was unlawful, in breach of his fiduciary duties towards Plaintiff, and injurious to Plaintiff and his legal claims.

b. Sheehan's enterprise conspired with Wyeth to have them mail the faux initial disclosures as part of a scheme to defraud Plaintiff by making him believe that he had competent legal representation in an adversarial proceeding which they knew was false. The Rule 26(a)(1) disclosures Fitzhugh sent to Closson contained a Certification of Service stating

> I hereby certify that I have served a copy of the above Defendant's Automatic Disclosures on all counsel of record listed below by first class mail, postage prepaid on this 10th day of November, 2006.
>
> Thomas M. Closson, Esq.
> Flygare, Schwarz & Closson, PLLC
> 11 Court Street, Suite 2
> Exeter, NH 03833-2745

675. Predicate Act Forty-Five: Tampering with a witness in violation of 18 USC § 1512

a. Fitzhugh's November 10, 2006, faux initial disclosures were meant to corruptly delay and prevent Plaintiff from testifying or providing information in an official proceeding

by making it seem like he was receiving competent advice from an attorney subject to the discipline of the courts and bar of Massachusetts, when he knew otherwise.

676. Predicate Act Forty-Six: Tampering with a witness in violation of 18 USC § 1512

a. On or around December 14, 2006, Closson summoned Plaintiff to his office in Exeter, NH, for the purpose of corruptly delaying and preventing his testimony in an official proceeding.

b. Closson was a fiduciary of Plaintiff's and had a duty to disclose several material facts which he concealed in furtherance of various schemes to defraud him and others. Closson informed Plaintiff that he had to settle his case against Wyeth immediately because they were threatening to sue him for bringing a frivolous lawsuit against them. He told Plaintiff that there was a good chance he would end up owing Wyeth thousands of dollars if he did not settle.

c. Plaintiff asked Closson about his complaints to the WHD, and Closson concealed the fact that any investigation of Wyeth had taken place. He informed Plaintiff that the lead investigator urged Closson to settle the case if he got an offer. He did not inform Plaintiff that the WHD had investigated Wyeth and determined that he and over 150 similarly situated employees were misclassified and owed back wages.

d. Closson emphasized Plaintiff's phone call with Lambert, during which Lambert informed him that both he and Judge Saris wanted the case settled quickly because Plaintiff's claims lacked merit. Closson did not inform Plaintiff that Lambert's representation was limited in scope, contrary to the written contingent fee agreement, and his representation to the court in the complaint. He also failed to inform Plaintiff that Lambert had cooperated with Wyeth's attorney Fitzhugh to ensure no evidence was available to the judicial officer when she made her preliminary assessment of the merits of Plaintiff's claims and Wyeth's defenses.

e. Closson concealed from Plaintiff, Wyeth's answer to the complaint that was filled with false and baseless accusations against him that were very injurious to his professional reputation and legal claims. He knew the false and baseless assertions could have easily been disproven with documents and information he concealed from Plaintiff, the WHD, and the judicial officer.

f. Closson did not inform Plaintiff that he was never licensed to practice law in Massachusetts, and could not sign papers or file motions or competently represent him without violating regulations governing the practice of law in Massachusetts.

g. Closson ensured Plaintiff wrote a letter to the Mass. AG's Office, withdrawing his complaint against Wyeth and stating that a full settlement had been reached, knowing

that Plaintiff was being victimized all over again by the same perpetrators, and that they intended to continue to victimize hundreds of vulnerable young professionals with his help.

h. Closson led Plaintiff to believe that the case would be dismissed "with prejudice" which meant the record would accurately reflect the fact that he won a settlement that included attorney's fees. Instead, Plaintiff was actually being tricked into agreeing that the record reflected he lost his claims against Wyeth, and they were the prevailing party.

i. Closson presented Plaintiff with an "Exhibit A" that he knew was materially different than the record that would be filed with the court dismissing the litigation. The "Exhibit A" Closson presented Plaintiff did not mention which party bore the costs of the legal action, the "Exhibit A" Fitzhugh and Lambert filed with the court indicated each party bore their own legal costs, reinforcing the false assertion that Wyeth was the prevailing party in the case.

j. Closson's actions on December 14, 2006, were in furtherance of various schemes to defraud Plaintiff and others, and he corruptly dealt with Plaintiff to prevent his testimony in an official proceeding by convincing him to settle his claims under fraudulent circumstances.

677. Predicate Act Forty-Seven: Mail fraud in violation of 18 USC § 1341

a. On or around December 14, 2006, Closson used the federal mail service to send Fitzhugh a completed confidential settlement agreement that was procured through fraud and in furtherance of various schemes to defraud Plaintiff and others.

678. Predicate Act Forty-Eight: Corruptly influencing a judicial officer in violation of 18 USC § 1503

a. Between December 14, 2006 and January 22, 2007, Sheehan's enterprise and Wyeth conspired to file a fraudulent Stipulation of Dismissal with the USDC Mass. regarding the outcome of Plaintiff's claims against Wyeth. The stipulation was titled "Exhibit A" but materially different than the stipulation Plaintiff agreed to under Closson's advice.

b. It was universally known by Lambert, Fitzhugh, Wyeth, Sheehan, and Closson that Closson's actions in advising Plaintiff to settle was in furtherance of various schemes to defraud him and others, and that he was engaged in the unauthorized practice of law. They also knew that Wyeth paid Closson and Lambert for their legal representation of Plaintiff, and that he was the prevailing party. Lambert and Fitzhugh knew that the "Exhibit A" Plaintiff agreed to was materially different than the one they filed on January 22, 2007.

c. Lambert and Fitzhugh's stipulation was meant to deceive Judge Saris into believing that Plaintiff had competent legal representation, and authorized the filing of the stipulation of dismissal which was false. As a result of their fraudulent conduct, Judge Saris did not supervise the settlement agreement.

679. Predicate Act Forty-Nine: Tampering with a witness in violation of 18 USC § 1512

a. After Lambert and Fitzhugh filed the fraudulent stipulation on January 22, 2007, they conspired with Closson, Wyeth, and Sheehan to fraudulently conceal the stipulation and other important legal documents from Plaintiff to prevent him from testifying in an official proceeding.

b. Pursuant to NH RSA 508:4e (I) regarding contingent fee agreements, Closson and Lambert were required to provide Plaintiff with a written statement stating the outcome of the matter, and since there was a recovery, showing a remittance and the method of its determination. Neither Lambert nor Closson provided Plaintiff with this information which would have put him on alert that he was the victim of fraud and needed to provide testimony to the court stating as much.

<u>Claim V Civil RICO in Violation of 18 U.S.C. § 1962 (b)</u>

604. Pursuant to 18 USC § 1961(3), Wyeth was a person. Pursuant to 18 USC § 1961(4), Closson, Lambert, and Sheehan were an enterprise consisting of associates-in-fact (Sheehan's enterprise). Wyeth gained an interest in and control of Sheehan's enterprise through a pattern of racketeering activity.

<u>Claim VI Civil RICO in Violation of 18 U.S.C. § 1962 (b)</u>

605. Pursuant to 18 USC § 1961(3), Lambert, Closson, and Sheehan are persons. Pursuant to 18 USC § 1961(4), Plaintiff was and is an enterprise whose activities affect interstate commerce. Lambert, Closson, and Sheehan acquired an interest in and control of Plaintiff through a pattern of racketeering activity.

<u>Claim VII Civil RICO in Violation of 18 U.S.C. § 1962 (c)</u>

606. Pursuant to 18 USC § 1961(3), Lambert and Closson are persons. Pursuant to 18 USC § 1961(4), Sheehan was an enterprise whose actions affected interstate commerce. Lambert and Closson were either employed or associated with Sheehan, and conducted their affairs through a pattern of racketeering activity.

Claim VIII Civil RICO in Violation of 18 U.S.C. § 1962 (d)

607. Lambert, Closson, Sheehan, and Wyeth conspired to and did violate 18 USC §§ 1962(a), (b), and (c).

608. As a result of the unlawful conduct of Wyeth, Closson, Sheehan, and Lambert, Plaintiff is entitled to and hereby requests a jury trial on all claims so triable and an award of:

a. Back pay and benefits in an amount equal to the difference between the value of his earnings and benefits since Wyeth terminated him and the value of earnings and benefits he would have received if Wyeth, Closson, Sheehan, and Lambert honored their responsibilities to conduct their business affairs in accordance with federal and state laws, and the common law requirement of good faith and fair dealing implied in every contract entered into in Massachusetts;

b. Lost future wages and benefits in an amount equal to the difference between the value of Plaintiff's projected future earnings after his professional reputation was severely damaged by the malicious and unlawful campaign of fraudulent and retaliatory conduct carried out by Wyeth, Closson, Sheehan, and Lambert; and the value of wages and benefits Plaintiff would have earned if the aforementioned defendant's conducted their business operations in accordance with state and federal laws, and the common law requirement of good faith and fair dealing implied in every contract entered into in Massachusetts;

c. Liquidated damages, legal costs, and attorney's fees pursuant to 18 USC § 1964(c);

d. Punitive damages in an amount that will discourage similar unlawful and fraudulent conduct by large multinational corporations in partnership with independent HR consultants and attorneys;

e. Profit disgorgement in an amount equal to the financial gains Wyeth benefitted from through the misclassification of at least 135 employees similarly situated with Plaintiff and who the WHD issued a final order that required Wyeth to re-classify as non-exempt and pay back wages; an order Wyeth refused to comply with and which Lambert, Closson, and Sheehan unlawfully helped to conceal to preserve the illicit benefits;

f. Profit disgorgement equal to the financial gains that Wyeth benefitted from by employing workers in violation of 29 USC § 207, and introducing hot goods made by those workers into interstate commerce in violation of 29 USC § 215(a)(1), which Lambert, Closson, and Sheehan unlawfully helped to facilitate and conceal;

g. Medical costs associated with treatment Plaintiff received and will receive in the future for ailments incurred as a result of the malicious conduct of Wyeth, Lewandowski,

Cowdrick, and Brack, which Closson, Sheehan, and Lambert assisted by ensuring Plaintiff was denied an opportunity to seek redress through their actions of fraud, breach of fiduciary duty, forgery, perjury etc.;

h. Financial charges Plaintiff incurred as a result of his inability to pay down his student loan debt because of unemployment and underemployment that was caused by his unlawful termination and other retaliatory conduct Wyeth, Lewandowski, Cowdrick, and Brack subjected him to, and which Lambert, Sheehan, and Closson assisted by ensuring Plaintiff was denied an opportunity to seek redress through their actions of fraud, breach of fiduciary duty, forgery, perjury, etc.

i. Compensation for mental anguish Plaintiff suffered as a result of the malicious acts of Wyeth, Cowdrick, Lewandowski, and Brack, which Closson, Sheehan, and Lambert helped inflict by ensuring Plaintiff was denied an opportunity to seek redress through their actions of fraud, breach of fiduciary duty, forgery, perjury, etc.

j. Compensation for the loss of enjoyment of life;

k. Striking all records and pleadings associated with the collusive lawsuit perpetrated by Wyeth, Sheehan, Lambert, and Closson that were not supported by any evidence made available to Plaintiff or the court during the legal proceeding;

l. Such other relief as the court deems appropriate.

Claim IX Abuse of Process

Plaintiff brings this claim against attorney Thomas Closson, Attorney Michael Lambert, the law firm Sheehan, Phinney, Bass + Green P.A. (Sheehan) and Pfizer (as successor to Wyeth) for using legal process to bring Plaintiff and Wyeth under the jurisdiction of the Unites States District Court for the District of Massachusetts (USDC Mass.) for the ulterior purposes of; unlawful conversion of Plaintiff's choses in action against Wyeth valued at over $100,000; impeding Plaintiff from representing a class of at least 137 similarly situated employees who Wyeth employed in violation of 29 USC § 207 and owed back wages for overtime worth about $166,000 in addition to liquidated damages; corruptly obstructing and impeding a pending proceeding before the United States Department of Labor (DOL) in violation of 18 USC § 1505; aiding and abetting a conspiracy to defraud the National Labor Relations Board (NLRB) in violation of 18 USC § 371; aiding and abetting a conspiracy to defraud the DOL in violation of 18 USC § 371; retaliating against Plaintiff for providing the DOL with truthful information about various Federal offenses committed by Wyeth in violation of 18 U.S.C. § 1513(e); aiding and abetting Wyeth's introduction of goods into commerce that were manufactured by persons employed in violation of 29 USC § 207, in violation of 29 USC § 215(a)(1); fraudulently concealing various predicate acts of racketeering by an enterprise funded by Wyeth with money

derived through a pattern of racketeering activity in furtherance of various schemes to defraud in violation of 18 USC 1962(a); depriving Plaintiff of his right to redress the government for harms he suffered in his person and property as guaranteed by Article XI of the Constitution of the Commonwealth of Massachusetts and the First Amendment of the Constitution of the United States of America; aiding and abetting a conspiracy to obtain the labor and services of persons through a scheme intended to cause the victims to believe that if they did not perform such labor or services they or other people would suffer serious harm in violation of 18 USC § 1589(a)(4); aiding and abetting a conspiracy to obtain the labor and services of persons through the abuse and threatened abuse of law and legal process in violation of 18 USC § 1589(a)(3); aiding and abetting a conspiracy to acquire and maintain indirectly and directly an interest in and control of an enterprise whose activities affect interstate commerce in violation of 18 USC § 1962(b); aiding and abetting a conspiracy by persons employed by and associated with an enterprise whose activities affect interstate commerce to conduct and participate in directly and indirectly in the conduct of the enterprises affairs through a pattern of racketeering activity in violation of 18 USC § 1962(c); aiding and abetting a conspiracy to conceal records, documents, and other objects with the intent to impair the their integrity and availability in an official proceeding in violation of M.G.L. Ch. 268 § 13E; obtaining the signature of Plaintiff to a written instrument under false pretenses with the intent to defraud him in violation of M.G.L. Ch. 266 § 31; obtaining by false pretenses an extension of time for the payment of an obligation and the release and alteration of the obligations of a written contract with the intent to defraud in violation of M.G.L. Ch. 266 § 33(1); inducing Plaintiff to part with property by a false pretense with the intent to defraud him in violation M.G.L. Ch. 266 § 34; aiding in the commission of a felony in violation of M.G.L. Ch. 274 § 2; aiding and abetting retaliation against Plaintiff for taking actions to seek his rights under the wages and hours provisions of M.G.L. Ch. 149 in violation of M.G.L. Ch. 149 § 148A; aiding and abetting a conspiracy to obtain control over Plaintiff's property by extortion with the intent of depriving him of the property in violation of NH RSA Ch. 637 § 637:5(I); aiding and abetting a conspiracy to injure, oppress, threaten and intimidate Plaintiff in the free exercise and enjoyment of rights and privileges secured to him by the Constitution and laws of the United States and because he exercised the same in violation of 18 U.S.C. § 241; aiding and abetting a conspiracy to deprive Plaintiff of rights privileges and immunities secured and protected by the Constitution and laws of the United States under color of various state and federal laws, statutes, ordinances, regulations and customs in violation of 18 U.S.C. § 241; aiding and abetting a conspiracy to obstruct, delay, and affect commerce by extortion in violation of 18 U.S.C. § 1951(a); aiding and abetting the retaliation against Plaintiff by Wyeth for engaging in concerted action in violation of 29 U.S.C. § 158(a)(1); and aiding and abetting a conspiracy to extort money and other pecuniary advantages and intending to compel Plaintiff to act against his will by using verbal and written communication to threaten an injury to Plaintiff and his property in violation of M.G.L. Ch. 265 § 25. The defendants also conspired to use legal process for the aforementioned ulterior purposes.

## Wyeth Colluded with Plaintiff's Attorneys to Avoid a Class Action Lawsuit

680. Plaintiff incorporates this entire complaint in the following claim for abuse of process.

681. After an honest effort to convince Wyeth to comply with the overtime provisions of the FLSA without having to involve law enforcement or taking other legal action, Plaintiff had enough of

Wyeth's malicious and vindictive treatment. On June 20th, 2004, he filed a complaint against Wyeth with the WHD for violating 29 USC § 207. In the complaint, Plaintiff expressed concern not only about himself, but also similarly situated employees who were unlawfully being required to work overtime for free. The following is an excerpt from His June 20th complaint

> I regret not filing this complaint earlier but I got repeated assurance from Wyeth that they were taking my concerns seriously and conducting an extensive investigation. I've been told as many as 20-30 technologists at the company are exempt and work well over 40 hours a week doing technician work.

682. On June 30, 2004, Wyeth terminated Plaintiff in retaliation for asserting rights he believed he had under the FLSA and for engaging in concerted action as defined by 29 USC § 157.

683. On July 13th, 2004, Plaintiff sent an email to Socha and Hanley, appealing his termination pursuant to Wyeth's AFT policy. In the email, Plaintiff made it clear that he was not only concerned about himself, but about the other employees in a similar position who were also being exploited by Wyeth. His email read in part

> Next I would like to address the underlying issue which has contributed significantly to all disciplinary actions taken against me by Wyeth thus far; my open and steadfast objection to making all of Wyeth's current employees, with similar job duties as myself, work overtime for free.

684. On July 23, 2004, Plaintiff met with Socha and Scoble to appeal his termination. Scoble represented the highest level of management at Wyeth's Andover location and oversaw hundreds of employees engaged in manufacturing operations that were classified as exempt from overtime.

685. During the meeting both Socha and Scoble stated they did not know the requirements under federal and state labor laws to determine what types of jobs qualified as exempt from overtime pay. Socha stated that a few people at Wyeth's headquarters in Pennsylvania were responsible for determining which jobs were exempt from overtime pay. Scoble nodded his head in agreement as she was saying this.

686. Plaintiff showed Socha and Scoble, a WHD Fair Pay Fact Sheet #170 that stated neither technicians nor technologists qualified for any available exemption under the FLSA. He informed them that he had previously e-mailed the fact sheet to both Lewandowski and Como, in April.

687. Socha responded to the Fair Pay Fact Sheet by saying that every position at Wyeth was analyzed by the job description in conjunction with a computer program that categorized the exempt/nonexempt status of the position, and that no position could exist at Wyeth without going through that test. Scoble nodded his head in agreement.

688. Towards the end of December 2004, Plaintiff met with Closson at his Court Street office in Exeter, NH. During the meeting, Closson declined to represent Plaintiff in his claims against Wyeth because they were subject to the jurisdiction of Massachusetts, and he was not licensed to practice law in Massachusetts.

689. On January 10th, 2005, Plaintiff submitted a follow-up to the original complaint he filed against Wyeth with the WHD. In the follow-up, he stated that Wyeth terminated him in retaliation for asserting rights he believed he had under the FLSA.

690. Plaintiff also included in the follow-up a copy of Socha's memo regarding unions which reads in part

> On the hearing date, the Company management appeared before the NLRB with the Union present to argue that the Union's characterization of the unit was inappropriate and deceptively misleading....The Union argued before the NLRB, that entire groups and particular individuals within groups should be excluded and therefore ineligible to vote in a representation election...Your management argued that if such a significant issue impacting EVM is to be put to a vote, all non-exempt employees within the EVM department should be deemed eligible to vote....There were no reasons given for the withdrawal, however, it is logical to conclude that the Union representative realized that he would have difficulty proving that a lawful basis exists to exclude certain groups and certain individuals from those performing the same types of jobs under identical working conditions.

691. Plaintiff consistently acted on behalf of other employees at Wyeth, and at least one of them; Coworker B, authorized him to speak on their behalf.

692. After receiving Plaintiff's follow up in January 2005, the WHD began investigating Wyeth's labor practices at their Andover location. By early March 2005, it was clear that Wyeth was facing extensive sanctions for misclassifying at least 150 employees as exempt from overtime and failing to keep accurate records of their employees pursuant to 29 U.S. Code § 211(c). The WHD determined that Wyeth owed about $170,000, in addition to liquidated damages of the same amount.

## Plaintiff Retains an Attorney

693. Plaintiff was unaware of the WHD investigation, and around the same time Wyeth began to realize they were facing extensive sanctions for widespread and pervasive labor violations, Closson had a change of heart regarding his ability to represent him in the matter. He summoned Plaintiff to his law office around mid-March of 2005, and agreed to represent him in his claims against Wyeth on a contingent fee basis. Closson said a friend was going to sponsor him so he could practice law in Massachusetts.

694. Closson directed Plaintiff not to discuss the matter with anyone, and to forward all communications regarding Wyeth to him. He told Plaintiff that he would communicate about the Wyeth case with law enforcement and others on his behalf.

695. During the March 2005 meeting, Plaintiff agreed to provide Closson all of the documentary evidence he had that was related to the Wyeth matter, and he did so shortly after their meeting.

696. Plaintiff had already been through what seemed like a nightmare. He could not find equivalent employment and was in dire financial straits which had severe negative repercussions on his family relationships. He was suffering from acute anxiety that manifested as physical pain in his neck and back and required medical treatment. The only source of income he could find was through employment in manual labor jobs which exasperated his physical pain and caused further strain on his relationships.

697. Plaintiff had met with at least ten different representatives of Wyeth management and HR trying to convince them to honor their commitments and follow the law; he was subjected to malicious retaliation each time. After a prickly beginning, his relationship with his supervisor improved dramatically and the lab was performing better than ever. Unfortunately, she was forced to resign for refusing to cooperate with Wyeth's various schemes to exploit their employees and retaliate against Plaintiff with false accusations.

698. Plaintiff did not realize it at the time, but Wyeth was engaged in the systematic fraudulent inducement of young college graduates to accept position that were intentionally misrepresented. Their business partner, Brack, developed a system to quickly screen out employees who resisted being exploited, or expressed an awareness of the labor laws that Wyeth believed it was their right to ignore.

699. One method Wyeth used to identify and rid their workplace of employees who were skeptical of their abusive practices, was convincing them that an Employee Relations Representative such as Lewandowski, would be their fiduciary and advocate on their behalf to management. They used the technique with Plaintiff, and he greatly appreciated the support, until he learned the hard way that it was a ruse; part of a malicious scam intended to exploit his trust and placing Lewandowski in a supreme position to lead a campaign of cold and calculated retaliation.

700. Plaintiff was greatly appreciative when Closson agreed to take his case. He placed complete trust in Closson to take care of his interests as best he could. Plaintiff's mental and physical health were declining, and now he could stop struggling against the corporate juggernaut and let a trusted and knowledgeable professional fight for me.

701. As time passed, Plaintiff occasionally checked in with Closson to see how the case was coming along. Closson consistently assured him that he was diligently working on his case. Plaintiff was very thankful that Closson agreed to represent him on a contingent fee basis. He avoided badgering Closson out of respect for his time and money, and did not want to sully valued friendships with his family.

## The Wage and Hour Inquiry

702. On January 11, 2006, Plaintiff received a letter from the Mass. AG's office informing him that the proper agency for him to contact regarding his complaint against Wyeth was the WHD.

703. On January 25, 2006, Plaintiff received a letter from the WHD's new District Director, George Rioux, asking for more information about his complaint so his office could take further action. Plaintiff handed both of these letters over to Closson. The letters had the effect of convincing

Plaintiff that neither the WHD or Mass. AG's office ever took action in response to his complaints.

## Unauthorized Lawsuit is Filed on Plaintiff's Behalf

704. After giving Closson the January 25th letter from Rioux, Plaintiff didn't hear from him until around March 21st, 2006, when he was summoned to Closson's law office and shown a complaint that had been filed on his behalf a month earlier in USDC Mass.

705. Plaintiff was somewhat surprised by the complaint. He never spoke with Closson about filing a one, and he never heard of, let alone communicated with Lambert. He was vaguely familiar with the law firm Sheehan because they are one of the largest and most prestigious firms in New Hampshire. Plaintiff trusted that Closson was doing what was in his best interests, and if he didn't have a problem with Lambert and Sheehan filing the complaint, neither did Plaintiff.

706. Besides, during the March 21st meeting with Closson, while Plaintiff was reading the end of the complaint, he reached the closing which stated

> Respectfully submitted,
> Brent Arbogast
> By His Attorneys,
> Sheehan, Phinney, Bass + Green P.A.
> /s/ Michael J. Lambert

707. Just as Plaintiff was reading that the whole Sheehan law firm was behind him, Closson presented him with a contingent fee agreement stating that both he and Lambert would serve as his attorneys in his claims against Wyeth. There was no discussion about a limited scope of representation, and Closson did not reveal that he never became eligible to practice law in Massachusetts. Although Plaintiff had never met or communicated with Lambert or anyone else from the Sheehan law firm, he trusted Closson's advice and signed the agreement.

## What Functions Do Lawyers Perform?

708. If Lambert, Sheehan, and Closson (Plaintiff's attorneys) filed a complaint against Wyeth on his behalf for a legitimate purpose, it should be easy to identify specific actions they took for his benefit. Actions that clearly harmed Plaintiff and his legal interests should be rare and predisposed to a plausible explanation. For example, obeying the laws and adhering to the Rules of Professional Conduct, is more important than winning a case for a client through zealous representation. If an attorney must act in a way that harms the interests of their client, adherence to the law and Rules of Professional Conduct is a universally recognized absolute defense.

709. According to paragraph 2 of the preamble of the Massachusetts Rules of Professional Conduct (MRPC)

> As a representative of clients, a lawyer performs various functions. As advisor, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications. As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system. As negotiator, a lawyer seeks a result advantageous to the client but consistent with requirements of honest dealing with others. A lawyer acts as evaluator by examining a client's legal affairs and reporting about them to the client or to others.

710. It is reasonable to conclude that if Plaintiff's attorneys used legal process for a legitimate purpose, they were performing one of the various functions described in the Rules of Professional Conduct. What lawyerly function did Plaintiff's attorneys perform by filing a complaint on his behalf without authorization, and without informing him until a month later? Advising and negotiating do not seem relevant at this point. Evaluating is a possibility and we will keep that function in mind.

### Plaintiff's Attorneys Completely Disregarded the Rules of the Adversary System

711. Filing a complaint on Plaintiff's behalf matches best with the function of advocate. According to the MRPC, Lambert and Sheehan's function as an advocate entailed their zealous assertion of Plaintiff's position under the rules of the adversary system.

712. Before exploring whether Plaintiff's attorneys zealously asserted his position, let us examine their adherence to the rules of the adversary system.

713. When Lambert and Sheehan filed a complaint on his behalf, Plaintiff had never communicated with them; they were not his attorneys and were not authorized to file the complaint. Is that a violation of the rules of the adversary system?

714. The New Hampshire Supreme Court has spoken about unauthorized litigation. In Keenan v. Fearon, 130 N.H. 494 (N.H. 1988) an attorney filed an appeal on their client's behalf after the lower court refused to issue an injunction related to the construction of a building by a neighbor of the client. Unfortunately, the client never authorized the attorney to file an appeal. Justice Souter of the Supreme Court of New Hampshire had the following to say about that

> It is further the finding of the undersigned that the failure of Attorney Sorg to properly inform his client and to get his client's permission before filing the appeal in the primary action shows a complete disregard of the responsibilities imposed on an attorney.

715. In the complaint filed on Plaintiff's behalf, Sheehan and Lambert informed the court that they were Plaintiff's attorneys and authorized to use legal process on his behalf. In fact, Sheehan and Lambert were not Plaintiff's attorneys in the Wyeth case. Regulations governing the legal profession in New Hampshire and Massachusetts prohibited Closson, Lambert and Sheehan from being his attorneys. Plaintiff definitely did not have an attorney/client relationship with either Lambert or Sheehan, he never met or communicated with them, he was vaguely familiar with Sheehan because of their political activity in the state, but they certainly were not his attorneys.

716. Filing a lawsuit in federal court is a big deal that should be the result of much discussion and attempts at negotiation. A young person in debt $40,000 and at the dawn of their professional career should be advised of the consequences of suing a former employer, especially in light of the common practice, in the industry of their chosen profession, of employers performing a background check that includes the release and inspection of their civil court history records.

717. All fillings with a federal court are subject to the pleading standards of Rule 11 of the Fed.R.Civ.P., including a complaint. When Lambert and Sheehan filed the complaint on Plaintiff's behalf, the represented to the court that they were his attorneys and that he authorized them to file the complaint; both were false assertions.

718. Looking to another opinion by the New Hampshire Supreme Court in Astles' Case, 134 N.H. 602 (N.H. 1991), Judge Brock opined

> In today's society, more than ever before, the legal profession touches and affects nearly every facet of private and public life. Without debating the merits of this pervasiveness, one indisputable consequence of such an increase has occurred: the need for maintaining and requiring the highest possible levels of honesty and trustworthiness from the legal practitioners in this State. No single transgression reflects more negatively on the legal profession than a lie. As well as being the most fundamental of dishonesties, a lie is the most pernicious; it is easily and readily concealed and, as evidenced by the actions of this respondent, it serves as the seed for a growth of future dishonesty.

719. Lambert and Sheehan's actions in lying to the court about material facts related to the Wyeth case was a fundamental dishonesty, it was pernicious, and a seed of future dishonesty.

720. Lambert and Sheehan knew that Plaintiff's contingent fee agreement with Closson was void for public policy reasons pursuant to M.G.L. Ch. 221 § 46A. They also knew that filing a complaint on a person's behalf without authorization was illegal, and the complaint was void for public policy reasons.

721. Plaintiff's attorneys tried to ratify their illegal conduct through a contingent fee agreement on March 21, 2006. If a person uses fraud to convince their victim to ratify previous acts of fraud, does that make the initial fraud any less reprehensible? No, the evils of fraud can only be multiplied by more fraud, not diminished.

722. At the time Plaintiff was fraudulently induced into signing the March 2006 contingent fee agreement, a trove of material information was concealed from him that made the requisite informed consent an impossibility. For example, Closson, Lambert, and Sheehan knew that the WHD already investigated Wyeth and determined that Plaintiff and 150 similarly situated employees were misclassified as exempt and owed hundreds of thousands of dollars combined in back wages, but they had been actively concealing this information for close to a year. They knew that Closson had received a trove of documents and records from Wyeth implicating them in several sophisticated schemes of fraud and exploitation that exposed them to liability for numerous causes of action arising under the laws of the Commonwealth of Massachusetts, but concealed this information from Plaintiff. They knew that Lambert intended to limit his scope of representation of Plaintiff, and that Sheehan did not intend on representing him at all, and

they concealed this information. They knew that Closson never sought or received, or planned on seeking authorization to practice law in Massachusetts, but concealed that information from Plaintiff. They knew that Closson was not eligible for the statutorily provided attorney's fees provided to a prevailing party in a case brought pursuant to § 216(b) of the FLSA because of lack of admission to the bar, and they concealed this information from Plaintiff.

723. Lambert, Closson, and Sheehan knew that informed consent was required if they wanted Plaintiff to ratify their previous unlawful conduct by signing the March 2006, contingent fee contract, that was a fee sharing agreement between two attorneys in different law firms.

724. Let us examine what the New Hampshire Supreme Court has said about fee-sharing contracts that are entered into without informed consent. In Kalled v. Albee, 142 N.H. 747 (N.H. 1998), Judge Thayer stated

> The record reflects that the Deans did not give their informed consent to the fee-sharing arrangement between Kalled and Albee...Failure to obtain a client's informed consent constitutes a breach of fiduciary duty and a violation of public policy; such contracts are invalid.

725. According to Rule 1.0(e) of the New Hampshire Rules of Professional Conduct (NHRPC), the definition of informed consent is the following

> (e) "Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.

726. Did Lambert, Sheehan, or Closson explain to Plaintiff the risks associated with agreeing to their proposed course of conduct? Did they communicate adequate information so he could assess the material risks of and reasonably available alternatives to signing the March 21, 2006, contingent fee agreement?

727. Before answering these questions definitively, imagine Plaintiff being informed that as "local counsel", Lambert would have "very little" to do with his case; that Closson would be Plaintiff's "lead attorney" but not be able to appear on his behalf, file motions, serve papers, or engage in settlement negotiations without breaking the law; and that any work Closson did on Plaintiff's behalf was not compensable under the statutorily provided attorney's fees under § 216(b), because in the First Circuit, an unlicensed attorney is on the same footing as a layperson and not eligible for attorney's fees.

728. What if Plaintiff refused to sign the March 2006 contingent fee agreement? We can imagine Lambert and Sheehan explaining to the court that they wanted to withdrawal their appearance on Plaintiff's behalf pursuant to Local Rule 83.5.2(c), because he was uncomfortable with them filing a complaint on his behalf without authorization, and without ever meeting or communicating with them.

729. Moving on from speculating in an effort to reach the truth, Rule 1.2(c), of the NHRPC states

> (c) A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent.

730. Was it reasonable for Lambert to limit his scope of representation and leave Plaintiff without any competent attorney of record to advocate the substantive issues on his behalf? No, and Closson, Lambert and Sheehan knew as much.

731. Closson, Lambert, and Sheehan knew that it was unlawful for Closson to procure control of Plaintiff's claims. They also knew the axiom that a principal does not intend their agent to commit any unlawful acts.

732. Lambert, Closson, and Sheehan knew that Closson's violation of M.G.L. Ch. 221 § 46A, his failure to gain admission to the bar of Massachusetts, and his presentment of the complaint and contingent fee agreement to Plaintiff on Lambert and Sheehan's behalf, was a serious breach of loyalty because his actions on behalf of Lambert and Sheehan created a conflict of interest that had a substantial tendency to cause him to disregard his duty to serve Plaintiff with only Plaintiff's interests in mind.

733. Closson's unlawful conduct in procuring control of Plaintiff's claims, determining that he only had claims against Wyeth, and that none of his claims arose from torts subject to the jurisdiction of Massachusetts but only through violations of the FLSA, was a serious breach of fiduciary duty that terminated Closson's authority to act as Plaintiff's agent. Lambert and Sheehan knew that Closson had no right to act as Plaintiff's agent because of his serious breach of fiduciary duties.

734. Closson, Lambert, and Sheehan knew they had no right to act as Plaintiff's agent in regards to the Wyeth suit. They also knew that Plaintiff could not ratify their actions through the March 2006 contingent fee agreement under the advice of Closson, because it was illegal for Closson to procure control of Plaintiff's claims, or hold himself out as capable of practicing law in Massachusetts, or provide legal advice to Plaintiff regarding his claims against Wyeth.

735. Closson, Sheehan, and Lambert knew that fundamental contract law prevented the March 2006 contingent fee agreement from ratifying their conduct because it was not a valid contract.

736. Pursuant to Local Rule 83.5.2(a), Lambert's signature on the complaint indicating he was Plaintiff's attorney constituted an appearance and an expression that both he and Sheehan were Plaintiff's attorneys under penalty of Rule 11(b)(3) of the Fed.R.Civ.P.

737. Pursuant to Local Rule 83.5.2(c) regarding an attorney seeking to withdraw from a case

> (c) An attorney may withdraw from a case by serving notice of his withdrawal on his client and all other parties and filing the notice, provided that (1) such notice is preceded or accompanied by notice of the appearance of other counsel; (2) there are no motions pending before the court; (3) no trial date has been set; and (4) no hearings or conferences are scheduled, and no reports, oral or written, are due. Unless these conditions are met (including one whose services have been terminated by his client) may withdraw from a case only by leave of court.

738. Lambert and Sheehan were obligated to file a notice of appearance of other counsel before abandoning Plaintiff. If they sought leave of court because they were unable to find Plaintiff other counsel, they were required to tell the truth.

739. Pursuant to Fed.R.Civ.P. 11(b)(3), when Lambert filed the complaint on Plaintiff's behalf and indicated that he and Sheehan were Plaintiff's attorneys, they did so subject to Fed.R.Civ.P. 11(c)(1)(A), which states

> Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.

740. The entire Sheehan firm was liable for Lambert's Rule 11 violations arising from the complaint he filed on Plaintiff's behalf which falsely stated that he and Sheehan were Plaintiff's attorneys and authorized to file suit.

741. The contingent fee agreement entered into with Lambert on March 21, 2006, was not a valid contract because Sheehan and Lambert were already legally obligated to represent Plaintiff in the Wyeth case, and therefore no consideration on their behalf was provided through the contingent fee agreement. Furthermore, the contingent fee agreement documents Closson's assertion that he was qualified to practice law in Massachusetts, which is a violation of M.G.L. Ch. 221 § 46A, and the contract is void for public policy considerations in that regard.

742. We have determined that Plaintiff's attorneys did not act under the rules of the adversary system. Did they disregard the rules so they could zealously advocate Plaintiff's position? No.

743. It is unclear whether filing a lawsuit on another man's behalf knowing they were not authorized and could not be authorized due to public policy considerations automatically qualifies as an abuse of process. Those who engage in such conduct should have a very good reason for doing so that comports with the functions of a lawyer in representing a client.

744. Pursuant to Winship et al. v. the Bank of the United States, 30 U.S. 529 (1831)

> No man can be pledged but by himself. If he is to be bound by another, that other must derive authority from him. The power of an agent is limited by the authority given him; and if he transcends that authority, the act cannot affect his principal, he acts no longer as an agent.

### Plaintiff's Attorneys' Actions Injured Him and Benefitted Wyeth

745. As an advocate, lawyers are supposed to zealously assert their client's position. Let us examine the zealousness with which Plaintiff's attorneys asserted his position.

746. In 1990 Congress passed the Civil Justice Reform Act, partially to thwart wealthy and powerful litigants from impeding access to justice for those with lesser means. The Act required federal courts to implement Local Rules of Federal Procedure in an effort to prevent the abuse of discovery procedures that are vital to assess the merits of each party's claims and defenses based on evidence and facts.

747. As a result, various Local Rules obligate the attorneys of record for parties to an action to meet and confer about the principal issues in contention, and to exchange a litany of different categories of evidence that are fundamental to each parties claims and defenses. The meeting and exchange of evidence occurs early in the process.

748. In the USDC Mass., exchanging the basic evidence each party used to support their pleading must occur at least seven days before a scheduling conference that is presided over by a judge. The evidence exchanged by the parties is supposed to enable the judge to make a preliminary assessment of the merits of each parties claims and defenses, based on evidence. The obligations of the attorneys of record to exchange evidence and discuss the primary issues in contention are critical to ensuring the intentions of Congress through the Civil Justice Reform Act are met. Very few Local Rules relating to events after the scheduling conference have much significance in meeting the intentions of Congress under the Act.

749. Although referred to as "Rules", the Federal Rules of Civil Procedure and Local Rules have the force of a federal statute.

750. A good place to start examining the zealousness with which Plaintiff's attorneys asserted his position is their response to the answer Wyeth filed on April 17th. Lambert registered multiple employees of Sheehan to receive NEFs whenever a pleading, order, or other notice was filed with the court. Lambert did not register Closson in the court's Case Management/Electronic Case Files (CM/ECF) system. Closson did not receive notice that Wyeth filed their answer, and neither did Plaintiff. The NEFs generated by the court also allowed the recipient to view the filing on the PACER database once for free, and the NEFs usually came with a suggestion to download the file at that time because they only had one chance to view the filing for free.

751. Plaintiff was never shown Wyeth's answer by anyone until he received the case files from Closson in December 2018. The concealment of Wyeth's answer from Plaintiff will be addressed later when we discuss Lambert's function as Plaintiff's advisor. However, it should be noted that concealing material information from a principal is a serious breach of fiduciary duties, and terminates the agent's authority to act on behalf of the principal.

752. For now, we will focus on the contents of Wyeth's answer, and the response from Plaintiff's attorneys in light of the evidence possessed by them at the time.

753. At the time Wyeth filed their answer Plaintiff's attorneys possessed a copy of his application for employment which required him to submit to a background check that included information about his "character, background, general reputation, personal characteristics, or mode of living." In addition, Wyeth required Plaintiff to authorize "civil and federal courts, and former employers to release information they may have about me and release them from any liability and responsibility from doing so." Plaintiff also had to submit to a credit check. (It should be noted that Plaintiff's attorneys had this information when they filed the complaint against Wyeth)

754. At the time, Plaintiff had a good reputation, no experience with civil or federal courts, and his relationship with former employers was excellent. He also had decent credit. Plaintiff's favorable background check played a substantial role in Wyeth's decision to hire him. Similar

background checks were almost always requested by organizations Plaintiff sought employment with after he was terminated by Wyeth.

755. Plaintiff's attorneys also had a copy of the March 24th, 2004, job description for the DSS Technologist position which both he and his supervisor signed to attest to the accuracy of the duties and educational requirements of the position. The job description indicates that a high school diploma met the educational requirements for the DSS Technologist position. This was the only job description for the DSS Technologist position that either Plaintiff or his supervisor were willing to sign based on its accuracy.

756. Plaintiff's attorneys knew that the WHD had investigated Wyeth and ruled that Plaintiff and over 150 similarly situated employees were misclassified as exempt and owed hundreds of thousands of dollars which Wyeth refused to pay. Plaintiff's attorneys concealed this information from him and the court, and Plaintiff did not learn about it until September 2019, after filing a FOIA request with the DOL.

757. Let us examine the assertions in the pleadings relating to Plaintiff's claim for overtime compensation. Paragraph 10 of the complaint describes Plaintiff's duties and states in part

> Mr. Arbogast's work consisted almost exclusively of operating a machine that manufactured and packaged agar (a gelatinous substance used as a medium for growing micro-organisms), loading finished agar and other lab products onto a push-cart and delivering those products throughout the Andover facility.

758. The regulations and caselaw regarding exemptions under the FLSA make clear that an employee's actual duties determine whether they qualify for an exemption pursuant to 29 USC § 213(a)(1). A good example of this is found in Reich v. Newspapers of New Eng., Inc., 44 F.3d 1060 (1st Cir. 1995), Judge Torruella stated

> Of course, our decision should not be read to mean that all journalism work is nonexempt. The field of newspaper writing is certainly a medium capable of sustaining creativity. We want to reiterate that whether an employee is an exempt professional is independent of the title the employer ascribes to the position. As the interpretations point out, "[t]he field of journalism . . . employs many exempt as well as many nonexempt employees under the same or similar job titles." 29 CFR § 303(f).

759. Pursuant to Rule 8 of the Fed.R.Civ.P., the assertions in paragraph 10 of Plaintiff's complaint were facts directly relevant to the issue of whether he was properly classified as exempt under the FLSA, and Wyeth was obligated to respond to them. A failure to deny facts that require a response is considered an admission that the factual assertions are true. Wyeth did not deny the facts relating to Plaintiff's duties as asserted in Paragraph 10 of his claim for overtime.

760. Wyeth responded to the assertions of Paragraph 10 by stating in part

> Wyeth admits so much of the allegations in paragraph ten of the complaint that assert that the plaintiff's job consisted of operating a machine that manufactured and packaged agar, loading finished agar and other lab products onto a push-cart and delivering those products throughout the Andover facility.

761. Wyeth was required to respond to the factual allegations in paragraph 10, and pursuant to Rule 8 of the Fed.R.Civ.P., Wyeth did not deny and therefore admitted that

> Mr. Arbogast's work consisted almost exclusively of operating a machine that manufactured and packaged agar ... loading finished agar and other lab products onto a push-cart and delivering those products throughout the Andover facility.

762. Paragraph 10 of the complaint, and Wyeth's response, are the only parts of the pleadings that contain factual assertions describing Plaintiff's duties at Wyeth. This exchange represents all of the factual contentions contained in the pleadings that relate to Plaintiff's claim for overtime and are relevant in reaching a decision based on the merits of whether or not he was properly classified as exempt.

763. As Plaintiff's attorneys, Lambert, Sheehan, and Closson were responsible for zealously supporting his position, which means they should have asserted enough facts in the complaint to support Plaintiff's claim that Wyeth misclassified him as exempt from overtime. If they did assert enough facts, and Wyeth admitted as true all the facts they asserted, an objective assessment of the merits of Plaintiff's claim for overtime compensations should have been very favorable. In fact, it seems logical to conclude that Plaintiff was entitled to judgment based on the pleadings, or at the very least, Wyeth should have been compelled to amend their answer.

764. But what if Plaintiff's attorneys did not plead sufficient facts to establish that he was misclassified as exempt? We are in luck, according to the well-established maxim in Judge Torruella's ruling Id. at 1060,1070

> The employer in an FLSA case bears the burden of establishing that its employees are exempt, and because of the remedial nature of the FLSA, exemptions are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."

765. However, even if Plaintiff established that he was misclassified, he still needed to prove how much overtime compensation he was entitled to, which naturally depends on how many overtime hours he worked. Factual allegations related to the amount of overtime Plaintiff worked are found exclusively in paragraph 19 of the complaint which states

> During the course of his employment at Wyeth, Mr. Arbogast routinely worked in excess of fifty hours per week.

766. This assertion lacks the specificity required to establish the exact amount of wages Wyeth owed Plaintiff. Unlike the issue of exemption, Plaintiff had the burden of proving the amount of damages he is entitled to. What did Wyeth have to say about this issue? Their response in Paragraph 19 states

> Wyeth lacks knowledge or information to either admit or deny whether Mr. Arbogast "routinely worked more than 50 hours per week," and therefore denies the allegations in paragraph nineteen of the complaint.

767. Admittedly, Plaintiff's attorneys did not possess much documentary evidence relating to the amount of overtime hours he worked at Wyeth. However, they did have evidence demonstrating Plaintiff repeatedly asked for a formal way to keep track of his hours and was denied each time. In addition, based on the pleadings, it should have been determined that Plaintiff should have been classified as a non-exempt hourly employee, and Wyeth was subject to the provisions of 29 USC § 211(c) which states

> Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder.

768. If Wyeth lacked information regarding whether Plaintiff routinely worked over 50 hours a week, they must have failed to comply with 29 USC § 211(c). What was Plaintiff's burden in establishing the amount of overtime hours he worked at Wyeth? Judicial precedent provides some clarity in Sec'y of Labor v. DeSisto, 929 F.2d 789 (1st Cir. 1991), where Judge Torruella stated

> Plainly, then, although the initial burden is on the employee...that burden is a minimal one. Where the employer has failed to keep adequate employment records, it pays for that failure at trial by bearing the lion's share of the burden of proof.

769. Based on the pleadings, Plaintiff was entitled to judgment on his claim for overtime compensation. The only issue left to determine was the amount he was entitled to, and Wyeth was responsible for the lion's share of proving Plaintiff's estimation was wrong.

770. What was the basis for Lambert's phone call to Plaintiff after the scheduling conference urging him to settle his claims because both he and Judge Saris believed they lacked merit? Plaintiff's attorneys seem to be zealously advocating for his adversaries position, not his.

771. Wyeth included several affirmative defenses in their pleading and the first three relate to Plaintiff's claim for overtime compensation. Wyeth's First Affirmative Defense states

> Count I of the plaintiff's complaint fails to state a claim upon which relief can be granted, because Wyeth's classification of the plaintiff's position as exempt was in conformity with the provisions of the Fair Labor Standards Act ("FLSA").

772. This affirmative defense lacks any specific facts to support their conclusion. It also seems rather bold considering the issue was already adjudicated by the WHD over a period of several months, and the agency responsible for defining, delimiting, and enforcing the provisions of the overtime requirements of the FLSA reached the opposite conclusion.

773. The WHD issued a final agency order stating that Plaintiff and 150 similarly situated employees were misclassified and owed overtime. Wyeth was represented by in-house labor attorney

O'Brien throughout the adjudication and had the opportunity to appeal the order within the WHD or through the Administrative Procedure Act but failed to do so.

774. Wyeth had the burden of establishing that Plaintiff was classified as exempt in conformance with the FLSA. Should the court consider their First Affirmative Defense as adequate and worthy of a response from Plaintiff? No, Wyeth's attorney left clues indicating the credence owed to such assertions, let us examine them.

775. Beginning with Paragraph 1 of Plaintiff's complaint, it is asserted that his claims arise from Wyeth's failure to pay him overtime and retaliatory termination in violation of the FLSA. Wyeth's response?

> Wyeth is not required to respond to the statements in this paragraph of the complaint, because they do not contain allegations of fact.

776. In Paragraph 4 of the complaint, subject matter jurisdiction is asserted pursuant to 28 USC § 1331 and 29 USC § 216(b). Wyeth's response?

> Wyeth is not required to respond to the allegations in paragraph four of the complaint, because they are conclusions of law and not allegations of fact.

777. What about personal jurisdiction over Wyeth? Plaintiff asserts in Paragraph 5 that Wyeth is registered with the Massachusetts Secretary of State's Office to do business in Massachusetts, and at all times relevant to the complaint did do business in Massachusetts. Wyeth's response?

> Wyeth is not required to respond to the allegations in paragraph five of the complaint, because they are conclusions of law and not allegations of fact.

778. What about Plaintiff's assertion in Paragraph 6 of the complaint stating that USDC Mass. is the proper venue for the proceeding pursuant to 28 USC § 1391(c); how did Wyeth respond to that?

> Wyeth is not required to respond to the allegations in paragraph six of the complaint, because they are conclusions of law and not allegations of fact.

779. Apparently, Wyeth's attorney believes that no response is required by an opposing party for assertions in a pleading that do not contain allegations of fact, especially if they are conclusions of law.

780. Let us examine the facts asserted to support Plaintiff's claims for overtime starting with Paragraph 18, which states that under the FLSA, Wyeth was required to pay Plaintiff overtime compensation for hours he worked over forty during a workweek. What did Wyeth have to say about that?

> Wyeth denies the allegations in paragraph eighteen of the complaint, and in further answering, states that the allegations contain conclusions of law to which no response is required.

781. Wyeth denies they were required to pay Plaintiff overtime compensation while clarifying that no response was required because the allegations contain conclusions of law.

782. Paragraph 22 claims Plaintiff lost income from his employment as a result of Wyeth's failure to pay him overtime compensation. How did Wyeth respond?

> The allegations in paragraph twenty-two of the complaint constitute conclusions of law to which no response is necessary...

783. What about paragraph 23 asserting that Wyeth either knew or showed reckless disregard that their conduct was prohibited by federal statute?

> The allegations in paragraph twenty-three of the complaint constitute conclusions of law to which no response is necessary...

784. What about Paragraph 24 asserting that Wyeth willfully violated his rights under the FLSA?

> The allegations in paragraph twenty-four of the complaint constitute conclusions of law to which no response is required...

785. At this point, we should have a good idea of the views of Wyeth's attorney regarding the esteem warranted by unsupported conclusions of law in a pleading. What was the purpose of their First Affirmative Defense, and was it in conformance with Rule 11(b)(1) of the Fed.R.Civ.P.? No, Wyeth pleaded their First Affirmative Defense in furtherance of one of the goals of the collusive lawsuit which was to affect the common law regarding the lawful assertion of exemptions to the overtime requirements of the FLSA in the pharmaceutical industry.

## Evidence Concealed By Plaintiff's Attorneys

786. Moving on to Claim II for retaliation in violation of 29 U.S.C. § 215(a)(3). We will start with the evidence Plaintiff's attorneys had and then examine Wyeth's pleading in light of that evidence.

787. Plaintiff's attorneys possessed a copy of Wyeth's Disciplinary Action policy, which among other things, demonstrated that his employment-at-will status included certain contractual obligations such as adhering to an established disciplinary procedure that was administered in a fair and uniform manner and enforced by Wyeth management. The Disciplinary Action policy explicitly distinguished between a "verbal counseling" which was not disciplinary in nature, but informational only, and a "discipline/reprimand" which was considered discipline at Wyeth.

788. Plaintiff's attorneys had a copy of an email he sent to his supervisor, Como, and Employee Relations Representative, Lewandowski, on April 16th, 2004. He was appealing the verbal counseling he received because it was based on the false premise that he was obligated to work overtime for free regardless of his actual duties. In the email, he says he wants to discuss the blatantly obvious misrepresentation of his position as meeting federal guidelines for a professional exemption. This was over ten days before Plaintiff received any discipline or reprimand at Wyeth.

789. Plaintiff's attorneys had a copy of an email he sent to his Employee Relations Representative on April 26, 2004, explaining why he believed his position was misclassified as exempt. The

email included a WHD publication stating why technicians and technologists did not meet the requirements for any exemptions available under the FLSA.

790. Plaintiff's attorneys had a copy of a memorandum issued by Lewandowski, disciplining him on April 27th, the day after he sent her an email explaining why he believed he was misclassified.

791. Lewandowski's April 27, 2006, disciplinary memorandum was completely based on events that supposedly occurred during a meeting with herself, Plaintiff, and his supervisor, Como. Plaintiff was accused of being insubordinate for calling both Lewandowski and Como incompetent in the meeting. The meeting was purportedly called by Lewandowski to inform Plaintiff and Como of the steps she was taking to evaluate whether his position was properly classified as exempt.

792. Plaintiff's supervisor was present during the entire meeting that Lewandowski based her discipline on. As a member of management, it was Como's responsibility to administer discipline, not Lewandowski's. Como refused to participate in or endorse the discipline because it was fraudulent.

793. Plaintiff's attorneys had a copy of the complaint he filed against Wyeth with the WHD on June 20th, 2004, ten days before he was terminated. They also had a copy of the response Plaintiff received from the District Director of the WHD, Corey Surett, dated July 1, 2004, the day after Plaintiff was terminated. He was terminated mid-day on June 30th, and July 1st was the next day. Both Plaintiff's complaint and Surett's response were sent through the federal mail system. The WHD could not have sent out a letter in response to Plaintiff's complaint on the same day he mailed the complaint.

794. Plaintiff's attorneys had a copy of the complaint filed with the Mass. AG's Office. The copy came from Wyeth and was time stamped as received by the Mass AG's Office on June 25, 2004, at 1:35 pm. The copy had markings at the top indicating Wyeth faxed it internally on August 9, 2004.

795. Plaintiff's attorneys had records demonstrating Lewandowski and Cowdrick engaged in fraudulent conduct by creating a new job description for the DSS Technologist position after Plaintiff expressed his concerns. It was clear that no job description for the position existed when Plaintiff was recruited, and that the March 24th job description he and his supervisor signed just nine days into his tenure at Wyeth was in response to Plaintiff's concerns about the misclassification of his position.

## Wyeth's False and Malicious Accusations in Their Answer

796. Next, we examine the factual assertions contained in the complaint along with Wyeth's defenses to those assertions contained in their answer.

797. Paragraph 28 contains the crux of Plaintiff's claim for retaliation and asserts his employment at Wyeth was terminated

> [b]ecause he complained, both informally and formally, about his misclassification as an exempt employee and the corresponding requirement that he continue to work

overtime without receiving the additional compensation required by the Fair Labor Standards Act.

798. Wyeth stated the following in paragraph 28 of their answer

> Wyeth denies the allegations in paragraph twenty-eight of the complaint. In further answering, Wyeth asserts that the plaintiff's supervisors approached him about problems with his performance and his insubordination prior to his voicing concern over the classification of the DSS Technologist as exempt.

799. Previously we addressed Wyeth's false and baseless paragraph 14 assertion that Plaintiff was "reprimanded" multiple times for insubordination and an inability to complete his assigned tasks before voicing concern over the misclassification of the DSS Technologist position.

800. Accusing an employee of being insubordinate and performing poorly at their job in publicly available records has very serious repercussions on that employee's professional reputation; Plaintiff's attorneys, and Wyeth and their attorneys understood the stakes were high. They were all aware that many employers, including Wyeth, research an applicants civil court history when making a hiring decision.

801. It is absolutely untrue that Plaintiff was "approached" by his supervisors about problems with his performance or insubordination before voicing concern over the misclassification of his position. The first time Plaintiff was approached by his supervisor was after he told her he believed his position was misrepresented as requiring a bachelor's degree and qualifying for a professional exemption under the FLSA. He requested a copy of the job description for a DSS Technologist from Como and was told that one did not exist. In response, Como approached him on March 24, 2004, with a new job description that indicated the educational requirements for the DSS Technologist position were met with a high school diploma. When Plaintiff was recruited, he was told the DSS Technologist position required a bachelor's degree. Both Plaintiff and Como signed and dated the job description.

802. It was not a coincidence that Como made a material change in the terms of Plaintiff's employment, that was directly related to the most fundamental criteria distinguishing between a non-exempt position from one that qualified for an exemption under the FLSA. This was nine days into Plaintiff's tenure at Wyeth.

803. If Wyeth had evidence supporting their malicious accusations, why did they violate several Rules of Federal Procedure, and statutes governing the practice of law in Massachusetts, to ensure no evidence was available during the legal proceeding? Plaintiff's attorneys had a duty to ensure Wyeth had evidence to support their harmful accusations against him, they failed to do so.

804. Plaintiff approached his supervisor again on Friday, April 2nd, the day after he received his first paystub indicating Wyeth did not compensate him for overtime. He requested to meet with Como regarding the misclassification of his position, and she agreed to meet with him the following Monday, April 5th. During the meeting, Plaintiff said he believed that he and Coworker B were misclassified as exempt. He provided a number of reasons to support his conclusion such as the educational requirements of the position, and their duties as production

workers in a manufacturing lab. Plaintiff also pointed out their lack of responsibility normally associated with properly classified exempt position.

805. During the meeting, Como expressed her belief that an employee's duties were irrelevant in determining whether they were properly classified as exempt. She believed that as long as they were paid a salary, they were properly classified as exempt professionals. At the end of the meeting Plaintiff asked for a formal way to keep track of his hours and Como said she would contact HR. The next day, Plaintiff sent her an email with a publication from the WHD stating why technicians and technologists did not meet the requirements for any exemptions available under the FLSA.

806. Here we are on April 6th, and Plaintiff was approached once in response to his request for a job description after informing his supervisor that he believed his position was misrepresented as requiring a bachelor's degree and qualifying for a professional exemption under the FLSA.

807. It was not until Como consulted with Lewandowski and Cowdrick regarding Plaintiff's concerns about the misclassification of his position that he was "approached" by Como. He was not approached for insubordination, rather, for being unprofessional and uncollaborative for trying to assert his right to either be assigned duties that were consistent with a properly classified exempt professional, or receive overtime compensation. The "approach" was directed by Lewandowski and Cowdrick after they intentionally deceived Como into believing Plaintiff was obligated to work overtime for free regardless of his duties.

808. Nevertheless, asserting that Plaintiff was "approached" for something is equivalent to abstract grumblings by an employee that have little to no value in determining whether Wyeth's reasons for taking an adverse employment action against Plaintiff were in furtherance of legitimate business concerns or a pretext for retaliating against him for asserting his rights. Unfortunately, none of Plaintiff's attorneys could or would motion the court for a more definite statement pursuant to Fed.R.Civ.P. 12(e), or have it stricken from the record.

809. Wyeth repeats a similar claim three separate times in their pleading, making it a candidate for a motion to strike pursuant to Fed.R.Civ.P. 12(f) based on redundancy, but again, Plaintiff's attorneys had no intention of helping him, they were there to help Wyeth.

## Wyeth's Obvious False Assertions Undermines Their Credibility

810. After establishing that Wyeth included blatantly false assertions in their pleading, their scandalous attacks against Plaintiff should be viewed with skepticism. Remember, Wyeth was obligated to provide Plaintiff and the court with the evidence they relied on to support the assertions in their answer, but consistently violated the Federal Rules of Civil Procedure, to avoid fulfilling their obligation.

811. For now, let us focus on Wyeth's affirmative defenses in response to Plaintiff's claim for retaliation. Starting with their Fourth Affirmative Defense, we read

> The plaintiff cannot establish a *prima facie* claim for retaliation under the provisions of 29 U.S.C. § 215(a)(3) as pleaded in Count II, because that section of the FLSA, by its

terms, only protects employees who have "filed any complaint or instituted or cause to be instituted any proceedings under or related to" the statute, and plaintiff did not do so prior to his termination by Wyeth.

812. Here we have an assertion that is ridiculously false enough to warrant suspicion of the pleader's integrity and cast doubt on all their other assertions.

813. First Circuit case law provided the elements required to qualify an employee's actions as "filed any complaint or instituted or cause to be instituted any proceedings under or related to" the FLSA. In Valerio v. Putnam Assocs. Inc., 173 F.3d 35 (1st Cir. 1999) Judge Campbell stated

> We hold, therefore, that the FLSA's anti-retaliation provision will protect an employee who has filed a sufficient complaint with an employer.

814. Five years later, citing Id. at 35, Judge Woodlock stated in Jackson v. McKesson Health Solutions LLC, Civil Action No. 03-11177-DPW (D. Mass. Oct. 29, 2004)

> It is worth noting that the First Circuit does not require that one file an official complaint with the Department of Labor to be covered by the FLSA anti-retaliation provision.

815. Plaintiff filed escalating verbal complaints about the misclassification of his position before March 24th, nine days after he began working at Wyeth. When that did not work, he sent emails, including one to his supervisor on April 6th which included a WHD publication stating why technologists did not qualify for any exemptions available under the FLSA. He sent another email on April 16th, pursuant to Wyeth's AFT policy expressing a desire to discuss the blatantly obvious misrepresentation of his position as meeting federal guidelines for a professional exemption.

816. Plaintiff met with his supervisor, Como, on April 5th about the misclassification issue, and Hanley, the Director of Clinical Manufacturing on April 19th about the same issue. He met with Lewandowski on April 21st about the misclassification of his position, and on April 23rd, Lewandowski called a meeting with Plaintiff and Como to inform them about the steps she was taking to investigate Plaintiff's concerns that his position was misclassified.

817. On April 26th, Plaintiff sent the following email to Lewandowski along with the same WHD publication stating why technologists did not qualify for any exemptions under the FLSA. This was before Plaintiff received any discipline or reprimand from anybody whatsoever at Wyeth.

> Hi Kerri,
>
> Here's a webpage sponsored by the DOL. I understand from my past correspondences you're under the impression my position requires me to make discretionary judgments. I cannot emphasize enough this is far from the facts of the situation. When I started working here at Wyeth I was immediately given the responsibilities of making agar on the Agarclav/Tecnomat, and delivering the goods made in the lab. Because of inefficiencies inherent in both tasks as they were, and because I felt if I spent some extra time in correcting these inefficiencies I could get out of work in less than 10 hours, I began to push for the appropriate changes in the lab. The steps I took were not part

of my job and in fact my pushing for change was a vital source of friction between myself, Gerard, and Karin.

818. Plaintiff denies that he was "approached" or "reprimanded" for any reason before he voiced his concerns about the misclassification of his position. However, even if he was, it was because of the fraudulent conduct by Wyeth and Brack in recruiting employees for positions that were intentionally misrepresented as qualifying for a professional exemption under the FLSA. As the April 26th, email demonstrates, there was some friction between Plaintiff and his supervisor, but that was because Plaintiff believed Wyeth acted in good faith and in compliance with the law when they represented the position as qualifying for a professional exemption. Plaintiff came to Wyeth innocently expecting to benefit from the heightened responsibilities and independence associated with a position that met the requirements of a bona fide exempt professional position.

819. Plaintiff was not disciplined or reprimanded a single time until April 27th, the day after sending the April 26th email to Lewandowski. She disciplined him in retaliation for his email, and distributed the memo throughout Wyeth management and HR. Lewandowski's memo stated in part

> I am currently in process of investigating the matters you brought to the Company's attention in your emails to Karin Como, Kevin Hanley, and myself dated April 16th and 21st 2004 and in a conversation with me on April 21st 2004.
>
> - You explained that you felt discomfort with your position of DSS Technologist because you are concerned that it may be an hourly non-exempt position versus a salaried exempt position.; and
>
> On April 23rd 2004, I held a follow up meeting with you and your Supervisor, Karin Como, to update you on the status of your concerns listed above and the processes taken to evaluate these concerns further.

820. The facts and law are clear, Plaintiff filed several complaints about the misclassification of his position prior to his June 30th termination by Wyeth. Well-established First Circuit precedent recognized that 29 U.S.C. § 215(a)(3), protected Plaintiff from retaliatory discrimination in response to the written complaints he filed internally at Wyeth.

821. Plaintiff informed several members of Wyeth management on June 21st that he filed complaints with both the WHD, and Mass. AG's Office as a result of their labor violations.

822. Wyeth and Plaintiff's attorneys possessed a copy of the complaint Plaintiff filed with the Mass AG's Office that was time stamped as received on June 25, 2004. The copy of the complaint in Wyeth's possession indicated it was faxed internally on August 9, 2004, nearly two years before Wyeth filed their answer on April 17th, 2006.

823. An examination of Putnam and McKesson Health Solutions LLC demonstrates the relationship between a complaint pursuant to Massachusetts wage laws, and the FLSA in the following excerpt

> The basic overtime provision of the Massachusetts statute is essentially identical to the FLSA. Compare 29 U.S.C. § 207(a)(1) with M.G.L. c. 151, § 1A. Massachusetts adopted its nearly-identical statute almost twenty years after the Supreme Court decided Overnight Motor and nearly a decade before Overnight Motor's gloss was formally codified in Section 114. The absence of a direct Massachusetts analogue to Section 114 is, therefore, immaterial. To our knowledge, no Massachusetts court has even suggested the distinction Valerio seeks to advance, and, tellingly, she cites to no such case. We conclude that both the FLSA and Massachusetts law compel the same outcomes. Cf. Fakouri v. Pizza Hut of America, Inc., 824 F.2d 470 (6th Cir. 1987).; and
>
> For present purposes, the requirements imposed by the MMWL are the same as those under the FLSA. Therefore, as the FLSA claim goes, so does the MMWL claim. See 455 C.M.R. § 2.02(3) ("The terms `bona fide executive, or administrative or professional person' in [Mass Gen. Laws ch.] 151, § 1A(3), shall have the same meaning as set forth in Part 541 of Title 29 of the U.S. Code of Federal Regulations.").

824. Wyeth's Fourth Affirmative Defense was false and asserted for an improper purpose pursuant to Fed.R.Civ.P. 11(b)(4). At this time, Lambert had secretly breached his trust would not challenge any of the false and baseless claims in Wyeth's answer. Wyeth and Fitzhugh knew this, that's why they included them in their pleading.

825. The Supreme Court made it clear that a prima facie claim for discrimination was not a standard required to be met by a plaintiff in a pleading for retaliatory discrimination. See Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002). Wyeth's Fourth Affirmative Defense should have been stricken from the record as an inadequate defense pursuant to Fed.R.Civ.P. 12(e).

826. Wyeth's Fifth Affirmative Defense is not even an affirmative defense but a redundant potshot at Plaintiff's professional reputation. Let us read it

> The plaintiff cannot establish a *prima facie* claim for retaliation under the provisions of 29 U.S.C. § 215(a)(3) as pleaded in Count II, because his termination was precipitated by his repeated acts of insubordination and aggressive, uncooperative behavior towards his supervisors and his colleagues.

827. A plaintiff is not required to establish a prima facie claim in an action brought for retaliatory discrimination. The prima facie standard is an evidentiary one, not a pleading standard. Wyeth's Fifth Affirmative Defense should have been stricken from the record as redundant, irrelevant, scandalous, and insufficient.

828. Wyeth's last and Seventh Affirmative Defense states

> Plaintiff's employment with Wyeth was terminable at-will. Nevertheless, Plaintiff, without justification or excuse, improperly interfered with and disrupted Wyeth's workplace and failed to properly perform his duties, and he was terminated for cause.

829. Once again, Wyeth levels false and defamatory accusations against Plaintiff that had no basis fact or law. Their assertions do not belong in an affirmative defense. At the time Wyeth pleaded

their Seventh Affirmative Defense, they had no intention of providing any evidence to support their assertions.

830. Plaintiff's attorneys knew that Wyeth was engaged in widespread fraud and exploitation, and that their client was an innocent young professional ensnared by the egregious and abusive business practices of Wyeth. Plaintiff's attorneys filed the lawsuit to help Wyeth avoid being caught and held accountable, they had no intention of doing anything helpful for their client.

## Plaintiff's Lawyers Conspire with Wyeth to Subvert Laws Meant to Protect Plaintiff

831. The procedural enhancements implemented by the USDC Mass. in response to the Civil Justice Reform Act manifest themselves about two weeks after a defendant files their answer; Wyeth filed their answer on April 17th. The attorneys of record are required to meet and narrow the issues in contention. They are obligated to provide each other with the evidence relied on to support their assertions in the pleadings.

832. Pursuant to Local Rule 22.2 of USDC Mass., the evidence should have been exchanged a week before a scheduling conference presided over by Judge Saris on June 21, 2004. The evidence exchanged was supposed to form the foundation of a preliminary assessment of the merits of each parties claims and defenses by Judge Saris, who needed to consider a multitude of possibilities before determining an appropriate course of action.

833. The attorneys of record for each party are supposed to confer with their client to establish a budget for the full course, and various alternative courses of litigation. They must then file a certification with the court confirming they engaged in the prescribed activities.

834. Plaintiff never spoke with Lambert until after he negotiated a multitude of agreements with Wyeth regarding procedural issues that determined whether or not Plaintiff was afforded statutory and constitutional rights regarding due process, freedom of petition, freedom to contract, right to a jury trial, the right to honest services, an impartial judge, a right to legal costs and attorney's fees, right to association, etc. Once again, not only did Lambert not advocate Plaintiff's position, but he negotiated with Wyeth to ensure no evidence would be available for the judicial officer at the scheduling conference, which was injurious to Plaintiff and his claims, and only benefitted Wyeth.

835. On June 15th, before Plaintiff had communicated with Lambert or anyone else about.issues related to the pre-scheduling conference obligations, Lambert filed a certification with the court falsely indicating that he had conferred with Plaintiff about the numerous procedural rights implemented in response to the Reform Act. The certification contained a forgery of Plaintiff's signature.

836. On or about June 21st, 2004, Lambert phoned Plaintiff indicating he had just met with Judge Saris at the scheduling conference. Lambert urged Plaintiff to settle his case quickly because both he and Judge Saris believed his claims lacked merit. Plaintiff resisted Lambert's pressure to settle, and Lambert responded by exhorting in a sarcastic tone "Yes she's just a federal judge who has seen hundreds of cases like this, but she doesn't know what she's talking about!"

837. When Lambert phoned Plaintiff and urged him to settle his claims quickly because both he and the judge believed his claims lacked merit, he neglected to mention that he violated several Rules of Civil Procedure, and forged Plaintiff's signature on a certification, in an effort to ensure none of his evidence was available for the judicial officer. In addition, he engaged in illicit conduct to ensure Wyeth would be freed of their legal obligation to provide Plaintiff and the court the evidence they relied on in their false and malicious pleading.

838. Plaintiff did not speak with Lambert again after that phone call. On July 30, 2006, Closson mailed Wyeth, and copied Lambert, what were purported to be Rule 26(a)(1) initial disclosures. Pursuant to Rule 26(g)(1), an attorney of record must sign Rule 26 initial disclosures. Instead of Lambert signing the disclosures, Closson included a forgery of Plaintiff's signature. It is only appropriate for a party to a lawsuit who is not represented by counsel to sign their own Rule 26 disclosures. Lambert took no action to correct Closson's mistake, Plaintiff's attorneys were once again informing Wyeth and Fitzhugh that they had no intention of advocating for Plaintiff. Wyeth and Fitzhugh knew that Plaintiff did not have competent legal counsel and that the legal proceeding was not adversarial.

839. Lambert violated a court order by not showing up to mediation on October 11, 2006, and informed Wyeth not to serve him with any more papers related to the case. Wyeth's attorney began exclusively serving Closson with papers instead, they knew that Closson was not licensed to practice law in Massachusetts, was not an attorney of record, and could not sign or file papers, among a litany of other restrictions due to regulations of the legal profession in Massachusetts.

840. The legal proceeding Lambert, Sheehan, and Closson commenced against Wyeth on Plaintiff's behalf was supposed to be adversarial. Their actions should be easily recognized as an effort to benefit Plaintiff and his legal claims. In reality, the actions of Plaintiff's attorney during the legal proceeding are easily recognizable as benefitting Wyeth, and harming Plaintiff. In addition, their constant violations of laws, rules, and regulations that were implemented to protect litigants like Plaintiff bereaves them of the excuse that they acted harmfully because of their ethical duties as officers of the court.

841. On December 14, 2006, Closson invited Plaintiff to his office in Exeter, NH, and urged him to settle his claims with Wyeth under threat of owing Wyeth thousands of dollars for bringing a frivolous lawsuit. When Plaintiff asked Closson about the DOL, Closson responded that Colarossi said he should settle the case if he got an offer, he failed to mention the investigation that determined Plaintiff was misclassified as exempt and owed overtime wages. When Plaintiff asked about Lambert, Closson bluntly reminded him of Lambert's phone call during which he expressed his opinion that the claims lacked merit, and advised that Judge Saris came to the same conclusion and wanted the case settled quickly.

842. After warning Plaintiff that Wyeth was threatening to sue him for bringing a frivolous lawsuit, Closson presented him with a confidential settlement agreement proposed by Wyeth. The settlement agreement required Plaintiff and his attorneys to destroy or provide Wyeth with all documentation and other material evidence in their possession that was related to the case. Plaintiff was advised he could not speak with anyone about the case except for his attorney. He had to promise not to apply for or accept any positions of employment with Wyeth, their subsidiaries, affiliates, or successors.

843. Plaintiff was directed to write a letter to the Mass. AG's Office stating a full settlement had been reached in relation to his claims against Wyeth and that he was withdrawing his complaint.

844. Lastly, Closson showed Plaintiff a piece of paper titled "Exhibit A", that contained the terms in which his claims against Wyeth would be dismissed. The terms stated that the case would be dismissed with prejudice, which Closson led Plaintiff to believe meant prejudice against Wyeth, which seemed appropriate because Wyeth offered several thousand dollars representing overtime wages they owed him, and thousands more for attorney's fees.

845. At the time Closson advised Plaintiff on the settlement, he was not licensed to practice law in Massachusetts and never sought or received admission pro hac vice. Plaintiff was not aware that Lambert's representation of him was limited in scope, or that Closson was not admitted to practice law in Massachusetts. Plaintiff was not given an opportunity to view the records and documents Closson received from Wyeth August 2005. Plaintiff was not informed of any investigation conducted by law enforcement related to his complaints against Wyeth for labor violations. Letters from the Mass. AG's Office and WHD in 2006 instilled in Plaintiff a belief that their respective government agencies took no action in response to his complaints. Closson knew Plaintiff held this false belief, and took steps to ensure he continued to hold the false belief in perpetuity.

846. When Closson advised him to settle his claims according to the confidential settlement agreement, Plaintiff was unaware that Wyeth never exchanged basic information or evidence which the USDC Mass. believed was a crucial first step in a litigant's assessment of the claims and defenses of his pleading. Plaintiff was not aware that Wyeth presented Closson with an offer to accept judgment against them on his claim of overtime compensation, which included over $5,000 in back wages in addition to legal costs. Plaintiff was not aware that Wyeth filed an answer to the complaint and was never informed about the document or its contents.

847. At the time Closson advised Plaintiff to settle his claims in accordance with the confidential settlement agreement, he was unaware of and never saw the disclosures Closson presented Wyeth on July 31, 2006. Plaintiff was also unaware of and never saw the confidential mediation statement Closson prepared for court annexed mediation.

848. When Plaintiff was advised by Closson to enter into a settlement agreement with Wyeth on December 14, 2006, he had yet to attain employment remotely similar to his position at Wyeth. He had defaulted on his student loans, moved several times as a result of financial difficulties, and was embroiled in constant domestic strife due to an inability to provide for his family.

849. Plaintiff was being treated for acute anxiety that manifested itself as chronic pain and was exasperated by his reliance on the demands of employment in entry-level positions consisting entirely of manual labor. The positions included constant repetitive physical movements that precipitated bouts of muscle spasms that created a vicious cycle of anxiety induced muscle tension which in turn caused more anxiety that contributed to muscle spasms causing increased anxiety.

850. The confidential settlement agreement Plaintiff entered into on December 14, 2006, was the product of fraud that is not compatible with a peaceful society. The terms of the contract were unconscionable and contrary to public policy. But that is not all.

851. On January 22, 2007, Lambert conspired with Wyeth's attorney, Fitzhugh to file a fraudulent "Stipulation of Dismissal with Prejudice", indicating that each party was responsible for "[b]earing their own costs."

852. Plaintiff never agreed to a stipulation of dismissal with prejudice against him, and he never would have. Wyeth offered Plaintiff several thousand dollars as part of the settlement agreement. Plaintiff believed that offer represented an acknowledgment that Wyeth owed him that money for overtime compensation. The settlement seemed like a reasonable alternative to dragging out litigation that could eventually cost both parties, and the tax paying citizen, far more than the amount in dispute.

853. There are circumstances when the status of "prevailing party" is worth far more than the monetary value in dispute. A young professional suing their employer at the dawning of their career is one of those circumstances. Plaintiff may have agreed to settle the case by stipulation "with prejudice" but he did so with a belief that the prejudice was against his adversary and reflected the settlement-in-fact which included several thousand dollars in overtime compensation as well as attorney's fees.

854. Plaintiff denies authorizing anyone to file a stipulation of dismissal indicating he bore any costs associated with the litigation. It is an undisputable fact that neither Plaintiff, nor his attorneys bore any costs associated with his civil action against Wyeth. Plaintiff would not have participated in filing with the court a document containing false information. Plaintiff's attorneys were paid directly by Wyeth, not Plaintiff.

855. It seems clear that Plaintiff's attorneys did not file a complaint on Plaintiff's behalf as part of a zealous effort to advocate his legal position. They filed the complaint to prevent the WHD from further investigating Wyeth, to ensure Plaintiff would not have the opportunity to petition his government for redress from the harms Wyeth's illegal and fraudulent conduct caused him, and to provide Wyeth an opportunity to destroy Plaintiff's professional reputation through false legal pleadings they knew would not face an adversarial response. Plaintiff's attorneys colluded with Wyeth's attorneys while engaging in fraudulent concealment, forgery, witness tampering, witness retaliation, and more.

## Plaintiff's Attorneys Did Not Function as Advisors

856. Were Plaintiff's attorneys functioning as advisors when the filed a complaint on his behalf? No, Plaintiff communicated with Lambert once. Lambert tried to convince him to settle his case because his claims lacked merit. Lambert did not phone Plaintiff to inform him of his legal rights and obligations, and their practical implications. He phoned Plaintiff in furtherance of a conspiracy to defraud him. By advising Plaintiff that both he and Judge Saris believed his claims lacked merit, without disclosing their assessment was based on zero evidence, Lambert was trying to defraud Plaintiff of his ability to petition his government for redress in furtherance of various schemes by Wyeth to gain financially through a pattern of racketeering activity.

## Plaintiff's Attorneys Did Not Function as Negotiators

857. Were Plaintiff's attorneys functioning as negotiators seeking an advantageous result for him consistent with the requirement to deal honestly with others? No, Lambert's negotiations with Wyeth were done without Plaintiff's knowledge or approval and resulted in Wyeth's successful abuse of discovery practices that concealed evidence from him and the court; the same abuses which the Civil Reform Justice Act was intended to eliminate. After Plaintiff declined Lambert's advice to settle his claim, he was abandoned, and his attorneys went on to violate more laws, rules, regulations, and court orders that were all injurious to Plaintiff and his legal claims.

858. For example, Lambert was ordered to be present at the mediation by Judge Saris, instead he encouraged and aided and abetted the unauthorized practice of law by Closson. Lambert told Wyeth not to serve him any more papers and instead serve Closson, as a result, Wyeth served Closson with a Rule 68 Offer of Judgment that was more favorable than the stipulation Lambert filed with the court on January 22, 2007. Closson could not accept the Rule 68 Offer, and it was concealed from Plaintiff until December 2018. Although the settlement agreement Plaintiff was fraudulently induced into signing by Closson was not worth suing a former employer over, Lambert took it a step further and filed a fraudulent stipulation of dismissal that was worse that the settlement agreement Plaintiff actually agreed to.

859. Clearly Lambert did not perform the lawyerly function of Plaintiff's negotiator after filing the complaint against Wyeth on his behalf. Instead, Lambert performed a gangster's function in negotiating a plan that ensured Wyeth could conceal from the court and public, evidence implicating them in a widespread conspiracy to exploit young recent college graduates, including Plaintiff.

## Plaintiff's Attorneys Did Not Function as Evaluators

860. Did Plaintiff's attorneys act as evaluators when the filed a complaint on his behalf? The actions of Plaintiff's attorneys should be easily recognizable as done for his benefit because of the adversarial nature of the legal system.

861. The actions of Plaintiff's attorneys are not recognizable as beneficial to him. The WHD investigated Wyeth and found that Plaintiff, along with over 150 similarly situated employees were misclassified and collectively owed hundreds of thousands of dollars. Plaintiff's attorneys purposely concealed this information from him and the court. Those actions were for the benefit of Wyeth, not Plaintiff.

862. Plaintiff had advocated for other employees similarly situated at Wyeth who were also being unlawfully forced to work overtime for free. His attorneys knew that the WHD had determined that 150 other employees were misclassified, that Wyeth refused to comply with their orders, and that 29 USC § 216(b) provided a mechanism for collective action which Congress intended for use under the exact circumstances Plaintiff was in. His attorneys intentionally took steps to prevent Plaintiff from engaging in collective action with those who shared a community of interests. Again, the actions of Plaintiff's attorneys are not recognizable as beneficial to him, they benefitted Wyeth.

863. Regulations governing the practice of law in Massachusetts, specifically M.G.L. Ch. 241 § 46A, prohibited Closson from procuring control of Plaintiff's claims against Wyeth and prohibited Lambert and Sheehan from procuring control of Plaintiff's claims through Closson. The purpose of the statute prohibiting the unauthorized practice of law is to protect the public from incompetent legal representation. The unlawful actions of Plaintiff's attorneys resulted in him being denied competent legal representation. Plaintiff's attorneys knew their conduct was fraudulent and illegal, and that is why they worked so hard to conceal their myriad of lies.

864. The First Circuit has made it clear that an attorney not licensed to practice in USDC Mass. is on equal footing with a layperson when it comes to being eligible for statutorily provided attorney's fees for prevailing plaintiffs. In Martinez v. Hodgson, 265 F. Supp. 2d 135 (D. Mass. 2003), Judge Young declared

> The First Circuit has stated that, under Local Rule 83.5.3(b)
>
> an attorney who lacks pro hac vice status may be viewed as being on the same footing as a non-lawyer. Such a layperson, of course, is not entitled to § 1988 fees. Thus, an attorney . . . who engages in legal activities without having been admitted pro hac vice, accepts the risk that if his or her application for admission is denied, § 1988 fees will not be forthcoming.

865. Congress intended Plaintiff to have adequate access to the justice system and competent legal representation by providing for legal costs and attorney's fees for a prevailing plaintiff in an action brought pursuant to 29 USC § 216(b). Plaintiff's attorneys intentionally denied him those rights by, among other things, limiting the scope of Lambert's representation without informing him, and delegating to Closson duties that were unlawful for him to perform. These are the actions of a gangster, not a lawyer working on behalf of their client.

866. Although a multitude of other regulations are implicated by Closson's actions, such as Rule 1.7(a)(2) of the MRPC regarding conflicts of interest, it is enough to recognize that the actions of Plaintiff's attorneys served to defeat the mechanism which Congress implemented to ensure victims of labor violations receive adequate access to the justice system and competent legal representation. Attorney's fees for prevailing plaintiffs are crucial in furthering the intentions of Congress as expressed in the FLSA, and the actions of Plaintiff's attorneys precluded him from inuring that benefit.

867. Lambert intentionally sabotaged procedural obligations that were implemented by USDC Mass. to protect litigants of modest means from abusive discovery practices by wealthy and powerful litigants such as Wyeth. His efforts resulted in concealing dispositive evidence from the judicial officer during a scheduling conference where she was charged with engaging in a preliminary assessment of the merits of Plaintiff's and Wyeth's claims and defenses.

868. As Plaintiff's attorney, Lambert had a duty to act on his behalf to ensure Wyeth possessed evidence that supported the assertions in their pleading, especially the ones that contradicted his assertions in the complaint. Much of Wyeth's pleading consisted of redundant, irrelevant, false, and scandalous accusations against Plaintiff. An overwhelming amount of evidence possessed by Plaintiff's attorneys exposed Wyeth's cynical assertions in their pleading as delusional. Instead of utilizing the tools available through Rules of Civil Procedure, Lambert

went out of his way to ensure Wyeth's injurious accusations against Plaintiff in their pleading escaped the slightest scrutiny.

869. Lambert acted corruptly to prevent the availability of evidence described by the court as "[c]ertain basic types of information that are discovered in virtually every case and ordinarily must be disclosed before the parties can enter serious settlement negotiations." *District of Massachusetts Expense and Delay Reduction Plan, Comment to Rule 2.02* (Sequencing of Discovery). The court describes the procurement of this information as "[t]he essential first step in a litigant's investigation of the merits of the claims and defenses." Id.

870. Lambert's actions made it impossible for anybody to properly assess the merits of the claims and defenses in the pleadings or entertain serious settlement negotiations. After engaging in a prolonged course of illegitimate and felonious behavior aimed at defeating the purpose of regulations intended to protect his client and ensure Plaintiff and the court received basic information critical for engaging in even the crudest assessment of the merits of the claims and defenses in the pleadings, Lambert phoned Plaintiff and implored him to settle the case quickly because both he and the judge believed his claims lacked merit.

871. With the assistance of and ratification by Sheehan, Lambert and Closson continued to act or fail to act when they had a duty to protect Plaintiff's interests. Their conduct was inimical to Plaintiff's interests and not only was he denied his right to petition the government for redress, but he was severely harmed in his person and property by the court's illegitimate assertion of jurisdiction over him, facilitated by the defendants' unlawful behavior.

872. For example, despite having both a fiduciary and contractual duty to inform Plaintiff of any offers of settlement received by Wyeth, Plaintiff's attorneys concealed an Offer of Judgment presented to Closson that stipulated Wyeth would accept judgment against them for Plaintiff's overtime claim and pay him several thousand dollars in back wages and legal costs.

873. Wyeth's willingness to admit guilt in misclassifying Plaintiff and failing to properly compensate him for overtime was critically important to Plaintiff's claim of retaliation because it was also an admission that Wyeth misrepresented the position when recruiting him, and any friction that arose in Plaintiff's first weeks at Wyeth were a result of Wyeth's and Brack's fraudulent conduct.

874. In another section of this civil action, Plaintiff described how Wyeth intentionally manipulated various terms and conditions of employment for workers at the Andover facility in an effort to defeat the formation of a collective bargaining unit. These manipulations were done with an eye towards appearing before a tribunal in the future and arguing their case based on the terms and conditions they intentionally manipulated.

875. It was the same with employees in Plaintiff's position, who learned the hard way that they were duped into accepting a position that was misrepresented. The inevitable friction that arose through misunderstandings precipitated by the misrepresentation was addressed through a "verbal counseling" that did not rise to the level of retaliation that was actionable. It was only "informational", and distinct from a "discipline or reprimand".

876. Flash forward to an appearance before a tribunal related to retaliation in violation of 29 USC § 215(a)(3); "plaintiff's supervisors approached him about problems with his performance and his insubordination prior to his voicing any concern over the classification of the DSS

Technologist (*sic*) as exempt." Although this accusation is false, it is another example of an agent of Wyeth's unfairly demonizing an innocent young professional in a manner designed to foment extreme prejudice against their target, without being subject to liability for the false and injurious accusations.

877. Plaintiff's attorneys had an obligation to protect him from the malicious, fraudulent, and duplicitous attacks Wyeth levelled against him in the pleading. Not only did they not protect him, but they were also part of the conspiracy to abuse the court in such a manner and severely harm his reputation.

878. As mentioned in another section of this action, one tactic Wyeth used as part of their racketeering activity was to convince their victim that they shared a fiduciary relationship with an Employee Relations Representative who would advocate on their behalf and maintain confidentiality of their communications. This put the fiduciary in a supreme position to lead a campaign of malicious retaliation against the unsuspecting aggrieved employee. Plaintiff's attorneys conspired with Wyeth to use the same perfidious tactic in perpetrating a similar malicious campaign of abuse, oppression, and retaliation against him by abusing the legal process.

879. When Plaintiff requested any case files from Lambert and Closson in November 2018, he forgot about the confidential settlement agreement that required him and his attorneys to destroy or hand over all the documents and other evidence related to the Wyeth case. Closson's preservation of a substantial amount of the evidence that existed is laudable and in retrospect, should have been out of the question. He deserves much credit in that regard.

880. According to the records, the WHD did not forward the Wyeth case files to the Regional Solicitor's Office, and the reason given in the final report was that "[c]ase law in the first circuit is week (sic)..." One of the reasons Plaintiff's attorneys and Wyeth engaged in this collusive lawsuit was to ensure that case law in the First Circuit remained weak. If a victim of Wyeth's exploitive practices or their attorney did some legal research, they would see that Wyeth and Fitzhugh asserted that working in a factory operating a machine to manufacture products, and delivering those products on a push-cart, was properly classified as an exempt position under the FLSA. They would see the egregiously false attacks against Plaintiff and notice the suit was settled in Wyeth's favor with each party paying their own costs. This was another reason for the collusive lawsuit, and abuse of legal process.

881. As a result of the unlawful conduct of Wyeth, Closson, Sheehan, and Lambert, Plaintiff is entitled to and hereby requests a jury trial on all claims so triable and an award of:

a. Back pay and benefits in an amount equal to the difference between the value of his earnings and benefits since Wyeth terminated him and the value of earnings and benefits he would have received if Wyeth, Closson, Sheehan, and Lambert honored their responsibilities to conduct their business affairs in accordance with federal and state laws, and the common law requirement of good faith and fair dealing implied in every contract entered into in Massachusetts;

b. Lost future wages and benefits in an amount equal to the difference between the value of Plaintiff's projected future earnings after his professional reputation was severely damaged by the malicious and unlawful campaign of fraudulent and retaliatory conduct carried out by Wyeth, Closson, Sheehan, and Lambert; and the value of wages and benefits Plaintiff would have earned if the aforementioned defendant's conducted their business operations in accordance with state and federal laws, and the common law requirement of good faith and fair dealing implied in every contract entered into in Massachusetts;

c. Liquidated damages, legal costs, and attorney's fees pursuant to 18 USC § 1964(c);

d. Punitive damages in an amount that will discourage similar unlawful and fraudulent conduct by large multinational corporations in partnership with independent HR consultants and attorneys;

e. Profit disgorgement in an amount equal to the financial gains Wyeth benefitted from through the misclassification of at least 135 employees similarly situated with Plaintiff and who the WHD issued a final order that required Wyeth to re-classify as non-exempt and pay back wages; an order Wyeth refused to comply with and which Lambert, Closson, and Sheehan unlawfully helped to conceal to preserve the illicit benefits;

f. Profit disgorgement equal to the financial gains that Wyeth benefitted from by employing workers in violation of 29 USC § 207, and introducing hot goods made by those workers into interstate commerce in violation of 29 USC § 215(a)(1), which Lambert, Closson, and Sheehan unlawfully helped to facilitate and conceal;

g. Medical costs associated with treatment Plaintiff received and will receive in the future for ailments incurred as a result of the malicious conduct of Wyeth, Lewandowski, Cowdrick, and Brack, which Closson, Sheehan, and Lambert assisted by ensuring Plaintiff was denied an opportunity to seek redress through their actions of fraud, breach of fiduciary duty, forgery, perjury etc.;

h. Financial charges Plaintiff incurred as a result of his inability to pay down his student loan debt because of unemployment and underemployment that was caused by his unlawful termination and other retaliatory conduct Wyeth, Lewandowski, Cowdrick, and Brack subjected him to, and which Lambert, Sheehan, and Closson assisted by ensuring Plaintiff was denied an opportunity to seek redress through their actions of fraud, breach of fiduciary duty, forgery, perjury, etc.

i. Compensation for mental anguish Plaintiff suffered as a result of the malicious acts of Wyeth, Cowdrick, Lewandowski, and Brack, which Closson, Sheehan, and Lambert helped inflict by ensuring Plaintiff was denied an opportunity to seek redress through their actions of fraud, breach of fiduciary duty, forgery, perjury, etc.

j. Compensation for the loss of enjoyment of life;

k. Striking all records and pleadings associated with the collusive lawsuit perpetrated by Wyeth, Sheehan, Lambert, and Closson that were not supported by any evidence made available to Plaintiff or the court during the legal proceeding;

l. Such other relief as the court deems appropriate.

Claim X Deprivation of Rights in Violation of 42 U.S.C. § 1983

882. Plaintiff incorporates the entire complaint into this claim for deprivation of rights under color of state law.

883. Pursuant to 29 USC § 216(b), a plaintiff who prevails in a claim brought for violations of the FLSA is entitled to legal costs and reasonable attorney's fees. By providing legal costs and attorney's fees for prevailing plaintiff's, Congress sought to ensure victims of FLSA violations had adequate access to the courts. They recognized that victims of FLSA violations were usually bereft of financial resources and could not afford an attorney to represent them in vindicating their rights under the Act. Congress intended to ensure victims of FLSA violations had competent legal representation and adequate access to the courts by providing an incentive for attorneys to represent clients who had a legitimate cause of action.

884. Contingent fee agreements are a vital legal resource for parties with meritorious legal claims but lack the funds to compensate a lawyer on an hourly basis. Most claims brought for violations of the FLSA are instituted on the basis of a contingent fee agreement between the attorney and client.

885. In the State of New Hampshire, contingent fee agreements are governed by NH RSA 508:4-e, which states in part

> I. Contingent fee agreements between attorney and client shall be governed by Rules of Professional Conduct, Rule 1.5 as it may be amended by the supreme court from time to time and by any other rules regarding fees which are adopted or amended by the court.

886. The contingent fee agreement Plaintiff entered into with Lambert, Closson, and Sheehan contained the following provision

> Attorneys may terminate representation of the client for any just reason as permitted or required under the Rules of Professional Conduct or as permitted by the Rules of Court of the State of New Hampshire.

887. Plaintiff's choice of attorneys is limited by the New Hampshire Supreme Court, which is also responsible for governing the contingent fee agreement Plaintiff entered into with Lambert and Closson in March 2006.

888. At the time Plaintiff signed the 2006 contingent fee agreement with Lambert, Closson, and Sheehan, Sheehan was providing legal representation to the New Hampshire Supreme Court Professional Conduct Committee in federal court.

889. The New Hampshire Supreme Court (NHSC) Professional Conduct Committee is one of multiple committees that constitute the NHSC Discipline System. Other committees include the Complaint Screening Committee, and the Hearings Committee. Together they constitute a government body responsible for the promulgation and enforcement of the New Hampshire Rules of Professional Conduct.

890. Plaintiff filed a grievance against attorney Closson with the NHSC Attorney Discipline System on July 9, 2019. The grievance included a copy of the March 2006 contingent fee agreement between Plaintiff, Lambert, and Closson. The grievance stated that Closson was not licensed to practice law in Massachusetts, but represented himself as capable of practicing law in Massachusetts, and in March 2005, procured control of Plaintiff's claims against Wyeth, which were subject to the jurisdiction of Massachusetts.

891. Plaintiff informed the NHSC Attorney Discipline System that Sheehan and Lambert procured control of Plaintiff's claims against Wyeth from Closson, and filed a complaint on his behalf in USDC Mass. without authorization. He stated that Lambert and Sheehan falsely represented to USDC Mass. that they were Plaintiff's attorneys and authorized to file a complaint on his behalf. Plaintiff stated that he had never communicated with Lambert or even heard of him, and was only vaguely familiar with Sheehan when the complaint was filed.

892. Plaintiff informed the NHSC Attorney Discipline System that he did not learn of the complaint that was filed on his behalf until a month after it was filed, at which time Closson summoned him to his law office in Exeter, NH, and showed him the complaint. Plaintiff stated that while he was reading the ending of the complaint which stated that Lambert and Sheehan were his attorneys, Closson presented a contingent fee agreement that obligated Lambert and Closson to represent him in his cause of action against Wyeth. Plaintiff informed the NHSC Attorney Discipline System that no discussion regarding a limited scope of representation was ever had with Lambert or Closson, and the contingent fee agreement did not stipulate any limitations on the scope of either Closson's or Lambert's representation.

893. Plaintiff informed the Attorney Discipline System that throughout the legal proceedings initiated by Lambert and Sheehan, Lambert acted as though the scope of his representation was limited without informing Plaintiff or the court. Plaintiff also informed the Attorney Discipline System that Closson never sought or received pro hac vice admission to the court, and engaged in conduct that violated various statutes, rules, and regulations of the legal profession in Massachusetts.

894. Plaintiff informed the Attorney Discipline System that in August 2018, he happened to move to an apartment that had several views of Closson's old law firm office. He explained that this

piqued his curiosity about any Wyeth case files that either Lambert or Closson had that he could use to teach his son how not to behave in a difficult situation at school or work.

895. Plaintiff informed the Attorney Discipline Office that he emailed Lambert on November 20, 2018, and asked if he or Sheehan had any case files related to the lawsuit against Wyeth. Plaintiff explained that Lambert stated he had some pdfs but did not believe Sheehan retained paper files for longer than 10 years. Plaintiff informed the Attorney Discipline Committee that he responded to Lambert by asking him to check and make sure whether or not he or Sheehan had any paper files. Plaintiff explained that he did not receive a response so he followed up with another more specific email asking for any and all files either he or Sheehan had related to the Wyeth case.

896. Plaintiff informed the NHSC Attorney Discipline System that Lambert responded on November 21, 2018, stating that he was "local counsel" for Closson on the case and "therefore had a very limited role." He said he did not recall any discovery in the case.

897. Plaintiff explained to the NHSC Attorney Discipline Office that Plaintiff asked Lambert if he remembered phoning him after the scheduling conference and urging him to settle his claims because both he and Judge Saris believed they lacked merit. Plaintiff informed the Attorney Discipline Office that Lambert admitted that he informed Plaintiff that Judge Saris ordered the case to mediation and expressed concerns about the merits of Plaintiff's claims.

898. Plaintiff informed the Attorney Discipline Office that Lambert expressed his belief that he had cooperated with him more than any other firm would that was paid $1000 to act as local counsel on a case. Plaintiff also informed them that Lambert asserted Closson was his lead attorney in the Wyeth case.

899. Plaintiff informed the Attorney Discipline Office that Lambert contacted Closson regarding his concerns, and that Closson contacted Plaintiff afterwards and insisted that he was the lead attorney on the Wyeth case, and that Lambert worked for him as local counsel. He told the NHSC that Closson told him to leave Lambert alone because he did not have much to do with the Wyeth case.

900. Based on all the information and evidence Plaintiff submitted to the NHSC Attorney Discipline System, they declined to docket his grievance as a complaint. In a letter mailed to Plaintiff on July 12, 2019, the Attorney Discipline System informed Plaintiff that Lambert served as his local counsel in the case because Closson was not licensed to practice law in Massachusetts. The Attorney Discipline System also stated that it appeared Closson was Plaintiff's lead attorney in the Wyeth case.

901. On July 19, 2019, Plaintiff appealed the decision of the NHSC Attorney Discipline System to not docket his grievance as a complaint. On August 2, 2019, the NHSC Attorney Discipline System informed Plaintiff that his appeal was denied and incorporated the same reasons asserted in

the initial denial. The decision to deny Plaintiff's appeal represented the final ruling of the Attorney Discipline System and was not subject to further appeal.

902. Based on the prior association with Sheehan as their attorneys while Sheehan, Lambert, and Closson were engaged in illegal and fraudulent conduct related to the Wyeth case, and their ratification of the fraudulent and illegal conduct by Sheehan, Lambert, and Closson, the NHSC Attorney Discipline System demonstrated that Lambert, Sheehan, and Closson were operating in accordance with and approval of the NHSC Attorney Discipline System.

903. Plaintiff was obligated by NH state law to enter into a contingent fee agreement that was governed by the New Hampshire Rules of Professional Conduct, and the March 2006 contingent fee agreement specifically cites the New Hampshire Rules of Professional Conduct, and the Rules of Court of the State of New Hampshire. Therefore, the unlawful and fraudulent conduct that Lambert, Sheehan, and Closson engaged in while representing Plaintiff in the Wyeth case was done under the color of state law as that term is used pursuant to 42 USC § 1983.

904. As a result of the unlawful and fraudulent actions of Closson, Lambert, and Sheehan, which were done under the color of regulations of the legal profession as expressed through statute and the New Hampshire Supreme Court, Plaintiff was deprived of the following rights, privileges, and immunities secured by the U.S. Constitution and laws;

   a. The right to petition the government to redress grievances pursuant to the U.S. Const. amend. I.

   b. The right to be free from laws that impair the obligation of contracts pursuant to the U.S. Const. Art. I. Sec. X. Clause I.

   c. The right to honest services secured by 18 USC § 1346

   d. The right to pursue a chosen profession as secured by the U.S. Const. amends. V. and XIV; and

   e. The right to equal protection of the laws as secured by the U.S. Const. amend. XIV

905. As a result of the unlawful and fraudulent conduct by Sheehan, Lambert, and Closson, under the color of law in violation of 18 USC § 1983, Plaintiff is entitled to and hereby requests a jury trial on all claims so triable and an award of:

   a. Back pay and benefits in an amount equal to the difference between the value of his earnings and benefits since Wyeth terminated him and the value of earnings and benefits he would have received if Closson, Sheehan, and Lambert honored their responsibilities to conduct their business affairs in accordance with federal laws, their fiduciary

obligations as Plaintiff's attorneys, and the common law requirement of good faith and fair dealing implied in every contract entered into in Massachusetts;

b. Lost future wages and benefits in an amount equal to the difference between the value of Plaintiff's projected future earnings after his professional reputation was severely damaged by the malicious and unlawful campaign of fraudulent and retaliatory conduct carried out by Wyeth, Closson, Sheehan, and Lambert; and the value of wages and benefits Plaintiff would have earned if the aforementioned defendant's conducted their business operations in accordance with federal laws, and the common law requirement of good faith and fair dealing implied in every contract entered into in Massachusetts;

c. Legal costs, and attorney's fees for bringing this claim;

d. Punitive damages in an amount that will discourage similar unlawful and fraudulent conduct by attorneys seeking shelter under the corrupt regulations governing the legal profession in NH;

e. Profit disgorgement in an amount equal to the financial gains Wyeth benefitted from through the misclassification of at least 135 employees similarly situated with Plaintiff and who the WHD issued a final order that required Wyeth to re-classify as non-exempt and pay back wages; an order Wyeth refused to comply with and which Lambert, Closson, and Sheehan unlawfully helped to conceal to preserve the illicit benefits;

f. Profit disgorgement equal to the financial gains that Wyeth benefitted from by employing workers in violation of 29 USC § 207, and introducing hot goods made by those workers into interstate commerce in violation of 29 USC § 215(a)(1), which Lambert, Closson, and Sheehan unlawfully helped to facilitate and conceal;

g. Medical costs associated with treatment Plaintiff received and will receive in the future for ailments incurred as a result of the malicious conduct of Wyeth, Lewandowski, Cowdrick, and Brack, which Closson, Sheehan, and Lambert assisted by ensuring Plaintiff was denied an opportunity to seek redress through their actions of fraud, breach of fiduciary duty, forgery, perjury etc.;

h. Financial charges Plaintiff incurred as a result of his inability to pay down his student loan debt because of unemployment and underemployment that was caused by his unlawful termination and other retaliatory conduct Wyeth, Lewandowski, Cowdrick, and Brack subjected him to, and which Lambert, Sheehan, and Closson assisted by ensuring Plaintiff was denied an opportunity to seek redress through their actions of fraud, breach of fiduciary duty, forgery, perjury, etc.

i. Compensation for mental anguish Plaintiff suffered as a result of the malicious acts of Wyeth, Cowdrick, Lewandowski, and Brack, which Closson, Sheehan, and Lambert helped inflict by ensuring Plaintiff was denied an opportunity to seek redress through their actions of fraud, breach of fiduciary duty, forgery, perjury, etc.

j. Compensation for the loss of enjoyment of life;

k. Striking all records and pleadings associated with the collusive lawsuit perpetrated by Wyeth, Sheehan, Lambert, and Closson that were not supported by any evidence made available to Plaintiff or the court during the legal proceeding;

l. Such other relief as the court deems appropriate.

Claim XI Retaliatory Discrimination in Violation of 29 USC § 215(a)(3)

906. Plaintiff incorporates the entire complaint into this claim for retaliatory discrimination against Wyeth in violation of 29 USC § 215(a)(3).

907. Wyeth discriminated against Plaintiff as a result of protected action he engaged in that consisted of asserting his right to overtime compensation, or being assigned duties that fulfilled the duties requirements for properly classifying an employee as an exempt professional.

908. Plaintiff began asserting his rights under the FLSA during his first week of employment, and began suffering retaliatory discrimination during his second week of employment.

909. After a grueling and malicious campaign of retaliatory conduct by Wyeth, Plaintiff was terminated for refusing to waive his rights under the FLSA.

910. However, Wyeth and their agents became vengeful after Plaintiff's complaint to the WHD resulted in an investigation that exposed their widespread and egregious labor violations. Wyeth continued to monitor Plaintiff's job searching activities and making print outs of job applications and resume's he created on MonsterJobs.com over a year after Plaintiff stopped working there.

911. Eventually Wyeth and their agents conspired with Sheehan, Lambert, and Closson to file a collusive lawsuit whereby Plaintiff, the WHD, and USDC Mass. would be deceived into believing Plaintiff had competent legal representation in an adversarial proceeding, but was really being set up for abusive pleadings and other filings with the court.

912. The intentions of Wyeth and their agents, along with Sheehan, Lambert, and Closson, were many, and all were malicious. They intended to use Plaintiff as an example of the harm that would come to other workers who tried to assert their rights under the FLSA. They intended to destroy Plaintiff's professional career as a chemist. They intended to inflict emotional distress on Plaintiff by pretending his claims lacked merit and that he acted like a belligerent jerk at Wyeth for no reason.

913. As a result of the unlawful and fraudulent conduct by Sheehan, Lambert, Wyeth, and Closson, Plaintiff is entitled to and hereby requests a jury trial on all claims so triable and an award of:

a. Back pay and benefits in an amount equal to the difference between the value of his earnings and benefits since Wyeth terminated him and the value of earnings and benefits he would have received if Closson, Sheehan, and Lambert honored their responsibilities to conduct their business affairs in accordance with federal laws, their fiduciary obligations as Plaintiff's attorneys, and the common law requirement of good faith and fair dealing implied in every contract entered into in Massachusetts;

b. Lost future wages and benefits in an amount equal to the difference between the value of Plaintiff's projected future earnings after his professional reputation was severely damaged by the malicious and unlawful campaign of fraudulent and retaliatory conduct carried out by Wyeth, Closson, Sheehan, and Lambert; and the value of wages and benefits Plaintiff would have earned if the aforementioned defendant's conducted their business operations in accordance with federal laws, and the common law requirement of good faith and fair dealing implied in every contract entered into in Massachusetts;

c. Legal costs, and attorney's fees for bringing this claim;

d. Punitive damages in an amount that will discourage similar unlawful and fraudulent conduct by attorneys seeking shelter under the corrupt regulations governing the legal profession in NH;

e. Profit disgorgement in an amount equal to the financial gains Wyeth benefitted from through the misclassification of at least 135 employees similarly situated with Plaintiff and who the WHD issued a final order that required Wyeth to re-classify as non-exempt and pay back wages; an order Wyeth refused to comply with and which Lambert, Closson, and Sheehan unlawfully helped to conceal to preserve the illicit benefits;

f. Profit disgorgement equal to the financial gains that Wyeth benefitted from by employing workers in violation of 29 USC § 207, and introducing hot goods made by those workers into interstate commerce in violation of 29 USC § 215(a)(1), which Lambert, Closson, and Sheehan unlawfully helped to facilitate and conceal;

g. Medical costs associated with treatment Plaintiff received and will receive in the future for ailments incurred as a result of the malicious conduct of Wyeth, Lewandowski, Cowdrick, and Brack, which Closson, Sheehan, and Lambert assisted by ensuring Plaintiff was denied an opportunity to seek redress through their actions of fraud, breach of fiduciary duty, forgery, perjury etc.;

h. Financial charges Plaintiff incurred as a result of his inability to pay down his student loan debt because of unemployment and underemployment that was caused by his unlawful termination and other retaliatory conduct Wyeth, Lewandowski, Cowdrick, and Brack subjected him to, and which Lambert, Sheehan, and Closson assisted by ensuring Plaintiff was denied an opportunity to seek redress through their actions of fraud, breach of fiduciary duty, forgery, perjury, etc.

i. Compensation for mental anguish Plaintiff suffered as a result of the malicious acts of Wyeth, Cowdrick, Lewandowski, and Brack, which Closson, Sheehan, and Lambert helped inflict by ensuring Plaintiff was denied an opportunity to seek redress through their actions of fraud, breach of fiduciary duty, forgery, perjury, etc.

j. Compensation for the loss of enjoyment of life;

k. Striking all records and pleadings associated with the collusive lawsuit perpetrated by Wyeth, Sheehan, Lambert, and Closson that were not supported by any evidence made available to Plaintiff or the court during the legal proceeding;

l. Such other relief as the court deems appropriate.

914. Plaintiff asserts that this case is very complicated and he is acting pro se because he has been unable to find legal representation partly due to a lack of financial resources. He prays the court will allow him to reserve his rights to assert other claims arising from the same set of facts but not included in this initial complaint. Other claims Plaintiff would like to reserve the right to bring include but are not limited to:

A. Malpractice

B. Breach of Fiduciary Duty

C. Tortious interference with advantageous contractual relations

D. Unfair trade practices pursuant to M.G.L. 93A

E. Intentional infliction of emotional distress

F. Breach of contract

G. Civil conspiracy

H. Fraudulent inducement

I. Larceny chose in actions

J. Defamation

K. Unjust enrichment

L. Constructive fraud

M. Conversion

N. Negligence

O. Gross Negligence

P. Trespass to chattels

Q. Libel

Respectfully Submitted,

Brent Arbogast, pro se

Date: 1/31/2022

Brent Arbogast
9 Maple Street Apt. C
Exeter, NH 03833
Phone: (603) 706-0559
Brentarbogast@yahoo.com

Attachments: Table of Exhibits, an Abbreviation Key, Exhibits 1-94,

Plaintiff's Abbreviations Key

| Abbreviation | Meaning | Abbreviation | Meaning |
|---|---|---|---|
| USDC Mass. | The United States District Court for the District of Massachusetts | Fed.R.Civ.P. | Federal Rules of Civil Procedure |
| FLSA | Fair Labor Standards Act | CFR | Code of Federal Regulations |
| AFT | Assurance of Fair Treatment | USC | United States Code |
| GMP | Good Manufacturing Practices | RSA | Revised Statutes Annotated |
| SOP | Standard Operating Procedure | M.G.L. | Massachusetts General Laws |
| FDA | Food and Drug Administration | Reform Act | Civil Justice Reform Act |
| DOL | United States Department of Labor | Civil Justice Plan | United States District Court for the District of Massachusetts Expense and Delay Reduction Plan |
| Mass. AG | Massachusetts Attorney General Fair Labor and Business Practices Division | L.R. | Local Rules |
| WHD | United States Department of Labor Wage and Hour Division | FSC | Flygare, Schwarz & Closson |
| NHRPC | New Hampshire Rules of Professional Conduct | EIN | Employer Identification Number |
| CM/ECF | Case Management/Electronic Case Filing System | EAN | Employee Action Notice |
| MRPC | Massachusetts Rules of Professional Conduct | BG | Bishop Guertin |
| NLRB | National Labor Relations Board | Sheehan | Sheehan, Phinney, Bass + Green P.A. |
| FOIA | Freedom of Information Act | ADR | Alternative Dispute Resolution |
| NEF | Notice of Electronic Filing | PACER | Public Access to Court Electronic Records |
| SEC | Securities and Exchange Commission | HR | Human Resources |
| DSS | Development Support Services | RSO | Regional Solicitor's Office |
| DPO | Development Production Operations | TO&PS | Technical Operations and Product Supply |
| EVM | Engineering Validation and Maintenance | | |